1    GORDON & REES LLP
     M.D. Scully (SBN 135853)
2    101 W. Broadway, Suite 2000
     San Diego, CA 92101
3    mscully@gordonrees.com
     Tel: (213) 270-7871
4

5    PATTERSON BELKNAP WEBB & TYLER LLP
     Erik Haas (admitted *pro hac vice*)
6    1133 Avenue of the Americas
     New York, New York 10036
7    ehaas@pbwt.com
     Tel: (212) 336-2117
8

9    *Attorneys for Defendants Siemens*
     *Medical Solutions USA, Inc. and*
10   *Siemens Healthcare Diagnostics Inc.*

11              **UNITED STATES DISTRICT COURT**

12             **SOUTHERN DISTRICT OF CALIFORNIA**

13

14   QUIDEL CORPORATION, a            Case No.  3:16-CV-03059
15   Delaware Corporation,

16            Plaintiff,              **MEMORANDUM OF POINTS AND**
                                      **AUTHORITIES IN SUPPORT OF**
17        v.                          **DEFENDANTS' MOTION TO**
                                      **EXCLUDE THE SURVEY, EXPERT**
18                                    **REPORT, AND TESTIMONY OF**
                                      **MATTHEW G. EZELL**
19   SIEMENS MEDICAL SOLUTIONS
20   USA, INC., a Delaware corporation,
     SIEMENS HEALTHCARE              Judge:  Hon. Barry T. Moskowitz
21   DIAGNOSTICS INC. a California    Date: June 7, 2019
     corporation, and DOES 1-50      Time: 11:00 a.m.
22   INCLUSIVE,                       Courtroom: 15B
23
              Defendants.
24

25

26

27

28

# TABLE OF CONTENTS

**<u>Page</u>**

PRELIMINARY STATEMENT ..................................................................1

BACKGROUND ........................................................................................2

    A.    The Parties' Laboratory Customers .............................................2

    B.    Quidel Claims that Laboratories Were Deceived ......................3

    C.    Laboratories Testify They Were Not Deceived .........................4

    D.    The Ezell Survey ........................................................................5

        1.    The Open-Ended Questions ..............................................7

        2.    The "TSI Only" Questions ...............................................7

        3.    The "TRAb" Questions ....................................................8

        4.    Mr. Ezell's Conclusions ..................................................9

ARGUMENT .............................................................................................9

I.    THE EZELL SURVEY RECRUITED THE WRONG
     UNIVERSE ......................................................................................10

II.    THE EZELL SURVEY QUESTIONS WERE
     FATALLY AMBIGUOUS ..............................................................13

III.    THE EZELL SURVEY LED AND BIASED
     RESPONDENTS .............................................................................16

    A.    The Ezell Survey Design Biased Respondents .........................16

    B.    The Ezell Survey Was a Reading Test .....................................18

    C.    The Ezell Survey Control Was Flawed ....................................20

IV.    MR. EZELL'S UNSCIENTIFIC CONCLUSIONS
     LACK SUPPORT ...........................................................................22

CONCLUSION ..........................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. Lens.Com, Inc.*,
    722 F.3d 1229 (10th Cir. 2013) .......................................................................... 15

*Acad. of Motion Pictures Arts & Scis. v. Godaddy.com, Inc.*,
    2013 U.S. Dist. LEXIS 198591 (C.D. Cal. June 21, 2013) .............................. 23

*Am. Home Prods. Corp. v. Johnson & Johnson*,
    654 F. Supp. 568 (S.D.N.Y. 1987) .................................................................... 14

*American Home Products Co. v. Procter & Gamble Co.*,
    871 F. Supp. 739 (D.N.J. 1994) ........................................................................ 19

*Bobrick Washroom Equip., Inc. v. Am. Specialties, Inc.*,
    2012 U.S. Dist. LEXIS 111465 (C.D. Cal. Aug. 8, 2012) ............................... 21

*Brighton Collectibles, Inc. v. RK Tex. Leather Mfg.*,
    923 F. Supp. 2d 1245 (S.D. Cal. 2013) ............................................................. 16

*Clicks Billiards, Inc. v. Sixshooters Inc.*,
    251 F.3d 1252 (9th Cir. 2001) ........................................................................... 10

*Competitive Edge, Inc. v. Staples, Inc.*,
    763 F. Supp. 2d 997 (N.D. Ill. 2010) ................................................................ 15

*Continental Plastic Containers v. Owens Brockway Plastic Products,*
    *Inc.*, 141 F.3d 1073 (Fed. Cir. 1998) ................................................................. 12

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ..................................................................................... 1, 10

*Dreyfus Fund Inc. v. Royal Bank of Can.*,
    525 F. Supp. 1108 (S.D.N.Y. 1981) .................................................................. 11

*Elliott v. Google, Inc.*,
    860 F.3d 1151 (9th Cir. 2017) ........................................................................... 20

*Fancaster, Inc. v. Comcast Corp.*,
    832 F. Supp. 2d 380 (D.N.J. 2011) .................................................................... 19

*Fibermark, Inc. v. Brownville Specialty Paper Prods.*,
419 F. Supp. 2d 225 (N.D.N.Y. 2005) ..................................................... 13

*In re Fluidmaster, Inc., Water Connector Components Prods. Liability Litigation*, 2017 U.S. Dist. LEXIS 48792 (N.D. Ill. Mar. 31, 2017) .................. 12

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgm't, Inc.*,
618 F. 3d 1025 (9th Cir. 2010) ............................................................ 10

*Franklin Res., Inc. v. Franklin Credit Mgmt. Corp.*,
988 F. Supp. 322 (S.D.N.Y. 1997) ....................................................... 19

*Frisch's Rest., Inc. v. Shoney's Inc.*,
759 F.2d 1261 (6th Cir. 1985) ............................................................. 15

*FTC v. Nat'l Urological Grp., Inc.*,
2017 U.S. Dist. LEXIS 182256 (N.D. Ga. Oct. 10, 2017) ....................... 19

*GE v. Joiner*,
522 U.S. 136 (1997) ........................................................................... 22

*Icon Enters. Int'l v. Am. Prods. Co.*,
2004 U.S. Dist. LEXIS 31080 (C.D. Cal. Oct. 7, 2004) .......................... 10

*J & J Snack Foods Corp. v. Earthgrains Co.*,
220 F. Supp. 2d 358 (D.N.J. 2002) ...................................................... 13

*Johnson & Johnson - Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 1991 U.S. Dist. LEXIS 13689
(S.D.N.Y. Oct. 1, 1991) ...................................................................... 21

*Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125 (3d Cir. 1994) ................................... 18

*Keith v. Volpe*,
858 F.2d 467 (9th Cir. 1988) ................................................................. 9

*Kournikova v. General Media Communs., Inc.*,
278 F. Supp. 2d 1111 (C.D. Cal. 2003) ............................................... 11

*Kwan Software Eng'g, Inc. v. Foray Techs., LLC*,
2014 U.S. Dist. LEXIS 17376 (N.D. Cal. Feb. 11, 2014) ................... 11, 12

*Lanphere Enters. v. Jiffy Lube Int'l, Inc.*,
  138 F. App'x 20 (9th Cir. 2005)........................................................22

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007) .................................10, 15, 22

*Marlo v. UPS*,
  251 F.R.D. 476 (C.D. Cal. 2008) ......................................................20

*Native Am. Arts, Inc. v. Bud K World Wide, Inc.*,
  2012 U.S. Dist. LEXIS 69715 (M.D. Ga. May 18, 2012)..................15

*In re NCAA Ath. Grant-In-Aid Cap Antitrust Litig.*,
  2019 U.S. Dist. LEXIS 44512 (N.D. Cal. Mar. 8, 2019) ..................14

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck
  Consumer Pharmaceuticals Co.*,
  290 F.3d 578 (3d Cir. 2002) ......................................................17, 18

*Oracle Am., Inc. v. Google Inc.*,
  2016 U.S. Dist. LEXIS 58304 (N.D. Cal. May 3, 2016) ...................15

*P&G Pharm., Inc. v. Hoffmann-La Roche, Inc.*,
  2006 U.S. Dist. LEXIS 64363 (S.D.N.Y. Sep. 6, 2006) ..............18, 21

*P&G v. Ultreo, Inc.*,
  574 F. Supp. 2d 339 (S.D.N.Y. 2008) ..........................................16, 18

*Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*,
  292 F. Supp. 2d 594 (D.N.J. 2003)...................................................20

*Reinsdorff v. Skechers U.S.A.*,
  922 F. Supp. 2d 866 (C.D. Cal. 2013)...................................10, 12, 16

*Revlon Consumer Prods. Corp. v. Jennifer Leather Broadway, Inc.*,
  858 F. Supp. 1268 (S.D.N.Y. 1994) .................................................22

*Scotts Co. v. United Industries Corp.*,
  315 F.3d 264 (4th Cir. 2002) ...........................................................15

*Simon Prop. Grp. Ltd. P'ship v. mySimon, Inc.*,
  104 F. Supp. 2d 1033 (S.D. Ind. 2000) ............................................19

*Skechers U.S.A., Inc. v. Vans, Inc.*,
    2007 U.S. Dist. LEXIS 88635 (C.D. Cal. Nov. 20, 2007) ................................... 20

*Smith v. Wal-Mart Stores, Inc.*,
    537 F. Supp. 2d 1302 (N.D. Ga. 2008) ............................................................... 19

*Spraying Systems Co. v. Delavan, Inc.*,
    975 F.2d 387 (7th Cir. 1992) ............................................................................... 12

*THOIP v. Walt Disney Co.*,
    690 F. Supp. 2d 218 (S.D.N.Y. 2010) ................................................................ 21

*United States v. Hebshie*,
    754 F. Supp. 2d 89 (D. Mass. 2010) ................................................................... 22

*Wallace v. Countrywide Home Loans, Inc.*,
    2012 U.S. Dist. LEXIS 190575 (C.D. Cal. Aug. 31, 2012) ............................... 15

*York v. Starbucks Corp.*,
    2011 U.S. Dist. LEXIS 155682 (C.D. Cal. Nov. 23, 2011) ............................... 14

**Other Authorities**

42 C.F.R. § 493.1253 .................................................................................................. 3

Federal Rule of Evidence 702 ..................................................................................... 1

Bruce P. Keller, Survey Evidence in False Advertising Cases, in
    *Trademark and Deceptive Advertising Surveys* (2012) ............................... 16, 17

Federal Judicial Center, *Manual for Complex Litigation* § 11.493
    (2004) ............................................................................................................. 10, 16

Richard Leighton, *Using Daubert-Kumho Gatekeeping to Admit and
    Exclude Surveys in Lanham Act Advertising and Trademark Cases*,
    92 Trademark Rep. 743 (2002) ........................................................................... 16

Robert C. Bird, *Streamlining Consumer Survey Analysis*, 88
    Trademark Rep. 269 (1998) ................................................................................. 10

Shari S. Diamond, *Reference Guide on Survey Research*, in *Reference
    Manual on Scientific Evidence* (2011) ......................................................... 13, 20

1   Defendants Siemens Medical Solutions USA, Inc. and Siemens Healthcare

2   Diagnostics Inc. (collectively, "Defendants" or "Siemens") respectfully move to

3   exclude the survey, report, and testimony of Matthew G. Ezell.  Mr. Ezell's survey

4   and testimony fails to satisfy the most basic requirements for admissible scientific

5   evidence under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579

6   (1993) and Federal Rule of Evidence 702.

7   ## PRELIMINARY STATEMENT

8   Quidel's contention that the parties' customers were deceived by Siemens'

9   advertising rests on a fatally flawed survey of physicians conducted by Matthew G.

10  Ezell (the "Ezell Survey").  Mr. Ezell's testimony and the Ezell Survey are

11  inadmissible for at least four reasons.

12  ***First***, Mr. Ezell surveyed the wrong people.  In its Complaint, its discovery

13  responses, and even in its other expert reports, Quidel insisted that ***reference***

14  ***laboratories*** purchase the parties' assays, and decide which assay to purchase.

15  Quidel and its experts further attested that ███████████████████████████

16  ████████████████████████████████████████████████████████████████

17  ███████████████████████[1]  Quidel's positions in that regard are correct, and

18  affirmed by Siemens' and the actual customers' testimony.  Siemens and Quidel

19  sell their respective tests to a small group of sophisticated laboratories, not to

20  physicians.  There was no need for Quidel to survey its laboratory customers

21  because there were only four when Siemens launched its assay, and only two

22  switched to Siemens' assay.  Quidel only had to ask their understanding and views,

23  which it did before suit, and after suit, in depositions.  The two laboratories that

24  switched ███████████████████████████████████████  The

25  Ezell Survey ignored these facts, surveying physicians who do not purchase, and

26  have no control over the selection of, the parties' products.

27  

28  ---

[1] Thyroid stimulating immunoglobulins or "TSI" are the antibodies that cause
Graves' Disease.

1    **Second**, the Ezell Survey asked ambiguous and confusing questions.  To

2    determine whether respondents were misled, Mr. Ezell asked whether Siemens'

3    website communicated that its assay detects "TSI only" or is "a TRAb assay."

4    Quidel's own experts testified ████████████████████████████████████

5    ████████████████████████████████████  Indeed, the survey results

6    themselves demonstrate that the participants interpreted the terms in a manner

7    different from Quidel.

8    **Third**, the Ezell Survey suffers from multiple design flaws.  The wording and

9    ordering of the questions all but guaranteed the results that Quidel sought.

10    Moreover, the survey itself was nothing more than a reading comprehension test,

11    and an ambiguously crafted one at that.  And the "control" website biased

12    respondents and does not fit Quidel's theory of liability.  The proof is in the Ezell

13    Survey's results: When asked open-ended questions, fewer than **seven percent**

14    provided answers even suggesting they were deceived.  Such fundamental problems

15    do not merely go to weight.

16    **Finally**, Mr. Ezell's **conclusions** rest only on his say-so.  He did not and

17    could not describe how he coded respondents.  And the manner in which Mr. Ezell

18    classified respondents as "misled" showed his bias.

19    The survey, report, and testimony of Mr. Ezell should be excluded.

20    <u>**BACKGROUND**</u>

21    **A.    The Parties' Laboratory Customers**

22    Siemens and Quidel both manufacture and sell Graves' Disease assays.

23    Quidel sells the Thyretain Bioreporter TSI Assay ("Thyretain"), and Siemens sells

24    the IMMULITE 2000/2000 XPi TSI Assay ("IMMULITE TSI assay").  The name

25    of Siemens' assay and its performance data—98.5% specific and 98.6% sensitive—

26    were cleared by the Food and Drug Administration in 2016.  (Ex. 1.)

27    Siemens and Quidel ████████████████████████████████████

28    ████████████████████████████████████████  These

1  laboratories are sophisticated, multi-billion dollar entities that employ dozens of

2  MDs and PhDs, and that must perform validation testing to "[d]emonstrate that"

3  they "can obtain performance specifications comparable to those established by

4  the" manufacturer's FDA-cleared assay.  *See* 42 C.F.R. § 493.1253; (*see also* Ex. 3

5  at 116:12-25; Ex. 4 at 137:5-7.)

6  **B.     Quidel Claims that Laboratories Were Deceived**

7          When Quidel filed this case, it alleged that Siemens had falsely said or

8  implied that its assay could detect thyroid stimulating immunoglobulins ("TSI")

9  "only."  (FAC ¶¶ 15-18.)  As Quidel told it, Siemens' assay instead is similar to

10  "TRAb assays that fail to differentiate between stimulating and blocking

11  antibodies."  (*Id.* ¶ 24.)  According to Quidel, Siemens' "misleading marketing and

12  claims" gave ***laboratories*** an "incentive to purchase the cheaper" IMMULITE TSI

13  assay.  (*Id.* ¶ 21.)  Quidel maintained that because of Siemens' advertising, a

14  reference laboratory had "switched from Thyretain to the IMMULITE TSI assay."

15  (*Id.* ¶ 22.)  Physicians, in contrast, simply "rel[ied] on the results of the" laboratory-

16  chosen TSI test to aid in the evaluation of their patients.  (*Id.* ¶ 21.)

17          In its verified responses to Siemens' interrogatories, Quidel said the same.

18  When asked to describe its damages, Quidel claimed that "Sonic Healthcare USA, a

19  national reference laboratory in Texas, switch[ed] from Thyretain to the

20  IMMULITE" TSI assay because of "Defendants' wrongful conduct."  (Ex. 5 at 8-

21  9.)  Quidel also alleged that another large reference laboratory, Laboratory

22  Corporation of America ("LabCorp"), could soon switch because of Siemens'

23  advertising.  (*Id.*)  Quidel never claimed that physicians were deceived, or even

24  mattered to the labs' assay selection decisionmaking.  Over the course of discovery,

25  Quidel twice supplemented its responses to Siemens' interrogatories.  Each time it

26  repeated its allegation that laboratories were deceived and each time it made no

27  mention of physicians.  (Ex. 6 at 5-7; Ex. 7 at 4-7.)

28

Case No. 16cv03059
Defendants' Memorandum  of Law ISO
Motion to Exclude Ezell

1    Quidel's claim that laboratories, not physicians, were deceived was out of

2    necessity.  As Quidel's own expert swore, ███████████████████████████

3    ████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████

6    ███████████████████████████████████████████████

7    ████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████

9    ████████████████████████████████████████████

10    ████████████████████████████████████████████████████

11    ████████████████████████████████████████████████

12    ████████████████████████████████████████████████

13    ████████████████████████████████████████████

14         ████████████████████████████████████████████

15    ████████████████████████████████████████████

16    ████████████████████████████████████████████████████

17    ████████████████████████████████████████████

18    ████████████████████████████████████████████████

19    ████████████████████████████████████████████████████

20    ████████████████

21    **C.    Laboratories Testify** ██████████████████████

22    Before the IMMULITE TSI assay entered the market in 2016, ██████████

23    ████████████████████████████ Two switched from

24    Thyretain to the IMMULITE TSI assay: LabCorp and Sonic.  (Ex. 7 at 5-7.)  The

25    other two laboratories █████████████████████████████████████

26    ████████ Quidel subpoenaed LabCorp and Sonic and both █████████████

27    ████████████████████████████████████

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23      **D.    The Ezell Survey**

24           After the laboratories refuted Quidel's claims, Quidel turned to physicians.

25 To that end, Quidel retained Matthew G. Ezell to conduct an online survey of

26 "physicians that specialize in endocrinology."[2] (Ex. 12 ¶ 7.) This was Mr. Ezell's

27 first false advertising survey. (Ex. 13 at 15:15-19.)

---

28 [2] Mr. Ezell selected this population because Quidel's counsel told him to do so.

The purpose of Mr. Ezell's survey, he said, was to determine "what message or messages" were "communicated by" the IMMULITE TSI assay "websites."[3] (Ex. 12 ¶ 2.)  Mr. Ezell used a "test-control" survey design.  Meaning that after a series of screening questions, one group of physicians was shown a "test" stimulus (an excerpt of the actual Siemens website) and another group of physicians was shown a "control" stimulus (a modified excerpt of the Siemens website).  Before each question, respondents were required to re-read the website excerpt.  (Ex. 15 ¶¶ 15-16; Ex. 14 at 22-24, 86-88.)

The test group reviewed this website excerpt:

> The IMMULITE® 2000/2000 XPi TSI assay is the first automated and semiquantitative TSI assay available today. TSH receptor antibody (TRAb) assays detect both thyroid-blocking and -stimulating antibodies. However, blocking antibodies inhibit TSH stimulation of thyroid cells and lead to hypothyroidism. The IMMULITE 2000/2000 XPi TSI assay detects thyroid stimulating antibodies, the specific cause of GD pathology, with 98.5% specificity. With a 65-minute total assay time and ready-to-use, stable reagents, the use of this assay can make the diagnosis of GD faster and easier, allowing patients to be diagnosed and treated sooner.

The control group reviewed an excerpt drafted entirely by Quidel's counsel:

> The IMMULITE® 2000/2000 XPi assay is an automated and semiquantitative assay designed for the more specific detection and measurement of stimulating antibodies, but has a potential to detect blocking antibodies and does not differentiate between blocking and stimulating antibodies. The IMMULITE® 2000/2000 XPi assay detects thyroid stimulating antibodies, the specific cause of GD pathology, with 98.5% specificity. With a 65-minute total assay time and ready-to-use, stable reagents, the use of this assay can make the diagnosis of GD faster and easier, allowing patients to be diagnosed and treated sooner.

(Ex. 12 ¶ 17; Ex. 13 at 112:22-113:17; Ex. 14 at C15, D15; Ex. 15 ¶ 16.)

---

(Ex. 13 at 24:4-6.)

[3] Mr. Ezell's survey does not attempt to address whether those messages had any impact on the respondents.  (Ex. 13 at 54:4-57:17.)

Case No. 16cv03059
Defendants' Memorandum  of Law ISO
Motion to Exclude Ezell

### 1.    The Open-Ended Questions

After showing respondents the website excerpts, Mr. Ezell asked respondents two open-ended questions (the "Series 9 Questions").  The first asked: "What is the main message or messages communicated to you by the highlighted material?" (Ex. 12 ¶ 17.)  The second followed up, asking "what other message or messages, if any," were communicated by the website excerpt.  (*Id.*)  In response to these non-leading questions, ***less than seven percent*** of the test group said that the website communicated anything about the IMMULITE TSI assay's ability to detect "TSI only."  (Ex. 15 ¶ 89.)  That is, when asked an open-ended, non-leading question, ***93%*** of the surveyed physicians did ***not*** interpret Siemens' advertising to convey that its assay detected "TSI only."

### 2.    The "TSI Only" Questions

Participants were then asked a series of leading questions (the "Series 10 Questions") about whether the website excerpt conveyed that the IMMULITE TSI assay detects "TSI only."  (Ex. 12 ¶ 17.)  The first (Question 10.0) asked: "Does the highlighted material communicate anything about IMMULITE assay's ability to detect TSI only?"  Respondents were given three choices: Yes, No, or Don't know. (Ex. 14 at 23.)  Those who answered "Yes" were then asked Question 10.1: "What does the highlighted material communicate about IMMULITE assay's ability to detect TSI only?"  And then re-asked at Question 10.2: "What else, if anything, does the highlighted material communicate about IMMULITE assay's ability to detect TSI only?"

Regardless of their answers to the open-ended questions, participants were then asked the ultimate question (Question 10.3): "Although you may have already indicated, based on the highlighted material, do you understand that IMMULITE assay ...?

- <u>Does</u> detect TSI only
- Does <u>not</u> detect TSI only

1   • Don't know or no opinion"

2   (Ex. 12 ¶ 17.)  At no point during the survey were participants told what "TSI only"

3   means, or even asked to explain what they understood the term to mean.  And, as

4   explained *infra*, Quidel's own experts could not define "TSI only."

5   ### 3.   The "TRAb" Questions

6   For the few participants who did not believe the website said anything about

7   "TSI only" in the Series 10 Questions,  Mr. Ezell asked them another set of leading

8   questions (the "Series 11 Questions").  The crux of those questions was whether the

9   IMMULITE TSI assay is (or is not) a "TRAb assay."  (Ex. 12 ¶ 17.)  These

10   questions followed the same format as the previous set.  Respondents were first

11   asked whether "the highlighted material communicate[s] anything about whether or

12   not IMMULITE assay is a TRAb assay."  (Question 11.0)  Those who answered

13   "Yes" were then asked two open-ended questions about "what" the "highlighted

14   material communicate[d] about whether or not IMMULITE assay is a TRAb

15   assay."  (Questions 11.1 and 11.2)  And, finally, respondents were asked the

16   ultimate question (Question 11.3): "Although you may have already indicated,

17   based on the highlighted material, do you understand that IMMULITE assay ...?

18   • <u>Is</u> a TRAb assay

19   • Is <u>not</u> a TRAb assay

20   • Don't know or no opinion"

21   (*Id.*)  At no point during the survey were respondents told what "TRAb assay"

22   means, or asked to explain what they understood the term to mean.  Again, as

23   explained *infra*, Quidel's own expert concluded this was unclear and ambiguous."[4]

24

25

26

27

28

---

[4] The Ezell Survey also asked participants whether they order "TSI only" and "TRAb assays."  Mr. Ezell did not draw *any* conclusions from the responses to those questions.  (Ex. 12 ¶ 17; *see also* Ex. 13 at 293:25-294:4 ("I don't think I said it would be material to doctors."); *id.* at 307:15-308:24 (admitting the Ezell Survey was irrelevant to materiality.)

Case No. 16cv03059
Defendants' Memorandum  of Law ISO
Motion to Exclude Ezell

### 4.    Mr. Ezell's Conclusions

Mr. Ezell considered any respondent who believed the IMMULITE TSI assay "is a TSI assay, does detect TSI only, is not a TRAb assay, *etc.*" as having "received a false message." (Ex. 12 ¶ 19 (emphasis added).) But he did not disclose and could not particularize how he determined who was misled. Based on participants' answers to the survey questions, Mr. Ezell used what is best described as a "holistic" approach to decide whether each participant had "received a false message." (Ex. 13 at 260:13-24; Ex. 15 ¶ 89.)

Mr. Ezell could not determine which respondent received which allegedly "false message," (Ex. 13 at 263:16-264:24), could not "say definitely" which messages he considered "false," (*Id.* at 265:20-24), and hoped Siemens would not "hold [his] feet to the fire in case we find some other language that's here in the false message category." (*Id.* at 265:24-266:1.) As his testimony indicates, Mr. Ezell did not and could not produce the protocol or rules that he used to classify respondents. Nonetheless, it appears that all but one respondent was coded as "misled" based on her response to the closed-ended Series 10 and 11 Questions. (Ex. 15 ¶ 88.)

After his "holistic" coding, Mr. Ezell concluded that 81.87% of the test group participants received a "false message," 15.38% did not, and the rest were "indeterminable." In contrast, 14.45% of the control respondents received a false message, 72.25% did not, and the rest were indeterminable. Doing the math, Mr. Ezell found that on a "net basis," 67% percent of respondents received a "false message." (Ex. 12 ¶¶ 19-21.)

### <u>ARGUMENT</u>

As the proponent, Quidel bears the burden of proving that the Ezell Survey is admissible. *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988). In assessing any expert evidence, the Court must determine both "whether the reasoning or methodology" used "is scientifically valid and" whether "that reasoning or

1   methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at

2   592-93.  And in assessing survey evidence, the Court must ensure there is a "proper

3   foundation" for the survey by confirming that it is "relevant and conducted

4   according to accepted principles." *Clicks Billiards, Inc. v. Sixshooters Inc.*, 251

5   F.3d 1252, 1263 (9th Cir. 2001).  If "not conducted according to accepted scientific

6   principles," a survey must be excluded. *Reinsdorft v. Skechers U.S.A.*, 922 F. Supp.

7   2d 866, 878 (C.D. Cal. 2013) (citing *Fortune Dynamic, Inc. v. Victoria's Secret*

8   *Stores Brand Mgm't, Inc.*, 618 F. 3d 1025, 1036 (9th Cir. 2010)).

9        Although minor flaws go to weight, "serious flaws in a survey will make any

10  reliance on that survey unreasonable." *Icon Enters. Int'l v. Am. Prods. Co.*, 2004

11  U.S. Dist. LEXIS 31080, at *71 (C.D. Cal. Oct. 7, 2004).  A district court thus must

12  "look at the cumulative effect of all of the flaws in a survey." *Louis Vuitton*

13  *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 596, 581 (S.D.N.Y.

14  2007).  The Ezell Survey is flawed, results-oriented research that should be

15  excluded.

16  **I.    THE EZELL SURVEY RECRUITED THE WRONG UNIVERSE**

17       The threshold question for the admissibility of any survey is whether the

18  "population" surveyed "was properly chosen and defined."  Federal Judicial Center,

19  *Manual for Complex Litigation* § 11.493 (2004).  The reason is intuitive: There

20  "may be systematic differences in the responses of members of the population and

21  nonmembers," and therefore a "'survey that provides information about a wholly

22  irrelevant universe of respondents is itself irrelevant.'" *Icon Enters. Int'l*, 2004

23  U.S. Dist. LEXIS 31080, at *78 (quoting Shari S. Diamond, Reference Guide on

24  Survey Research, in *Reference Manual on Scientific Evidence*, 240-41(2000)).[5]

25  _____

26  [5] *See also* Robert C. Bird, *Streamlining Consumer Survey Analysis*, 88 Trademark
    Rep. 269, 272 (1998) ("The most common reason for a survey to be held
27  inadmissible or minimally probative [is] the use of an improper universe," for "[n]o
    matter how accurate or proper the question posed, placing the survey before an
28  inappropriate subject renders the data worthless.").

A survey that is slightly over- or under-inclusive might be admissible, but only if it targets "the correct group." *Kournikova v. General Media Communs., Inc.*, 278 F. Supp. 2d 1111, 1125 (C.D. Cal. 2003) (excluding survey). In false advertising cases, the correct group must consist of actual or potential **purchasers** of the product. *Kwan Software Eng'g, Inc. v. Foray Techs., LLC*, 2014 U.S. Dist. LEXIS 17376, at *13 (N.D. Cal. Feb. 11, 2014) (excluding survey that polled users, rather than purchasers, of a product); *Dreyfus Fund Inc. v. Royal Bank of Can.*, 525 F. Supp. 1108, 1116 (S.D.N.Y. 1981) ("To be probative and meaningful," an expert must survey "potential consumers of the products in question.").

The Ezell Survey fails this threshold requirement. The population surveyed—"physicians who specialize in endocrinology"—is not under- or over-inclusive, it is irrelevant. In its Complaint, Quidel alleged that reference laboratories, not physicians, were misled by Siemens' advertising. In its responses to interrogatories, Quidel said the same. And during discovery, ████████ ██████████████████████████████████████████████████ ████████████████████████ ( *See supra* p. 3-4.) The laboratory that fills the physician's order decides which assay to purchase and utilize.

At their depositions, Quidel's actual customers likewise ████████ ██████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████ ████████████████████████████ ██████████████████████████████ ██████████████████████████████

Mr. Ezell's report does not explain why he surveyed physicians, instead of the parties' actual customers. (Ex. 12 ¶¶ 7-9.) When asked at his deposition, he could only say that he "underst[ood], from counsel for plaintiff, that endocrinologists are directed to" Siemens' website. (Ex. 13 at 24:4-6.) But even

1    then, he had "no opinion" on whether "physicians order on a brand basis instead of

2    a category basis."  (*Id.* at 25:2-5.)  Mr. Ezell's failure to "identify any basis" for

3    "selecting the survey population that he used" is ground enough to exclude his

4    testimony.  *Reinsdorft*, 922 F. Supp. 2d at 878.

5         But even with benefit of the doubt, and assuming that Mr. Ezell surveyed

6    physicians because they were "directed to Siemens' website," the Ezell Survey

7    remains inadmissible.  Courts routinely exclude surveys of end-users of a product

8    when, as here, those users do not actually ***purchase*** the product.  In *Kwan Software*

9    *Engineering*, for example, the plaintiff surveyed the "potential ***users*** of the

10   software" at issue (employees), but not "potential ***purchasers***" (procurement

11   officers).  2014 U.S. Dist. LEXIS 17376, at *13 (emphasis added).  The court

12   excluded the survey because the expert had failed to "show that potential users of

13   the software are the relevant audience for its false advertising claims."  *Id.*  As here,

14   none "of the members of the survey are people" who "are potential purchasers of

15   the products—those whose decision to purchase the product could be influenced."

16   *Id.*

17        Similarly, in *In re Fluidmaster, Inc., Water Connector Components Prods.*

18   *Liability Litigation*, 2017 U.S. Dist. LEXIS 48792 (N.D. Ill. Mar. 31, 2017), the

19   court excluded a survey of a device's ***users***, because it was "undisputed that the

20   vast majority of defendant's products are purchased by plumbing professionals for

21   subsequent installation in the end-user's home or business."  *Id*. at *87-88.  The

22   court found a survey of home owners "unrepresentative and irrelevant," and

23   rejected it for "ignor[ing] the majority of the typical purchasers in her survey."  *Id.*

24   at *88-89.

25        Courts across the country have reached the same conclusion.  *See*

26   *Continental Plastic Containers v. Owens Brockway Plastic Products, Inc.*, 141 F.3d

27   1073, 1080 (Fed. Cir. 1998) (holding that the "relevant consumer base" was

28   "wholesale purchasers" and not "the ultimate retail consumer"); *Spraying Systems*

Case No. 16cv03059
Defendants' Memorandum  of Law ISO
Motion to Exclude Ezell

1  *Co. v. Delavan, Inc.*, 975 F.2d 387, 394 n.5 (7th Cir. 1992) (survey irrelevant when

2  it questioned end-users "rather than actual purchasers" of the "equipment");

3  *Fibermark, Inc. v. Brownville Specialty Paper Prods.*, 419 F. Supp. 2d 225, 236-37

4  (N.D.N.Y. 2005) (survey of end-users irrelevant when they did not purchase the

5  product); *J & J Snack Foods Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 373

6  (D.N.J. 2002) (excluding survey of end-user consumers, rather than distributors

7  who directly purchased the product).

8      Mr. Ezell surveyed individuals who do not purchase the parties' assays, let

9  alone specifically order them. His survey should be excluded for this reason alone.

10  **II.    THE EZELL SURVEY QUESTIONS WERE FATALLY AMBIGUOUS**

11      The Ezell Survey violated another basic principle of survey research: He

12  asked respondents ambiguous and unclear questions. *See* Shari S. Diamond,

13  Reference Guide on Survey Research, in *Reference Manual on Scientific Evidence*,

14  388 (2011) ("If the crucial question is sufficiently ambiguous or unclear, it may be

15  the basis for rejecting the survey.").

16      Mr. Ezell relied on two questions to determine whether respondents received

17  a "false message." (Ex. 13 at 247:24-249:6; *see also* Ex. 15 ¶ 88.) In the Series 10

18  Questions, he asked whether Siemens' website communicates that the IMMULITE

19  TSI assay "does" or "does not" detect "TSI only." Mr. Ezell considered those that

20  answered "does detect TSI only" to be misled. And in the Series 11 Questions, he

21  asked whether the IMMULITE TSI assay "is" or "is not" a "TRAb assay." Mr.

22  Ezell considered those that answered "Is not a TRAb assay" to also be misled.

23      The two terms used by Mr. Ezell—"TSI only" and "TRAb assay"—are

24  fatally vague and ambiguous. Indeed, when asked to define either phrase, Mr. Ezell

25  responded that "you would have to ask the doctors." (Ex. 13 at 212:8-10, 240:20-

26  22.) Mr. Ezell did not, but Siemens did. At their depositions, ██████████████

27  ████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████

1 ██████████████████████████████████████████████

2 ███████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ██████████████████████████████████████████████

5 █████████████████████████████████████

6          This is not a technical problem.  The results from the Ezell Survey

7 demonstrate that physicians interpret "TSI only" and "TRAb assay" in a manner

8 inconsistent with Mr. Ezell's and Quidel's proposed definition of these terms.

9 When asked *what* about Siemens' website "communicate[d]" that the IMMULITE

10 TSI assay "detect[s] TSI only," dozens of participants cited only that the assay

11 detects TSI with "98.5% specificity."  (Ex. 15 ¶ 40; Ex. 16.)  Those respondents, by

12 definition, could not have been misled: They concluded that an assay that can detect

13 TSI with 98.5% specificity detects "TSI only," and Quidel does not allege that

14 Siemens' "sensitivity and specificity data are false."  (Dkt. 18 at 12.)

15          Mr. Ezell did nothing to avoid his mistake.  He could have conducted a

16 pretest to ensure that physicians understood the language he used.  *E.g.*, *York v.*

17 *Starbucks Corp.*, 2011 U.S. Dist. LEXIS 155682, at *36 (C.D. Cal. Nov. 23, 2011)

18 (excluding survey when expert "failed to pre-test the survey questions" to "see how

19 respondents may misunderstand the questions").  He could have defined "TSI only"

20 and "TRAb assay" for the participants.  *E.g.*, *In re NCAA Ath. Grant-In-Aid Cap*

21 *Antitrust Litig.*, 2019 U.S. Dist. LEXIS 44512, at *59 (N.D. Cal. Mar. 8, 2019)

22 (failure to "define" answer choices rendered survey "hopelessly ambiguous").  Or

23 he could have eschewed the "TSI only" phrase all together, and instead used a

24 *balanced* description of both parties' interpretation of Siemens' website.  *E.g.*, *Am.*

25 *Home Prods. Corp. v. Johnson & Johnson*, 654 F. Supp. 568, 581 (S.D.N.Y. 1987)

26 (survey flawed that did not include a balanced description of defendant's

27 interpretation of ad).  Instead, Mr. Ezell used terminology that even he could not

28 define.

Case No. 16cv03059
Defendants' Memorandum  of Law ISO
Motion to Exclude Ezell

Courts routinely exclude surveys that ask ambiguous questions, even when the survey shows a high rate of confusion.  For example, in *Scotts Co. v. United Industries Corp.*, 315 F.3d 264 (4th Cir. 2002), the plaintiff's survey purported to show that "more than 90% of respondents" were misled.  *Id.* at 279.  But the "ambiguity in the survey question" rendered it impossible to determine how respondents had interpreted the defendant's advertisement.  *Id.*  The Fourth Circuit therefore held that the survey "shed no light on the question that [was] key" to the plaintiff's "false advertising claims."  *Id.*

Likewise, in *1-800 Contacts, Inc. v. Lens.Com, Inc.*, 722 F.3d 1229 (10th Cir. 2013), the ambiguity in a "key question" left the Tenth Circuit with "no way of accurately discounting the survey data for any misunderstandings that might have arisen from the ambiguity" of the "question's language."  *Id.* at 1247.  And in *Wallace v. Countrywide Home Loans, Inc.*, 2012 U.S. Dist. LEXIS 190575 (C.D. Cal. Aug. 31, 2012), the court excluded a survey that asked respondents how many hours they worked in a "typical" week, without defining that term.  *Id.* at *15.  Because respondents could have interpreted "typical" to mean "most frequently occurring" or "on average," the court held the use of this "ambiguous term" was fatal to the survey.  *Id*.

Courts across the country have held the same.  *See Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1267-68 (6th Cir. 1985) (survey excluded when a phrase meant "different things to different people"); *Oracle Am., Inc. v. Google Inc.*, 2016 U.S. Dist. LEXIS 58304, at *20-21 (N.D. Cal. May 3, 2016) (same because phrases such as "popularity," "established user base," and "market demand" were not "specifically defined or analyzed"); *Native Am. Arts, Inc. v. Bud K World Wide, Inc.*, 2012 U.S. Dist. LEXIS 69715, at *21 (M.D. Ga. May 18, 2012) (same when  "illustration" was "ambiguous"); *Competitive Edge, Inc. v. Staples, Inc.*, 763 F. Supp. 2d 997, 1008 (N.D. Ill. 2010) (same because "source" has multiple meanings); *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F.

Supp. 2d 558, 604-05 (S.D.N.Y. 2007) (same when "business relationship" was
ambiguous).  The Court should do the same here.

## III.    THE EZELL SURVEY LED AND BIASED RESPONDENTS

The Ezell Survey also biased respondents.  Survey questions and stimuli
must be "clear and not leading."  Federal Judicial Center, *Manual for Complex
Litigation* § 11.493.  Accordingly, when a "survey format produce[s] biased,
unreliable results" and "fail[s] to use to adequate controls," those inadequacies
speak "not merely to the weight that should be accorded to the survey, but rather
to" the survey's "fundamental reliability."  *Reinsdorf*, 922 F. Supp. 2d at 878.  Mr.
Ezell's results-oriented approach does not merely undermine his survey's weight; it
requires exclusion.

### A.    The Ezell Survey Design Biased Respondents

When a survey uses questions or stimuli that "caused respondents to focus"
on a particular aspect of "the advertising," it does not provide a "basis to conclude
that" a defendant's "allegedly false advertising is likely to mislead."  *P&G v.
Ultreo, Inc.*, 574 F. Supp. 2d 339, 352 (S.D.N.Y. 2008); *see also Brighton
Collectibles, Inc. v. RK Tex. Leather Mfg.*, 923 F. Supp. 2d 1245, 1257 (S.D. Cal.
2013) ("When a survey question begs its answer it is not a true indicator of the
likelihood of consumer confusion.").  The Ezell Survey suffers from these
problems, and more.

By re-asking the same questions, the structure of Mr. Ezell's survey
telegraphed his desired answers.  Proper false-advertising surveys use a funnel-
shaped format.  *See, e.g.*, Bruce P. Keller, Survey Evidence in False Advertising
Cases, in *Trademark and Deceptive Advertising Surveys*, 179 (2012).[6]  With this
approach, the interviewer first asks a filter question, which asks *generally* whether

---

[6] *See also* Richard Leighton, *Using Daubert-Kumho Gatekeeping to Admit and
Exclude Surveys in Lanham Act Advertising and Trademark Cases*, 92 Trademark
Rep. 743, 780 (2002) ("Many, if not most, Lanham Act case surveys use a funnel
approach in their questionnaires.")

an ad communicates something about the disputed issue—e.g., "Does the website communicate anything about stimulating antibodies?"  *Id.*  For those that say "Yes," the interviewer *then* asks targeted questions about the alleged false message—e.g., "Does the website communicate that the assay detects TSI only." Structuring the survey in this manner avoids telegraphing the "correct" answer to participants.  *Id.*  (*See also* Ex. 15 ¶¶ 76-79.)

Mr. Ezell took a very different approach.  For his questions about "TSI only," the filter question directly asked whether the website communicated anything about the assay's "ability to detect TSI only."  He then followed up, asking participants *twice* to explain "what" the website "communicate[s] about the" assay's "ability to detect TSI only."  And, for his ultimate question from which he which draws his conclusions, he asked again whether the assay "does detect TSI only."  (Ex. 12 ¶ 17.)  The Series 11 "TRAb assay" questions follow the same format.[7]  (*Id.*)  By the time a participant finally made it to the final and most consequential closed-ended question, the survey had already suggested the answer—the website communicates a "TSI only" or "not a TRAb assay" message—*four times*.

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 592 (3d Cir. 2002), is instructive on the problem with the Ezell Survey's approach.  There, the defendant's advertisements implied that its antacid was formulated for "all-night relief."  The plaintiff disagreed with that message, and hired Mr. Ezell's firm to conduct a survey.  There, the filter question was not "suggestive" because it "asked *generally* whether the product label communicated" anything about "how long the product would provide relief," but did not mention the "all-night relief" claim.  *Id.* at 592-93 (emphasis added).  Only "respondents who received" some "duration message" were asked

---

[7] Based on the survey's question-skip pattern, the vast majority of respondents answered the Series 10 "TSI only" questions, rather than the Series 11 "TRAb assay" questions.

1  targeted "follow-up questions to determine precisely what message about duration
2  they received." *Id.*

3      The Third Circuit contrasted this properly designed "funnel approach" to one
4  that "clearly flagg[ed] for the attention of the survey respondent the specific
5  message in the commercial that the plaintiff alleged to be misleading." *Id.*
6  (discussing *Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc*
7  *Rorer Pharm., Inc.*, 19 F.3d 125, 134 (3d Cir. 1994)).  The latter approach
8  improperly "led" respondents "to convey that they had received" the allegedly false
9  "message" and was therefore inadmissible.  *Id.*

10     The Ezell Survey suffers from the same flaw.  By "flagging" the messages
11 that Quidel considers misleading ("TSI only" and "not TRAb") in the filter
12 questions, and then re-asking a similar question ***three*** additional times, Mr. Ezell all
13 but ensured respondents gave his desired answer.  Like the Third Circuit, courts
14 have routinely rejected surveys that use such a results-oriented approach.  *E.g.,*
15 *P&G Pharm., Inc. v. Hoffmann-La Roche, Inc.*, 2006 U.S. Dist. LEXIS 64363, at
16 *85 (S.D.N.Y. Sep. 6, 2006) (failure to follow funnel approach); *P&G*, 574 F.
17 Supp. 2d at 352 (leading filter questions).[8]

18     **B.    The Ezell Survey Was a Reading Test**

19     The bias from the Ezell Survey's design was further exacerbated by requiring
20 doctors to read (and then re-read) a highlighted, three-sentence excerpt of Siemens'
21 website before each question.  For example, by the time most participants answered
22 the ultimate "TSI only" or "TRAb assay" questions, they had been forced to read
23 the website excerpt at least ***six times***.  (Ex. 15 ¶ 64; Ex. 14 at C15-C20, D15-D20.)
24 By repeatedly drawing participants to the allegedly misleading language, Mr. Ezell
25 tested the participants' reading skills, not their actual impressions.

---

[8] Other aspects of the Ezell Survey were also leading.  The closed-ended questions
suffered from yay-saying bias; respondents were not able to review the website in
context; and by asking respondents similar questions, the Ezell Survey suffered
from consistency bias.  (*See* Ex. 15 ¶¶ 48-91.)

*American Home Products Co. v. Procter & Gamble Co.*, 871 F. Supp. 739 (D.N.J. 1994), explains the problem. There, the district court excluded a survey because of the "extended time the participant was permitted to study," "view," and "review" the challenged ad "during the course of the entire survey interview." *Id.* at 761. The survey, the court held, was nothing more than "an open-book test" instead of a "measure of realistic consumer reaction." *Id.* Applying these principles, courts have concluded that "focusing respondents' attention on certain statements and then asking true/false questions" turns "the survey into an 'open-book reading comprehension test.'" *FTC v. Nat'l Urological Grp., Inc.*, 2017 U.S. Dist. LEXIS 182256, at *138 (N.D. Ga. Oct. 10, 2017); *see also Franklin Res., Inc. v. Franklin Credit Mgmt. Corp.*, 988 F. Supp. 322, 335 (S.D.N.Y. 1997) ("Surveys which do nothing more than demonstrate the respondents' ability to read are not probative . . . .").

Mr. Ezell's decision to show (and then re-re-re-re-re-show) the excerpted language in isolation should be contrasted with how he used Siemens' real website. Participants were shown Siemens' complete webpage *once*, and could not return and review it before answering any questions. (Ex. 13 at 146:1-17.) Worse still, many of the "links" on the webpage, which provide necessary context about the IMMULITE TSI assay, were denied to the participants. (Ex. 15 ¶¶ 51-53.) Courts have routinely excluded similar surveys for failing to approximate real-life conditions. *E.g.*, *Fancaster, Inc. v. Comcast Corp.*, 832 F. Supp. 2d 380, 405 (D.N.J. 2011) (excluding survey that used website excerpt and "static screenshots"); *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1327 (N.D. Ga. 2008) (same when "respondent [had] no choice but to scroll" to particular message); *Simon Prop. Grp. Ltd. P'ship v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1043 (S.D. Ind. 2000) (same for survey of static website excerpt). The same logic follows here.

### C.     The Ezell Survey Control Was Flawed

Finally, the website excerpt shown to the control group biased respondents. Proper controls are an "essential feature of reliable survey evidence" because they "enable the surveyor to separate the wheat (the effect of the advertisement, alone, on the participant) from the chaff (the effect of 'the participant's prior knowledge and/or prior (mis)conceptions')." *Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*, 292 F. Supp. 2d 594, 601 (D.N.J. 2003). In designing a survey, an expert must "select a stimulus for the control group that shares as many characteristics with the experimental stimulus as possible." Diamond, *Reference Guide*, at 399. Failure to do so renders the control "useless in eliminating explanations for respondents' confusion." *Skechers U.S.A., Inc. v. Vans, Inc.*, 2007 U.S. Dist. LEXIS 88635, at *26-27 (C.D. Cal. Nov. 20, 2007).

The Ezell Survey design did not control for respondents' misconceptions; in fact, it created them to inflate Quidel's desired results. At his deposition, Mr. Ezell testified that the control was written ***entirely by counsel to Quidel***, without his input.[9] (Ex. 13 at 112:22–113:17.) And it shows. Instead of removing the allegedly misleading language for the control group, Quidel's counsel added gratuitous language that all but ensured the results Quidel wanted. Specifically, the control website stated that the IMMULITE TSI assay "does not differentiate between blocking and stimulating antibodies." (Ex. 12 ¶ 17.) This additional language—telling participants that the assay could not differentiate TSI from thyroid blocking antibodies[10]—all but guaranteed that participants would say the

---

[9] That Mr. Ezell abdicated his responsibilities to Quidel's counsel is reason enough to exclude his survey. *See, e.g.*, *Elliott v. Google, Inc.*, 860 F.3d 1151, 1160 (9th Cir. 2017) (excluding survey designed by counsel "who [was] not qualified to design or interpret surveys"); *Marlo v. UPS*, 251 F.R.D. 476, 485 (C.D. Cal. 2008) (survey had "essentially no probative value" when "Plaintiff's counsel who has not claimed to be an expert on survey methodology appears to have designed the questions").

[10] As explained in detail in Siemens' Motion for Summary Judgment, even Quidel's scientific experts ████████████████

1   control website did not convey a "TSI only" message.  *P&G Pharm., Inc. v.*

2   *Hoffmann-La Roche, Inc.*, 2006 U.S. Dist. LEXIS 64363, at \*88 (S.D.N.Y. Sep. 6,

3   2006) (survey excluded when the "disclaimer" used in the control "was suggestive

4   and implanted responses to closed-ended questions").

5          Worse still, the control design does not match Quidel's own litigation theory.

6   The control website changed the FDA-cleared name of Siemens' assay (the

7   IMMULITE 2000/2000 XPi ***TSI*** assay) by dropping the "TSI" moniker

8   altogether—calling Siemens' assay the "IMMULITE 2000/2000 XPi assay."  That

9   change alone disqualifies the Ezell Survey.  To avoid dismissal of its Complaint,

10  Quidel insisted that it "does not allege that the name" of the IMMULITE TSI Assay

11  is "false."  (Dkt. No. 18 at 12.)  The Court relied on that representation in

12  concluding that Quidel's claims were not precluded.  (Dkt. No. 22 at 11 ("[T]he

13  product name and performance data are not disputed.").)  Because Mr. Ezell

14  removed language that Quidel agreed is "not disputed," his control was useless.

15  *E.g.*, *Bobrick Washroom Equip., Inc. v. Am. Specialties, Inc.*, 2012 U.S. Dist.

16  LEXIS 111465, at \*48-50 (C.D. Cal. Aug. 8, 2012) (when "advertisements" for the

17  "purported control group" were "substantially different from" those in the test

18  group, the survey "effectively predetermined its results"); *THOIP v. Walt Disney*

19  *Co.*, 690 F. Supp. 2d 218, 240-41 (S.D.N.Y. 2010) (same).

20                      \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

21          The Ezell Survey was designed to create the results that Quidel wanted.  The

22  proof is in the data Mr. Ezell ignored.  When initially asked to describe the "main

23  message" from Siemens' website, before any of the leading questions, fewer than

24  ***seven percent*** of respondents mentioned "TSI only."  (Ex. 15 ¶ 89.); *see also*

25  *Johnson & Johnson - Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*,

26  1991 U.S. Dist. LEXIS 13689, at \*23 (S.D.N.Y. Oct. 1, 1991) (crediting responses

27  to open-ended questions over leading closed-ended questions).  It took repeated,

28  leading questions for Quidel to cobble together its desired results.

## IV.    MR. EZELL'S UNSCIENTIFIC CONCLUSIONS LACK SUPPORT

District courts should exclude "an expert opinion that is connected to the underlying data 'only by the ipse dixit of the expert.'" *Lanphere Enters. v. Jiffy Lube Int'l, Inc.*, 138 F. App'x 20, 22 (9th Cir. 2005) (quoting *GE v. Joiner*, 522 U.S. 136, 146 (1997)).  For that reason, when interpreting and coding survey responses, experts must provide "a detailed set of instructions so that decision standards are clear" and so that "responses can be scored consistently and accurately." *Louis Vuitton Malletier*, 525 F. Supp. 2d at 611.  Moreover, a survey is entitled to "no weight" when the "coding of the responses was too subjective" or when the expert "does not describe the methods she used to conclude that her results were statistically significant." *Revlon Consumer Prods. Corp. v. Jennifer Leather Broadway, Inc.*, 858 F. Supp. 1268, 1276 (S.D.N.Y. 1994).

Mr. Ezell did not disclose the method by which he coded respondents, though he appears to have relied exclusively on the closed-ended Series 10 and 11 Questions.  (*See* Ex. 12 ¶¶ 19-21; Ex. 15 ¶¶ 88-89.)  When asked at his deposition, Mr. Ezell could not determine which participant received which supposedly "false message," (Ex. 13 at 263:16-264:24), and he could not "say definitely" which messages he considered "false."  (*Id.* at 265:20-24.)  It is impossible to reproduce his analysis from his report and deposition, which provides yet another ground for exclusion.  *United States v. Hebshie*, 754 F. Supp. 2d 89, 125 (D. Mass. 2010) ("Documentation is necessary to test a hypothesis; in fact, reproducibility is the sine qua non of 'science.'").

Mr. Ezell's subjective coding practices showed his bias and led to under-reporting rates of deception in the control group.  For example, he classified 23 physicians in the control group as "Indeterminable."  (Ex. 15 ¶ 112.)  But 17 of those physicians, according to their response to the closed ended questions, should have been classified as having received a "false message."  (*Id.*)  Had those respondents been properly coded, nearly 25% of the respondents in the *control*

group would have been classified as having been misled.  That would have been reason enough to exclude the Ezell Survey.  *See Acad. of Motion Pictures Arts & Scis. v. Godaddy.com, Inc.*, 2013 U.S. Dist. LEXIS 198591, at *11-13 (C.D. Cal. June 21, 2013) (excluding a survey when the control group elicited an "18% rate of confusion").  As is, even the roughly 15% of the control group that demonstrated confusion calls into question the validity of the control Mr. Ezell used.

Moreover, Mr. Ezell included among the misled those who said, somewhere during the survey, that the IMMULITE is a "TSI assay."  But he could not separate these individuals from the participants who received some other allegedly false message.  (Ex. 13 at 263:16-264:24.)  The problem, again, is that Quidel convinced the Court that it is not challenging the "TSI assay" phrase in the IMMULITE TSI assay's name.  (*See supra* p. 21.)  Unable to separate the respondents who received the Court-approved "TSI assay message," the Ezell Study is useless.

## CONCLUSION

For the foregoing reasons, Siemens respectfully requests that the survey, expert report, and testimony of Matthew G. Ezell be excluded.

DATE:  April 17, 2019

Respectfully submitted,

PATTERSON BELKNAP WEBB & TYLER LLP

*/s/ Erik Haas*
Erik Haas
1133 Avenue of the Americas
New York, New York 10036
ehaas@pbwt.com
Phone: (212) 336-2117
Fax: (212) 336-2222

/s/ *M.D. Scully*
M.D. Scully (SBN 135853)
GORDON & REES LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101
mscully@gordonrees.com
Tel: (213) 270-7871

*Attorneys for Defendants Siemens Medical Solutions USA, Inc. and Siemens Healthcare Diagnostics Inc.*

Case No. 16cv03059
Defendants' Memorandum  of Law ISO
Motion to Exclude Ezell