T. KEVIN ROOSEVELT, SBN 205485
*kroosevelt@ftrlfirm.com*
JARED M. TOFFER, SBN 223139
*jtoffer@ftrlfirm.com*
LINDSAY A. ARAGON, SBN 254537
*laragon@ftrlfirm.com*
**FINLAYSON TOFFER
ROOSEVELT & LILLY LLP**
15615 Alton Parkway, Suite 250
Irvine, CA 92618
Telephone:949.759.3810
Facsimile: 949.759.3812

Attorneys for Plaintiff
QUIDEL CORPORATION

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUIDEL CORPORATION, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>SIEMENS MEDICAL SOLUTIONS USA, INC., a Delaware corporation, SIEMENS HEALTHCARE DIAGNOSTICS INC. a California Corporation and DOES 1-50 INCLUSIVE,<br><br>Defendants. | CASE NO. 3:16-CV-3059 BTM AGS<br><br>Judge: Hon. Barry T. Moskowitz<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE SURVEY, EXPERT REPORT, AND TESTIMONY OF MATTHEW G. EZELL**<br><br><u>Hearing Date:</u><br>Date:  June 7, 2019<br>Time:  2:00 p.m.<br>Place:  United States District Court<br>    333 West Broadway<br>    San Diego, CA 92101<br>    Courtroom 15B<br><br>Filing Date:  December 19, 2016<br>Final Pretrial Conference: August 7, 2019 |

## **TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................... 1

II.    THE CONTEXT FOR MR. EZELL'S  CONSUMER SURVEY AND
       EXPERT OPINIONS .................................................................................. 1

III.   ARGUMENT ............................................................................................. 3

       A.    Legal Standards for Admission of Consumer Surveys. ............................ 3

       B.    Mr. Ezell Surveyed the Correct Universe of Respondents. ...................... 4

       C.    Siemens' Remaining Arguments, At Best, Go to the Weight of
             Mr. Ezell's Survey Rather Than Its Admissibility. ................................. 12

IV.    CONCLUSION ....................................................................................... 23

i

# TABLE OF AUTHORITIES

Cases

*1-800 Contacts, Inc. v. Lens.com, Inc.*
722 F.3d 1229 (10th Cir. 2013) ............................................................... 15

*A & M Records, Inc. v. Napster, Inc.*
No. C9905183MHP, 2000 WL 1170106 (N.D. Cal. Aug. 10, 2000) ...................... 8

*Academy of Motion Pictures Arts & Sciences v. GoDaddy.com, Inc.*
No. CV 10-3738 ABC (CWx), 2013 WL 12122803 (C.D. Cal. June 21, 2013) ............................................................... 22

*AHP Subsidiary Holding Co. v. Stuart Hale Co.*
1 F.3d 611 (7th Cir.1993) ............................................................... 4

*Am. Home Prods. Corp. v. Johnson & Johnson*
577 F.2d 160 (2d Cir. 1978) ............................................................... 5

*Appliance Recycling Centers of Am., Inc. v. JACO Envtl., Inc.*
2006 WL 8434390 (C.D. Cal. Oct. 19, 2006) ............................................. 12

*Clicks Billiards Inc. v. Sixshooters Inc.*
251 F.3d 1252 (9th Cir. 2001) ......................................................... 4, 17

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*
173 F.3d 725 (9th Cir. 1999) ........................................................... 12

*Competitive Edge, Inc. v. Staples, Inc.*
763 F. Supp. 2d 997 (N.D. Ill. 2010), *aff'd*, 412 F. App'x 304 (Fed. Cir. 2011) ............................................................... 16

*Continental Plastic Containers v. Owens Brockway Plastic Prod., Inc.*
141 F.3d 1073 (Fed. Cir. 1998) ........................................................... 9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*
509 U.S. 579 (1993) ............................................................... 3

*E & J Gallo Winery v. Proximo Spirits, Inc.*
No. 1:10-cv-00411 LJO JLT, 2011 WL 5922090 (E.D. Cal. Nov. 28, 2011) ............................................................... 4

*Fancaster, Inc. v. Comcast Corp.*
832 F. Supp. 2d 380 (D.N.J. 2011) ...................................................... 21

*Fibermark, Inc. v. Brownville Specialty Paper Prod., Inc.*
419 F. Supp. 2d 225 (N.D.N.Y. 2005) ................................................... 10

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*
618 F.3d 1025 (9th Cir. 2010) ......................................................... 4, 17

*Frisch's Rest., Inc. v. Shoney's Inc.*
759 F.2d 1261 (6th Cir. 1985) ........................................................... 16

*Icon Enters. Int'l, Inc. v. Am. Prod. Co.*
No. CV 04-1240 SVW (PLAx), 2004 WL 5644805 (C.D. Cal. Oct. 7, 2004) ............................................................... 5, 8, 12

*In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*
No. 14-cv-5696 2017 WL 1196990 (N.D. Ill. Mar. 31, 2017) .............................. 9

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*
No. 14-md-02541 CW 2019 WL 1747780 (N.D. Cal. Mar. 8, 2019) ...................... 13

*J & J Snack Foods, Corp. v. The Earthgrains Co.*
  220 F. Supp. 2d 358 (D.N.J. 2002) ........................................................... 11

*Kournikova v. General Media Communs., Inc.*
  278 F. Supp. 2d 1111 (C.D. Cal. 2003) ...................................................... 8

*Kwan Software Eng'g, Inc. v. Foray Techs., LLC*
  No. C 12-03762 SI 2014 WL 572290 (N.D. Cal. Feb. 11, 2014) ............... 7

*Malletier v. Dooney & Bourke, Inc.*
  525 F. Supp. 2d 558 (S.D.N.Y. 2007) ...................................................... 16

*Marketquest Grp., Inc. v. BIC Corp.*
  No. 11-cv-618-BAS (JLB), 2018 WL 1782724 (S.D. Cal. Apr. 12, 2018) .... 3, 6, 12

*Merck Eprova AG v. Brookstone Pharm.*
  920 F. Supp. 2d 404 (S.D.N.Y. 2013) ........................................................ 5

*Native Am. Arts, Inc. v. Bud K World Wide, Inc.*
  No. 7:10-CV-124 (HL) .............................................................................. 16

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*
  290 F.3d 578 (3d Cir. 2002) ..................................................................... 21

*Oracle Am., Inc. v. Google Inc.*
  No. C 10-03561 WHA 2016 WL 1743116 (N.D. Cal. May 2, 2016) .......... 6

*Reinsdorf v. Skechers U.S.A.*
  922 F. Supp. 2d 866 (C.D. Cal. 2013) ........................................................ 7

*Simon Prop. Grp. L.P. v. mySimon, Inc.*
  104 F. Supp. 2d 1033 (S.D. Ind. 2000) .................................................... 21

*Smith v. Wal-Mart Stores, Inc.*
  537 F. Supp. 2d 1302 (N.D. Ga. 2008) ..................................................... 21

*Southland Sod Farms v. Stover Seed Co.*
  108 F.3d 1134 (9th Cir. 1997) .............................................................. 1, 11

*Spraying Sys. Co. v. Delavan, Inc.*
  975 F.2d 387 (7th Cir. 1992) .................................................................. 10

*The Dreyfus Fund, Inc. v. The Royal Bank of Canada*,
  525 F. Supp. 1108 (S.D.N.Y. 1981) ........................................................... 8

*The Scotts Co. v. United Indus. Corp.*
  315 F.3d 264 (4th Cir. 2002) ................................................................... 14

*Wallace v. Countrywide Home Loans Inc.*
  No. SACV 08-1463-JST (MLGx) 2012 WL 11896333 (C.D. Cal. Aug. 31, 2012) ........................................................................................... 15

*York v. Starbucks Corp.*
  No. CV 08-07919 GAF (PJWx) 2011 WL 8199987 (C.D. Cal. Nov. 23, 2011) ....................................................................................................... 13

Statutes

Fed. R. Evid. 401 ....................................................................................... 4

iii

1  Plaintiff Quidel Corporation submits this Opposition to Defendants Siemens
2  Medical Solutions USA, Inc. and Siemens Healthcare Diagnostics, Inc.'s (together,
3  "Siemens") Motion to Exclude the Survey, Expert Report, and Testimony of Matthew
4  G. Ezell [Dkt. No. 135].

5  ## I.  INTRODUCTION

6  Courts in the Ninth Circuit routinely admit consumer surveys in cases like this
7  one.  Any alleged technical unreliability of the survey goes to the weight, not the
8  admissibility, of the survey.  Here, as explained below, Mr. Ezell's survey is admissible
9  under Ninth Circuit authority because it has a proper foundation, it is relevant, and it
10  was conducted according to accepted principles.  Thus, the Court should deny
11  Siemens' Motion.

12  ## II.  THE CONTEXT FOR MR. EZELL'S
13  ## CONSUMER SURVEY AND EXPERT OPINIONS

14  Mr. Ezell's survey, expert report, and testimony must be considered in the
15  context for which Quidel is offering them in this case.  This case is, in part, a false
16  advertising case under the Lanham Act, 15 U.S.C. § 1125(a), involving two assays
17  (blood tests)—Quidel's assay and Siemens' assay—used for the measurement of
18  thyroid stimulating antibodies that, among other clinical uses, can aid in the detection
19  of Graves' disease.

20  A plaintiff pursuing a false advertising claim under the Lanham Act must show:
21  (a) a false statement of fact by the defendant in a commercial advertisement about its
22  own or another's product; (b) the statement actually deceived or has the tendency to
23  deceive a substantial segment of its audience; (c) the deception is material, in that it is
24  likely to influence the purchasing decision; (d) the defendant caused its false statement
25  to enter interstate commerce; and (e) the plaintiff has been injured as a result of the
26  false statement.  *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th
27  Cir. 1997) (citations omitted).  Under the Lanham Act, a false marketing statement is
28  "material" if "it is likely to influence the purchasing decision" of the advertisement's

1

audience.  *Id.*  "Reactions of the [advertisement's audience] are typically tested ***through the use of consumer surveys.***"  *Id.* (citations omitted) (emphasis added).

In its First Amended Complaint (the "FAC"), Quidel alleges that Siemens has falsely marketed/promoted its Immulite 2000/ 2000 XPi TSI assay (the "Immulite Assay"), that these misstatements have been influential to the relevant market's decisions, and that Quidel has been harmed.  [Dkt. No. 12.]  As shown in detail in Quidel's Motion for Partial Summary Judgment on the Element of Falsity [Dkt. No. 145] and its Opposition to Siemens' Motion for Summary Judgment, the evidence substantiates Quidel's allegations given that the following statements by Siemens about the Immulite Assay are literally and deliberately false:  (a) the Immulite Assay is capable of detecting thyroid stimulating immunoglobulins ("TSI") only; (b) the Immulite Assay is not like a TRAb assay, which detects both thyroid-stimulating and -blocking antibodies, but cannot distinguish between them; and (c) the Immulite Assay does not detect thyroid-blocking antibodies.

In support of its allegations that Siemens' literally and deliberately false statements influenced the "purchasing decisions" of the relevant audience of Siemens' misstatements, Quidel engaged Mr. Ezell to conduct a consumer survey and provide his expert opinions.  [Dkt. No. 135-2 (Declaration of Erik Haas, Exs. 12, 14).]  Mr. Ezell is a partner in the marketing research and consulting firm of Ford Bubala & Associates.  [*Id.*, Ex. 12, ¶ 1.]  Mr. Ezell designed and caused to be conducted a survey to address the issue of what message or messages are communicated by Siemens Healthcare IMMULITE 2000/2000 XPi TSI Assay web pages (the "Web Pages") and other Siemens documentation with similar messages.  [*Id.*, Ex. 12, ¶ 2.]  The universe for this survey was comprised of physicians who specialize in endocrinology and who, as part of their practice, order assay tests to assist in patient diagnosis.  [*Id.*, Ex. 12, ¶ 7.]

According to Mr. Ezell, the survey results, after adjusting the survey data for mismeasurement error based upon the Control Web Pages, evidence that

approximately sixty-seven percent (67.42%) of the relevant universe are likely to be misled or deceived by Defendants' messages.  [*Id.*, Ex. 12, ¶ 8.]  Also according to Mr. Ezell, it is his considered opinion, based upon his education, background, and professional experience and based upon his review and analysis of the survey results, that the survey results indicate that the messages on Defendants' Web Pages are likely to mislead or deceive a substantial portion of the relevant universe into believing (1) that the Immulite Assay is a "TSI assay," (2) that the Immulite Assay detects only thyroid-stimulating antibodies, and/or (3) that the Immulite Assay is not a TRAb assay. [*Id.*, Ex. 12, ¶ 22.]  It is also Mr. Ezell's opinion that other Siemens documentation with similar messages are likely to mislead or deceive a substantial portion of the relevant universe in a similar manner.  [*Id.*]

### III.    ARGUMENT

Siemens contends that Mr. Ezell's survey, report, and testimony should be excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702 because "Mr. Ezell's survey and testimony fails to satisfy the most basic requirements for admissible scientific evidence."  [Dkt. No. 135-1 (Memo. of Ps & As at p. 1).]  Specifically, Siemens claims that (a) Mr. Ezell's survey recruited the wrong universe of respondents, (b) the survey questions were fatally ambiguous, (c) the survey led and biased respondents, and (d) Mr. Ezell's unscientific conclusions lack support.  [*Id.* at pp. 1-2, 10-23.]

### A.    <u>Legal Standards for Admission of Consumer Surveys.</u>

Although the admissibility of survey evidence is governed by *Daubert*, the Ninth Circuit has held that evidence from a professionally conducted survey should generally be found sufficiently reliable and admissible under the gatekeeping test of *Daubert*.  *Southland Sod Farms*, 108 F.3d at 1143 n.8; *Marketquest Grp., Inc. v. BIC Corp.*, No. 11-cv-618-BAS (JLB), 2018 WL 1782724, at *3 (S.D. Cal. Apr. 12, 2018). This is so because "[u]nlike [with] novel scientific theories, a jury should be able to determine whether asserted technical deficiencies undermine a survey's probative

value." *Southland Sod Farms*, 108 F.3d at 1143 n.8; *Marketquest*, 2018 WL 1782724, at *3; *E & J Gallo Winery v. Proximo Spirits, Inc.*, No. 1:10-cv-00411 LJO JLT, 2011 WL 5922090, at *3 (E.D. Cal. Nov. 28, 2011); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292 (9th Cir. 1992) ("[I]t is routine to admit a relevant survey; any technical unreliability goes to weight, not admissibility.") (citation omitted).

A survey can be admitted into evidence once it has passed the threshold conditions of having a proper foundation, being relevant, and having been conducted according to accepted principles. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001) (citations omitted); *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010) ("We have long held that survey evidence should be admitted as long as [it is] conducted according to accepted principles and [is] relevant.") (quotations omitted).  "Once the survey is admitted ... follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility.  ***These are issues for a jury*** …." *Clicks Billiards,* 251 F.3d at 1263 (citation omitted) (emphasis added); *Fortune Dynamic,* 618 F.3d at 1036.  "While there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, ***such situations will be rare*** . . . ." *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir.1993) (citation omitted) (emphasis added).

Here, Siemens appears to challenge Mr. Ezell's survey and testimony on two grounds:  that his survey and testimony are not relevant to the issues in this case and that his survey was not conducted according to accepted principles.

**B.    Mr. Ezell Surveyed the Correct Universe of Respondents.**

Here, Mr. Ezell's survey has the tendency of proving that Siemens' advertising materials are likely to mislead or deceive a substantial portion of the relevant market into believing Siemens' false statements about the Immulite Assay.  Thus, the survey is relevant.  *See E & J Gallo,* 2011 WL 5922090, at *3 (citing Fed. R. Evid. 401).

Siemens claims that Mr. Ezell's survey is not relevant because he allegedly surveyed the wrong universe of respondents. According to Siemens, the only relevant universe of respondents would be the laboratories – Laboratory Corporation of America ("LabCorp") and Sonic Healthcare USA ("Sonic/CPL") – and not physicians who specialize in endocrinology and who, as part of their practice, order assay tests to assist in patient diagnosis. [Dkt. No. 135-1 (Memo. of Ps & As at pp. 1, 10-13).]

With respect to consumer surveys, the appropriate universe is "'that segment of the population whose perceptions and state of mind are relevant to the issues in the case.'" *Icon Enters. Int'l, Inc. v. Am. Prod. Co.*, No. CV 04-1240 SVW (PLAx), 2004 WL 5644805, at *24 (C.D. Cal. Oct. 7, 2004) (quoting 5 J. Thomas McCarthy, Trademarks and Unfair Competition § 32:159 (4th ed. 2001)). "'The definition of the relevant population is crucial because there may be systematic differences in the responses of members of the population and nonmembers.'" *Id.* (quoting Reference Manual on Scientific Evidence, 240 (Federal Judicial Center 2000)). In Lanham Act false advertising cases, "[i]n determining whether a challenged advertisement is likely to confuse or mislead customers, courts must look to the person to whom the advertisement is addressed." *Merck Eprova AG v. Brookstone Pharm., LLC*, 920 F. Supp. 2d 404, 418 (S.D.N.Y. 2013) (citing *Am. Home Prods. Corp. v. Johnson & Johnson*, 577 F.2d 160, 166 (2d Cir. 1978)).

Siemens argument regarding what constitutes the appropriate universe of respondents fails for several reasons. Here, the relevant customer market includes physicians.



In similar situations, courts have found that the universe of respondents chosen for Mr. Ezell's survey was appropriate. *See Merck*, 920 F. Supp. 2d at 418 ("Because [the defendant's] labels and package inserts were intended to encourage product substitution, and thus ***directed in part*** to pharmacists and physicians . . . , [the plaintiff] surveyed those groups.") (emphasis added); *Marketquest,* 2018 WL 1782724, at *5 ("Although Marketquest may not sell directly to end consumers, it directly promotes its mark and products to end consumers through its websites, online catalogs, and catalogs that distributors show to customers to facilitate their orders."); *see also Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2016 WL 1743116, at *5 (N.D. Cal. May 2, 2016) ("The standard for a 'proper universe' of respondents, such that a survey would be sufficiently reliable to be admissible, is not as demanding as Oracle

claims."). Thus, Siemens argument regarding the universe of respondents involved in Mr. Ezell's survey fails.

The cases cited by Siemens in support of its relevancy argument are easily distinguishable. For example, in *Kwan Software Eng'g, Inc. v. Foray Techs., LLC*, No. C 12-03762 SI, 2014 WL 572290 (N.D. Cal. Feb. 11, 2014), the court rejected an expert's survey and opinions that were proffered to support a false advertising claim arising from advertising for photo software. *Id.* at *5. The survey purported to show that the advertisements at issue were likely to mislead or confuse consumers. *Id.* at *4. The survey focused on potential users of the software rather than potential purchasers because, according to the plaintiff, the software was designed for and purchased for its users, rather than its purchasers. *Id.* However, the court found that the plaintiff had not shown that any of the members of the survey are people who would see the alleged misrepresentations or people who are potential purchasers of the software. *Id.* at *5. In addition, the proffering party "made no attempt to show" the survey's probative value despite its unrepresentative sample. *Id.* The court explained that "[w]ithout such a showing," it could not "conclude that the survey examined the proper universe of consumers" and cited to *Merck*, 920 F. Supp. 2d at 418 (cited above in this Opposition) for an example of how the plaintiff could have made the required showing. *Id.*

In *Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866 (C.D. Cal. 2013), the court excluded an expert's survey and opinions that purported to test brand recognition but were proffered as evidence that "one can fairly easily parse how much of the audience appeal of the work originates from the various elements." *Id.* at 873. The survey provided no basis to indicate how its sample was selected, or why its respondents were representative of the relevant population. *Id.* at 878. In addition, the proffering party made "virtually no attempt to defend [the expert's] methods," and could not identify any scientific principles underlying the survey, which appeared to violate numerous accepted practices in the field of survey research. *Id.* at 878-79.

In *Icon Enters.*, 2004 WL 5644805, the court **refused to exclude** a consumer survey on the basis that the expert selected an inappropriate universe, finding that "the universe selected by [the expert], though perhaps imprecise, is not so flawed as to render the survey evidence inadmissible." *Id.* at *24-26. The court also explained that "courts within the Ninth Circuit are reluctant to exclude survey evidence on the basis of an overinclusive or underinclusive target population." *Id.* at *26; *see also A & M Records, Inc. v. Napster, Inc.*, No. C9905183MHP, 2000 WL 1170106, at *4 (N.D. Cal. Aug. 10, 2000) (same).

In *Kournikova v. General Media Communs., Inc.*, 278 F. Supp. 2d 1111 (C.D. Cal. 2003), the court excluded what it determined to be an overinclusive survey. *Id.* at 11125. The plaintiff, a famous tennis player, sued the defendant, the publisher of Penthouse, for publishing nude photographs of a woman incorrectly identified as the plaintiff. *Id.* at 1114-15. The plaintiff alleged false advertising and false endorsement. *Id.* To establish that a reasonable customer would be likely to believe that the plaintiff voluntarily associated herself with the defendant's publication, the plaintiff offered survey evidence that showed that a substantial portion of the respondents thought that the plaintiff consented to or cooperated with the defendant. *Id.* at 1124-25. However, the survey sample was drawn from a universe that included **all adults**. *Id.* at 1125. The court found that, given the test for false endorsement, the universe should have consisted of the average reader of the defendant's magazine. *Id.* As it was, less than ten percent of the sample population had purchased Penthouse in the last year and less than 25 percent had purchased a similar men's magazine. *Id.* Thus, the court concluded that the survey was impermissibly overinclusive. *Id.*

In *The Dreyfus Fund, Inc. v. The Royal Bank of Canada*, 525 F. Supp. 1108 (S.D.N.Y. 1981), the court refused to consider "the results of a pilot study for a survey [the plaintiff was] preparing," finding that "[n]o **weight** can be given to the [plaintiff's] study at this point … because its execution was seriously flawed." *Id.* at 1115-16 (emphasis added). In particular, the plaintiff's expert witness "who designed the study,

testified that the questionnaires were not administered according to his instructions." *Id.* at 1116. In addition, the plaintiff's expert witness testified that "approximately half of the respondents had not been selected in a manner designed to ensure a random sampling." *Id.*

In *In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, No. 14-cv-5696, 2017 WL 1196990 (N.D. Ill. Mar. 31, 2017)—a product liability nationwide class action lawsuit involving the defendant's product (water supply lines)—the plaintiffs retained an expert "to develop a conjoint study to assess the impact that two attributes" of the defendant's product "have on consumers' willingness-to-pay ('WTP')" for the defendant's product. *Id.* at \*27. The court found that the ***yet-to-be-conducted survey***, which was to feature "only ordinary consumers 'who have or will purchase'" the defendant's products, was flawed because (1) it was undisputed that the vast majority of the defendant's products were purchased by plumbing professionals for subsequent installation in the end-user's home or business, and (2) the plaintiffs did not "explain how a conjoint study will reliably measure the WTP for consumers who indirectly acquire a toilet connector through a third-party." *Id.* In addition, the court found that the plaintiffs had not shown how the yet-to-be-conducted survey "will reliably measure purchasers' WTP" based on its proposed methodology. *Id.* at \*29. In this regard, the court noted that "[a]sking an unrepresentative group of purchasers to artificially assign values among an arrangement of potentially unimportant attributes that fails to approximate real-world purchasing decisions does not seem designed to produce a reliable WTP estimate that can be used to calculate class-wide damages." *Id.* at \*31. Accordingly, the court excluded the proposed survey. *Id.*

*Continental Plastic Containers v. Owens Brockway Plastic Prod., Inc.*, 141 F.3d 1073 (Fed. Cir. 1998), ***did not involve a consumer survey at all***. In that case, the court granted the defendant's motion for summary judgment in a patent and trade dress infringement case involving plastic fruit juice bottles. *Id.* at 1075. On appeal, the

1   plaintiff argued that the district court "erred because it did not properly identify the

2   relevant consumer base in applying the test for likelihood of confusion and, as a result,

3   failed to recognize the evidence of confusion adduced by [the plaintiff]." *Id.* at 1080.

4       The *Continental Plastic* court rejected the plaintiff's argument, explaining that

5   the district court found that the relevant consumer base was wholesale purchasers of

6   empty bottles without lids or labels. *Id.* The plaintiff argued that the relevant market

7   includes the ultimate retail consumer, i.e., the person purchasing bottled juice in the

8   grocery store. *Id.* The court found that the district court properly rejected the

9   plaintiff's data on the basis that these consumers are buying juice, not plastic bottles.

10  *Id.* at 1081. The court concluded: "Thus, [the plaintiff] is faced with an

11  insurmountable hurdle. The wholesalers to whom it markets its bottles are not in the

12  bottle business, they are in the juice business. While the shape of the bottle may create

13  confusion as to the source of the juice, this is irrelevant to the determination as to

14  confusion as to the source of the bottles." *Id.*

15      In *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387 (7th Cir. 1992), the court

16  found only that issues with the universe of respondents chosen for the plaintiff's

17  surveys "limit[ed] the surveys' probative value," but ***did not require their exclusion***.

18  *Id.* at 389 n.5. In that case, the plaintiff's surveys targeted as respondents farmers

19  rather than actual purchasers of the spraying equipment at issue. *Id.* "Since a sizable

20  portion of the parties' products are sold to distributors and equipment manufacturers,

21  the selection of farmers only as the relevant universe limits the surveys' probative

22  value even further." *Id.*

23      *Fibermark, Inc. v. Brownville Specialty Paper Prod., Inc.*, 419 F. Supp. 2d 225

24  (N.D.N.Y. 2005)—a trade dress infringement case involving press board—is another

25  case that ***did not involve a consumer survey***. But it does support the proposition that

26  juries determine the relevant market. Indeed, with respect to the element of confusion

27  of customers in the market for the particular product at issue, the court explained that

28  "there was insufficient evidence upon which the jury could reasonably have found end-

users to be the relevant market." *Id.* at 237. By contrast, the court concluded that "[t]he jury could have reasonably concluded that the converters are the relevant market." *Id.* This case undermines Siemens argument.

In *J & J Snack Foods, Corp. v. The Earthgrains Co.*, 220 F. Supp. 2d 358 (D.N.J. 2002)—a trademark infringement case—the court excluded a consumer survey because, among other flaws, "the universe chosen for the survey was improper." *Id.* at 371. The court explained that the survey "did not imitate the market conditions of the [plaintiff's] at all. It is undisputed that [the plaintiff] sells all of its frozen cookie dough product with the 'BREAK & BAKE' mark through its food service distributors to distributors who offer the product to fund raising organizations." *Id.* In addition, there was testimony that "the ultimate consumer would not know the product because it has not been advertised to consumers." *Id.* The court continued: "As a result, the market conditions for the [plaintiff's] study should have been limited to the commercial distributors in the food service industry who may have contact with frozen dough products. . . . Instead, the universe here consisted of adults shopping at one of four malls in the United States who either 'do at least some of the grocery shopping for their household, . . . or 'have purchased refrigerated cookie dough in the past and/or ... intend to purchase refrigerated cookie dough in the future." *Id.* at 371-72. According to the court, "[t]his universe renders the study unreliable as it ignores the fact that the ultimate consumer does not have any contact with the 'BREAK & BAKE' mark on [the plaintiff's] product. In addition, it only concerns the views of ultimate consumers who purchase or may purchase refrigerated dough when [the plaintiff's] product is unquestionably frozen." *Id.* at 372.

As shown above, none of Siemens' cases provide any legitimate basis to exclude Mr. Ezell's survey or his opinions. *See, e.g., Southland Sod Farms*, 108 F.3d at 1142 (concluding that the district court abused its discretion in excluding a consumer survey on relevance grounds). Even if the Court were to find that the survey universe was underinclusive because it did not include the laboratories, excluding Mr. Ezell's survey

would still not be warranted.  "'The selection of an inappropriate universe generally affects the weight of the resulting survey data, not its admissibility.'"  *Marketquest*, 2018 WL 1782724, at *3 (quoting 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:162 (5th ed. 2018)).  "Even if a survey does not select the optimal universe, the results are often still probative of the fact it was intended to prove."  *Id.* (citation omitted).  "Indeed, courts within the Ninth Circuit are largely unwilling to exclude survey evidence on the basis of an overinclusive or underinclusive target population."  *Id.* (citing *Icon Enters.*, 2004 WL 5644805, at *25-26).  Accordingly, there is no basis to exclude Mr. Ezell's survey on relevance grounds.

In addition, even if this were a close call (and it's not), in Ninth Circuit false advertising cases, it is well-established that questions about the relevant market should be decided by the jury.  *See Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999) (affirming district court's decision to submit to the jury the factual question of the nature of the market); *Appliance Recycling Centers of Am., Inc. v. JACO Envtl., Inc.*, 2006 WL 8434390, at *3 (C.D. Cal. Oct. 19, 2006) (determining that jury should decide which characterization of the market size is was correct).  Thus, Siemens' relevance argument should be rejected because the relevant customer market presents an important jury question.

## C.    Siemens' Remaining Arguments, At Best, Go to the Weight of Mr. Ezell's Survey Rather Than Its Admissibility.

Siemens' remaining arguments focus on whether Mr. Ezell's survey was conducted according to accepted principles.  Mr. Ezell details how he designed his survey, how the survey was conducted, the specific questions asked, the results of the survey, and other relevant factors in his expert report and in Exhibit A to his report.  [Dkt. No. 135-2 (Haas Decl., Exs. 12 (¶¶ 3-6, 10-21) & 14).]  As these documents show, Mr. Ezell's survey was conducted according to accepted principles.

In support of its argument to the contrary, Siemens first contends that two terms used by Mr. Ezell—"TSI only" and "TRAb assay"—in the survey are fatally vague and

ambiguous.  [Dkt. No. 135-1 (Memo. of Ps & As at pp. 13-16).]  This argument is nonsense.

Siemens' own website—which was shown to Mr. Ezell's survey respondents (*i.e., physicians who specialize in endocrinology*)—define the terms "TSI" and "TRAb."  [Dkt. No. 135-2 (Haas Decl., Ex. 14 at pp. 2-17).]  In those materials, TSI is defined as "thyroid-stimulating immunoglobulins," and TRAb is defined as "TSH receptor antibody."  [*Id.*]  It is further explained in those materials that:

- TSI binds "to the TSH receptor on the thyroid cells and stimulate the uncontrolled production of thyroid hormones";
- TRAb assays "detect both thyroid-blocking and -stimulating antibodies";
- The Immulite Assay is a "TSI assay"; and
- TRAb is "less specific than TSI."

[*Id.*]

The cases cited by Siemens in support of its argument are distinguishable.  For example, in *York v. Starbucks Corp.*, No. CV 08-07919 GAF (PJWx), 2011 WL 8199987 (C.D. Cal. Nov. 23, 2011)—a class action employment case—the court excluded the plaintiff's survey (conducted by telephone with certain of the defendant's employees) because it found that the plaintiffs' expert "grossly deviated from the best practices outlined in" another one of plaintiffs' own expert's (described as someone who had extensive experience in the area of collecting and analyzing survey data) report.  *Id.* at *12.  The court found that plaintiffs' survey expert "failed to comply with well established principles and procedures designed to insure the reliability of survey data" in at least 13 different respects and excluded the survey.  *Id.* at *12-13.

In *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, No. 14-md-02541 CW, 2019 WL 1747780 (N.D. Cal. Mar. 8, 2019)—an antitrust case—the defendants' expert witness surveyed 1,086 consumers of college football and basketball on-line to determine the reasons why they watch college sports.  *Id.* at *15.  One of the reasons that respondents could select was that student-athletes

are "amateurs and/or not paid." *Id.* The court found several problems with the survey, including that the expert "did not define 'amateurs' or 'not paid' in his survey, or determine what either of those terms meant to respondents. . . . Worse, the use of the phrase 'amateurs <u>and/or</u> not paid' renders the responses hopelessly ambiguous." *Id.* (emphasis in original). There is, however, ***no indication that the court excluded*** the survey at issue; it just didn't give it much weight (especially in comparison to the plaintiffs' expert's survey). *Id.* at *16.

In *The Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 279 (4th Cir. 2002)—a false advertising case—the key to the plaintiff's claim was the question of whether its competitor's packaging conveyed "the message that [the defendant's product] *kills* mature crabgrass." *Id.* at 279 (emphasis in original). The plaintiff's expert's survey asked the respondents to view the packaging and answer the following question: "should this product prevent the growth of crabgrass that looks like the crabgrass pictured?" *Id.* The court explained that "[t]hrough the use of the word 'prevent,' this question suffers from the same ambiguity as does the [defendant's] packaging itself. That is, we cannot tell from this question whether the respondents who answered yes believed that [the defendant's product] could prevent mature crabgrass by stopping it before it started, or whether they believed that [the defendant's product] could kill if applied to established, mature crabgrass." *Id.*

In that case, however, there were many other issues with the plaintiff's survey. According to the court, "the manner in which the survey was conducted creates significant questions about its relevance and reliability." *Id.* at 280. The court noted that "the interviewers conducted the survey in this case in a way that effectively required the respondents to express a specific opinion, even if they did not have an opinion, by specifically *not* offering the respondents the opportunity to give 'not sure' as a response." *Id.* (emphasis in original). In addition, the court found that by showing respondents only a portion of the defendant's product's packaging, the survey "elicited information about the consumer's reaction to an isolated part of the packaging, when

the relevant issue in a false advertising case is the consumer's reaction to the advertisement as a whole and in context." *Id.*

In *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229 (10th Cir. 2013)—a trademark infringement case—the plaintiff claimed that the district court wrongly excluded its "consumer-confusion survey." *Id.* at 1246. For this survey, the respondents "were recruited through an online questionnaire and were limited to consumers who said that they either had bought contact lenses in the previous 12 months or were considering buying them in the next 12 months." *Id.* "During the survey they ***were told to imagine*** that they had just conducted a Google search for '1800contacts,' and then they viewed screenshots of search results in which an ad for Lens.com appeared among the sponsored links." *Id.* (emphasis added). "After studying the screenshots, they were asked whether they thought that the Lens.com ad either 'originate[d] from 1–800–CONTACTS' … or 'ha[d] sponsorship or approval from 1–800–CONTACTS.'" *Id.*

In that case, the appellate court agreed with the district court's decision to exclude the survey, explaining that the "respondents may have believed that they were being asked whether the ad had resulted from use of the search term '1–800–CONTACTS.' . . . An affirmative answer based on this belief would not have been at all probative of the likelihood of confusion that [the plaintiff's] has alleged." *Id.* "In presenting the survey responses, [the plaintiff's] expert lumped together the affirmative responses to the ambiguous question with the affirmative responses to the question whether the respondent believed that the Lens.com ad 'ha[d] sponsorship or approval from 1–800–CONTACTS.'" *Id.* at 1246-47. "As a result, the court had no way of accurately discounting the survey data for any misunderstandings that might have arisen from the ambiguity of the first question's language." *Id.* at 1247.

In *Wallace v. Countrywide Home Loans Inc.*, No. SACV 08-1463-JST (MLGx), 2012 WL 11896333 (C.D. Cal. Aug. 31, 2012)—an employment class action case— the court found that a proffered survey was inadmissible, concluding that the survey

1    was "flawed in several respects." *Id.* at \*3.  "The most significant infirmity, which

2    infects the entire [survey], is the presence of bias." *Id.*  The court also noted that the

3    following survey question was problematic:  "'How many hours did you work in the

4    *typical* week when you worked as an Account Executive for [Defendants] between

5    January 20, 2002 and December 31, 2004?'" *Id.* at \*5 (emphasis in original).  The

6    word "typical" was not defined for the respondents. *Id.*  According to the court,

7    "'typical' is an ambiguous term that may mean 'most frequently occurring' rather than a

8    mathematical average, which is the metric at issue in this case." *Id.*

9         In *Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261 (6th Cir. 1985), the court

10   **did not exclude the survey at issue**. *Id.* at 1269 ("Therefore it was not clear error to

11   discount the probity of this survey.").  And in *Oracle,* 2016 WL 1743116, the court did

12   not exclude the survey in its entirety despite "a potential overlap in common

13   terminology" used in the survey. *Id.* at \*4.  The other cases cited by Siemens involved

14   surveys that suffered from multiple defects, not merely definitional issues (as Siemens

15   would have the Court believe):

16        • *Native Am. Arts, Inc. v. Bud K World Wide, Inc.*, No. 7:10-CV-124 (HL),

17           2012 WL 1833877, at \*7 (M.D. Ga. May 18, 2012) (finding that, among

18           other things, the survey expert's "failure to present the complete manner in

19           which Defendant displays, offers to sell, or sells its goods renders the

20           survey unreliable under Rule 702 and misleading and confusing under

21           Rule 403.").

22        • *Competitive Edge, Inc. v. Staples, Inc.*, 763 F. Supp. 2d 997, 1008-09

23           (N.D. Ill. 2010), *aff'd*, 412 F. App'x 304 (Fed. Cir. 2011) ("The reliability

24           of the survey is diminished by Little's failure to define his target universe .

25           . . ."; "Worse, it is possible that *certain respondents took the survey more*

26           *than once.*") (emphasis added).

27        • *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 568-69

28           (S.D.N.Y. 2007) ("These flaws include the use of an improper stimulus,

the poor choice of a control bag, the failure to instruct respondents against guessing, the improper classification of respondents, as well as other significant methodological errors."; "The Special Masters found that the facts strongly suggest that the Jacoby Confusion Survey was 'not reported in an accurate manner and ... was not conducted in an objective manner," and "also found significant flaws in the survey including the improper definition of its universe, the use of a survey question that asked respondents for a legal conclusion, and the improper classification of certain respondents as confused 'based on factors not relevant to the marks at issue.'").

In sum, Quidel has shown that Siemens' vague-and-ambiguous-terms argument fails, and none of the cases cited by Siemens compels a different conclusion.

Siemens remaining arguments about alleged design flaws in Mr. Ezell's survey (i.e., purported bias, reading test, and flawed control) and alleged issues with Mr. Ezell's conclusions (i.e., alleged subjective coding) are equally unavailing. Although Quidel strongly disagrees with Siemens' purported remaining issues concerning Mr. Ezell's survey, exclusion of the survey is not warranted or appropriate even if the Court were to consider such issues. Indeed, the great weight of authority in the Ninth Circuit is that the types of remaining issues raised by Siemens—"follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like"—"go to the weight of the survey rather than its admissibility. ***These are issues for a jury*** …." *See Clicks Billiards,* 251 F.3d at 1263 (emphasis added); *Fortune Dynamic,* 618 F.3d at 1036. This is not that rare situation where exclusion of a consumer survey is warranted or appropriate. *See AHP Subsidiary*, 1 F.3d at 618.

An analysis of the alleged substance of the remaining issues raised by Siemens shows that Siemens has mischaracterized Mr. Ezell's survey and methods. For example, Mr. Ezell's survey asked open-ended—not leading—questions in the Series

10 and 11 questions and, thus, did not suggest answers, as Siemens claims. [Dkt. No. 135-2 (Haas Decl., Ex. 12).] The survey also did not ask true/false questions in the Series 10 and 11 questions. [*Id.*]

In addition, Siemens' argument that Mr. Ezell testified that the survey control was written entirely by Quidel's counsel without his input is false. As Mr. Ezell testified:

> Q: D-15 is kind of the first big one. So how did you come up with the language you used on the highlighted portion?
>
> A: So we wanted to make false or misleading statements in the test cell, which appear on page C-15, truthful, and we had discussions with counsel for plaintiff in how to make changes to the test cell to make those statements truthful.
>
> Q: Did you draft this language or did counsel?
>
> A: I believe counsel did it. I don't recall if I came to the conclusion on my own that the TSI portion should be removed, but, ultimately, counsel provided guidance in coming to the language that is used in the control cell.
>
> Q: And so after counsel drafted this language, did you make any edits to it?
>
> A: I didn't know that any changes were made ever, but after counsel suggested some language, I believe it was this exact language, then my partner and I reviewed this and agreed that this was appropriate to use, and we proceeded with the control cell interviews.
>
> Q: What materials -- did you review any materials before you signed off on this language for the control?
>
> . . .
>
> A: I certainly reviewed the test cell stimulus and compared the two.
>
> Q: Anything else?
>
> A: I'm sure I looked, again, at the first amended complaint at some point. And anything else, no.
>
> . . .
>
> Q: Did you review the website for any of Siemens' other assays in creating the control stimulus?
>
> A: No, I did not.

18

Q:  Why not?

A:  Again, I understand that the messages that appear in the test cell were alleged to mislead, and we wanted to make those statements truthful, and we received guidance from counsel for plaintiff to make those statements truthful and we proceeded with the interviews.

Q:  But you didn't make this statement when you said that, counsel made the statement and you signed off on it; is that right?

A:  Counsel suggested the wording that appears on page D-15 and, yes, I approved the use of it as a control cell stimulus.

[Roosevelt Decl., Ex. 13 at pp. 112-115).]  This testimony makes clear that Mr. Ezell had input into the control.

Siemens' argument that Mr. Ezell's survey should be disqualified because the survey control design allegedly does not match Quidel's own litigation theory, as set forth in Quidel's opposition to Siemens' motion to dismiss the FAC, is also false.  As Quidel stated in that opposition:  "The FAC, however, does not allege that the name of the IMMULITE Assay nor its sensitivity and specificity data are false.  Rather, the FAC attacks Defendants' false and misleading ***message*** that the assay does something it does not – detect TSI only and differentiate between stimulating and blocking antibodies.  Doc. No. 12, ¶ 15.  Thus, Defendants' argument that its statements are 'unambiguously true' misses the mark."  [Dkt. No. 18 at p. 12 (emphasis added).]  As this shows, Siemens has misrepresented Quidel's position.

Siemens' argument that Mr. Ezell did not disclose the method by which he coded respondents is likewise false.  As Mr. Ezell testified:

Q:  "False message (e.g., is a TSI assay, does detect TSI only, is not a TRAb assay, etc.)"  Is that data from the close-ended questions or the open-ended questions in the 10.0 and 11.0 series, some combination of both? Can you just explain it to me?

A:  Sure.  Whether respondent gave a false message in terms of an open-ended response or a close-ended response, they would be in category 1.  And if there was no false message at all, they would be in category 2.  And sometimes the respondent might say one thing in terms of their open-ended response and somewhat contradict themselves in terms of their close-ended response, so those five people on page 10 we put into category 3, "Indeterminable."  Does that answer your question?

1    Q:  Yeah. I think we can drill it down in a minute.  Just so I get this right, if I answered, I'm taking the survey and I go through 10.0, I say
2    "Yes," write some words in 10.1 and 10.2, and then answer 1 for 10.3, I will either go into the 1 bucket or the 3 bucket; is that fair?

3    A:  That's correct.

4    . . .

5    Q:  If you answered "Yes" to 10.0, "Does detect TSI only" to 10.3, I
6    would go in the response category 1 bucket on page 10 of your report, unless, based on your review of my responses 10.1, 10.2, 9.0 and 9.1, you
7    concluded that my response was indeterminable, right?

8    . . .

9    THE WITNESS:  I think we're on the same page, but let me restate
10    in my terms, if that's okay.  If there was any false message to any question, open-ended or close-ended, and they did not contradict
11    themselves, the respondents did not contradict themselves, they were in category 1, "False Message."

12    . . .

13    Q:  So if I answered, to 10.3, "Does detect TSI only," I'm either
14    going to be in bucket 1 or bucket 3 for table 1; is that fair?

    A:  That is correct.

15    Q:  And if I answered "Does not detect TSI only," I'm either --
16    which is option number 2 on 10.3, I'm either going to be in bucket number 2, "Not False Message," or bucket number 3, "Indeterminable," from table
17    1 on page 10; is that correct?

18    . . .

19    THE WITNESS:  I believe that is correct.

20    . . .

21    Q:  A better way to say that, did you code or categorize the open-
22    ended responses to questions 9.0 and 9.1?

    . . .

23
24    THE WITNESS:  In terms of just those questions, there is no single code or coding exercise that took place with just those two questions, but
25    overall we did code, as I said, the entire response from a particular respondent.

26    . . .

27    Q:  And the way you did that is the way we discussed before the
28    break, you would take either the answers to 10.3 or 11.3, review the open-ends, put them in the bucket to determine if they are indeterminable; is

20

that right? We had the long conversation, but is that what you mean how you coded on an overall basis?

. . .

THE WITNESS: I think I can restate to be clear on the record that we -- if there was a false message present that was not contradicted by a verbatim response, then that respondent or the totality of their responses went into category 1, "False Message," and if there was a contradiction, there were very few of those, but if there was, then that respondent got put into 3, "Indeterminable." And if there were no false messages anywhere, they would be category 2.

Q: To be clear, for questions 9.0 and 9.1, you didn't go through and determine whether or not someone, for example, took away a TSI-only message and so wrote in response to 9.0 and 9.1, right?

A: I think, as I answered, I did not code individually the responses to 9.0 and 9.1, but, rather, the entire respondent in terms of 9.0 to 11.3.

[Roosevelt Decl., Ex. 13 at pp. 160-170.] As this shows, Mr. Ezell did in fact disclose the method by which he coded respondents.

And yet again, the cases cited by Siemens do not support its position that Mr. Ezell's survey must be excluded. First, Siemens cited to an order that has been vacated and, thus, should not be given any weight. *Fancaster, Inc. v. Comcast Corp.*, 832 F. Supp. 2d 380 (D.N.J. 2011), *vacated* (July 31, 2012). Second, *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578 (3d Cir. 2002), ***did not involve exclusion of a consumer survey at all***. Instead, the court discussed purported issues with the proffered survey and the weight given by the trial court to the survey. *Id.* at 592-94. Similarly, the court in *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302 (N.D. Ga. 2008), ***did not exclude the disputed survey***. Instead, it concluded that "although this is a close case, the Court concludes that the better option is to admit the survey evidence and to consider the survey's flaws in determining the evidentiary weight to assign the survey in the likelihood of confusion analysis." *Id.* at 1334.

In *Simon Prop. Grp. L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033 (S.D. Ind. 2000), the plaintiff's "home page survey creates a situation in which respondents are shown the [plaintiff] and [defendant] home pages one right after the other." *Id.* at

1041.  The court found that exclusion of the survey was warranted because, among other problems, "such a sequential or side-by-side encounter would virtually never occur in the marketplace."  *Id.*  The court concluded that "[t]he proposed home page survey bears no reasonable relation to situations in which consumers might actually be exposed to the parties' trademarks in the marketplace.  All three versions are highly leading and suggestive.  All three fail to include the most elementary form of control."  *Id.* at 1052.

In *Academy of Motion Pictures Arts & Sciences v. GoDaddy.com, Inc.*, No. CV 10-3738 ABC (CWx), 2013 WL 12122803 (C.D. Cal. June 21, 2013)—a case involving claims under Anticybersquatting Consumer Protection Act—the court concluded that a proffered survey was fatally flawed.  *Id.* at *3.  The survey expert's "assignment was to conduct a survey 'to determine the extent to which 75 accused domain names are confusingly similar to the [plaintiff's] marks.'"  *Id.*  The court explained that "confusing similarity is to be determined by directly comparing the accused domain names with the [plaintiff's] marks."  *Id.*  However, the expert's "methodology did not call on her respondents to make such a comparison between the accused domain names and the [plaintiff's] marks.  Instead, she showed respondents the accused domain names and asked, 'When you see [domain name' what product(s), service(s), organization(s), activity(ies), or other associations, if any, come to mind?'"  *Id.*  "If the respondent gave any answer other than 'Don't Know/Not Sure,' he/she was then asked, 'What makes you say that?'"  *Id.*  The court explained that these "open-ended questions seeking free-associations between the accused domain names and anything else cannot yield responses that illuminate whether, upon direct comparison, the accused domain names are confusingly similar to the [plaintiff's] marks.  Worse, by asking respondents to indicate what products or services come to mind, the survey question ignores [the law's] directive that 'confusingly similar' is to be 'ascertained without regard to the goods and services of the parties.'"  *Id.*  The court concluded that

22

"[i]n light of these flaws, the survey's results cannot be relevant to any issue in the case." *Id.*

In sum, Siemens cannot show that its remaining technical issues with Mr. Ezell's survey (even had such issues been credible) warrant excluding the survey—given its clear admissibility under Ninth Circuit law—and none of the cases cited by Siemens compels a different conclusion.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Exclude the Survey, Expert Report, and Testimony of Matthew G. Ezell.

DATED:  May 24, 2019                FINLAYSON TOFFER
                                    ROOSEVELT & LILLY LLP


                                    By:_____*/s/ T. Kevin Roosevelt*_____
                                          T. Kevin Roosevelt
                                    Attorneys for Plaintiff QUIDEL CORP.