# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUIDEL CORPORATION,<br><br>                      Plaintiff,<br><br>    v.<br><br>SIEMENS MEDICAL SOLUTIONS USA, INC., *et al.*,<br><br>                      Defendants. | Case No. 16-cv-3059-BAS-AGS<br><br>**ORDER DENYING DEFENDANTS' MOTION TO EXCLUDE THE SURVEY, EXPERT REPORT, AND TESTIMONY OF MATTHEW G. EZELL**<br><br>**[ECF No. 135]** |

Plaintiff Quidel Corporation and Defendants Siemens Medical Solutions USA, Inc. and Siemens Healthcare Diagnostics Inc. have each retained expert witnesses to opine on portions of this litigation. One of Plaintiff's experts is Matthew G. Ezell, who conducted a survey and wrote an expert report based on his findings from the survey. Defendants seek to exclude the survey, report, and testimony of Mr. Ezell. ("Mot.," ECF No. 135.) For the foregoing reasons, the Court **DENIES** the Motion.

///

## I. Relevant Background[1]

Plaintiff and Defendants each manufacture and sell assays (blood tests) that can aid in the detection of Graves' disease. Plaintiff sells the Thyretain Bioreporter TSI Assay ("Thyretain"), and Defendants sell the IMMULITE 2000/2000 XPi TSI Assay ("IMMULITE").

Plaintiff alleges Defendants have engaged in false advertising and unfair competition due to Defendants' advertising of IMMULITE. Plaintiff's claims stem in part from a statement on Defendants' website that says IMMULITE detects "TSI only." A "TSI only" assay is one that detects only thyroid stimulating immunoglobins ("TSI"), as opposed to an assay that fails to differentiate between thyroid stimulating and thyroid blocking immunoglobins ("TBI"). Assays that are unable to differentiate between TSI and TBI are called "TRAb" assays. Plaintiff alleges IMMULITE is not a "TSI only" assay, and that Defendants' false advertising caused customers to purchase Defendants' product over Plaintiff's product and thus damaged Plaintiff.

Plaintiff engaged Mr. Ezell to conduct a consumer survey and provide expert opinion regarding Plaintiff's allegations that "Siemens' literally and deliberately false statements influenced the 'purchasing decisions' of the relevant audience of Siemens' misstatements." ("Opp'n," ECF No. 175, at 2.) Ezell surveyed "physicians that specialize in endocrinology and who, as part of their practice, order assay tests to assist in patient diagnosis." ("Ezell Report," Exhibit 12 to Declaration of Erik Haas, ECF 135-3, at ¶ 7.)

For the survey, Ezell asked a test group of physicians to review an excerpt from Defendants' website regarding IMMULITE, and he asked a control group to review an edited excerpt. (Ezell Report at ¶ 17.) The test group reviewed the

---

[1] A more extensive background section is available in the Court's order on the parties' cross-motions for summary judgment, which is filed concurrently with this order. Therefore, the Court only includes background information here that is relevant to the present Motion.

– 2 –

following excerpt:

> **TEST CELL HIGHLIGHTED MATERIAL**
> The IMMULITE® 2000/2000 XPi TSI assay is the first automated and semiquantitative TSI assay available today. TSH receptor antibody (TRAb) assays detect both thyroid-blocking and -stimulating antibodies. However, blocking antibodies inhibit TSH stimulation of thyroid cells and lead to hypothyroidism. The IMMULITE 2000/2000 XPi TSI assay detects thyroid stimulating antibodies, the specific cause of GD pathology, with 98.5% specificity.

The control group reviewed the following excerpt:

> **CONTROL CELL HIGHLIGHTED MATERIAL**
> The IMMULITE® 2000/2000 XPi assay is an automated and semiquantitative assay designed for the more specific detection and measurement of stimulating antibodies, but has a potential to detect blocking antibodies and does not differentiate between blocking and stimulating antibodies. The IMMULITE® 2000/2000 XPi assay detects thyroid stimulating antibodies, the specific cause of GD pathology, with 98.5% specificity.

The respondents were asked what message(s) were communicated by the material they viewed. (*Id.*) They were then asked if the material communicated "anything about IMMULITE assay's ability to detect TSI only" and if so, what. (*Id.*) They were then asked whether they understood that IMMULITE does or does not detect TSI only, or whether IMMULITE is a TRAb assay. (*Id.*) They were also asked open-ended questions about what the material communicates about whether IMMULITE detects TSI only and about IMMULITE's ability to detect TSI only. (*Id.*) They were then asked whether they were likely to order both a TSI only and TRAb assay, and why. (*Id.*)

Ezell concluded that approximately 67.42% of the relevant universe is likely to be misled or deceived by Defendants' false message. (*Id.* ¶ 8.) He defined a "false message" as one that states IMMULITE is a TSI assay, detects TSI only, or is not a TRAb assay. (*Id.* ¶ 19.) He concluded that Defendants' webpage is likely to mislead a substantial portion of the relevant universe "into believing (1) that Defendants' IMMULITE Assay is a 'TSI assay,' (2) that Defendants' IMMULITE

Assay detects only thyroid stimulating antibodies, and/or (3) that Defendants' IMMULITE Assay is not a TRAb assay." (Ezell Report at ¶ 9.)

Defendants move to strike Ezell's report and opinions.

## II. Legal Standard

The trial judge must act as the gatekeeper for expert testimony by carefully applying Federal Rule of Evidence 702 to ensure specialized and technical evidence is "not only relevant, but reliable." *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 589 & n.7 (1993); *accord Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (holding *Daubert* imposed a special "gatekeeping obligation" on trial judges). In exercising its gatekeeping function, a court "may, in an appropriate case, exclude a flawed survey report from being received into evidence." 6 McCarthy on Trademarks and Unfair Competition § 32.1158 (5th ed. 2019).

Consumer surveys may be used as evidence to show that the alleged misrepresentations have misled, confused, or deceived the consuming public. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1140 (9th Cir. 1997). The Ninth Circuit has "held that survey evidence should be admitted as long as it is conducted according to accepted principles and is relevant." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010) (alteration omitted). "The admissibility threshold for survey evidence in the Ninth Circuit is notably low." *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1025 (C.D. Cal. 2018).[2]

## III. Analysis

Defendants seek to exclude Ezell's survey, opinion, and report for a variety of reasons, each of which the Court discusses in turn.

---

[2] Both parties spend a good portion of their briefs analyzing cases decided by courts in other circuits. These cases are irrelevant, as different circuits have different levels of admissibility for consumer surveys. This Court is bound by the Ninth Circuit's permissive rulings.

– 4 –

### A. The Population Surveyed

Defendants first argue that Ezell surveyed an irrelevant population. The universe for Ezell's survey was "comprised of physicians that specialize in endocrinology and who, as part of their practice, order assay tests to assist in patient diagnosis." (Ezell Report at ¶ 7.) Defendants assert Plaintiff has consistently alleged that laboratories, not physicians, were misled by Defendants' advertising. (Mot. at 11.) Defendants believe Ezell's survey is irrelevant because physicians are the end-users of the assays, but do not actually purchase the assays, and thus any survey evidence of their impressions of Defendants' website is immaterial. (*Id.* at 12.)

One of the criteria a court considers in assessing the validity and reliability of a survey is whether "the proper universe was examined and the representative sample was drawn form that universe." *Medisim Ltd. v. BestMed LLC*, 861 F. Supp. 2d 158, 166 (S.D.N.Y. 2012). The party must show that those surveyed "are the relevant audience for its false advertising claims." *Kwan Software Eng'g, Inc. v. Foray Techs., Inc.*, No. C 12-3762 SI, 2014 WL 572290, at *5 (N.D. Cal. Feb. 11, 2014). In *Kwan*, the court rejected a survey because the party did not show "that any of the members of the survey are the people who would see the alleged misrepresentations" or are those "whose decision to purchase the product could be influenced." *Id.*

To support their argument that physicians are not relevant in this case, Defendants first point to Plaintiff's operative complaint. The complaint alleges that laboratories, who are Plaintiff's "direct customers[,]" "have an incentive to purchase" Defendants' cheaper product "and rely on the face of Siemens' misleading marketing." (First Amended Complaint, ECF No. 12, ¶ 21.) In contrast, clinicians, who are not Plaintiff's direct customers, "rely on the results of the tests to treat patients." (*Id.*) Although not altogether clear, it appears Plaintiff is implying that physicians base their purchasing decisions on a product's merit, but laboratories make decisions based on advertising. Defendants argue Plaintiff cannot now claim that physicians view advertisements. The Court disagrees and finds Plaintiff did not

– 5 –

concretely define the relevant market of consumers in its complaint. Plaintiff is not precluded from arguing the breadth of the relevant market at this time.

Defendants next point to the deposition of Plaintiff's expert Jennifer Sipos, who testified that at her institution, "when a TSI is ordered [by a clinician], there is no indication on the report of which assay (Roche, Thyretain, Immulite, etc.) was utilized" and the physician only receives the results from the test, i.e. the measurement of TSI. (Exhibit 8 to Declaration of Erik Haas, ECF No. 137, at 9.) Defendants argue this shows that the physicians do not distinguish between the assays, and therefore their opinions of Defendants' description of IMMULITE is not relevant.

Plaintiff disagrees and argues that physicians do order specific assay tests. (Opp'n at 5–6.) Plaintiff points to the deposition of Defendants' employee, Carole Dauscher. Ms. Dauscher testified that Defendants previously hired a marketing agency to conduct a marketing campaign aimed at clinicians. (Exhibit 1 to Declaration of T. Kevin Roosevelt, ECF No. 177, at 106:1–9.) According to Ms. Dauscher, the agency marketed to physicians as opposed to laboratories because "it's really important to educate the physicians . . . [b]ecause if they don't order the test, then there's . . . no point of having it in the laboratory." (*Id.* at 106:15–25.) Physicians were not the ones buying the assays, but they became informed of the tests through marketing, and they could go to Defendants' website or talk to the laboratories for more information. (*Id.* at 107:1–6; 108:18–23.) Further, Dr. Silberman, a director of Sonic/CPL laboratory testified that the clinicians are "substantially" in charge of deciding which type of assay to run. (Exhibit 3 to Declaration of T. Kevin Roosevelt, ECF No 177, at 117:14–22.) Clinicians consult with the laboratory, and some clinicians "have the capability of [sic] and ask for [the assay] by name . . . and in some circumstances they will specify." (*Id.*)

The evidence shows the physicians are not simply end-users of the assay with no opinion as to what product they are using or no say in how they receive that

product. *See Kwan Software Eng'g*, 2014 WL 572290, at *4 (excluding survey evidence because it had not been proven that those surveyed were "potential purchasers of the product—those whose decision to purchase the product could be influenced"). This is not a situation where all physicians blindly use whatever assay the laboratory happens to carry, with no input into what assay they use on patients. Given the conflicting testimony, it is possible the physicians' opinions regarding the products are relevant and their opinions could be influenced by marketing or website information.

The Court finds that a survey of physicians could be relevant in this case. Of course, the findings would not be relevant to the laboratories' reaction to Defendants' marketing or website, but only to the physicians' reaction. *See Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 394 n.5 (7th Cir. 1992) (finding when the surveys targeted farmers rather than the "actual purchasers" of the product, the selection of farmers as the relevant universe "limits the surveys' probative value"). The Court declines to strike the Ezell report for this reason.

### B. The Questions

Defendants next argue that the survey questions are ambiguous. (Mot. at 13.) Defendants find it problematic that Ezell used the terms "TSI only" and "TRAb assay" in the survey without defining the terms. (*Id.*) Plaintiff appears to admit the respondents received no definition of "TSI only." (Opp'n at 13.)[3] And Ezell admits he did not ask the respondents what they understood "TSI only" to mean, ("Ezell Depo.," Exhibit 13 to Declaration of Erik Haas, ECF No. 135-3, at 212:24–25) nor did he ask them how they defined a TRAb assay, (*id.* at 240:17–19). Of course, whether the assay is a TSI only assay or a TRAb assay is a critical question in this case, as it forms the basis for much of Plaintiff's claims.

Plaintiff argues this is an issue for the jury. As the Ninth Circuit has explained,

---

[3] Plaintiff points out that the website the respondents were able to view during the survey defines "TSI" and "TRAb."

– 7 –

when evaluating a survey, the court first asks: is the survey admissible, meaning "is there a proper foundation for admissibility, and is it relevant and conducted according to accepted principles?" *Click Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001). Once the survey is admitted, the jury decides "follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like." *Id.* "Technical unreliability" issues go to the weight of the survey, not its admissibility, and are issues for the jury. *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292 (9th Cir. 1992).

The issue of ambiguity of survey questions is one that has been looked at by various courts. Defendants point to *Wallace v Countrywide Home Loans, Inc.*, No. 08-1463-JST (MLGx), 2012 WL 11896333, at *5 (C.D. Cal. Aug. 31, 2012), where the court analyzed a survey that asked about the respondents' "typical" work week. The court determined the understanding of the word "typical" was not uniform and it excluded the survey for this reason and various other reasons. In *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010 (C.D. Cal. 2018), the defendants took issue with two surveys. They objected that one of the surveys asked suggestive or vague questions, and also objected that the expert did not measure how respondents had interpreted the statements in another survey. *Id.* at 1024. The court found that these objections go to the weight rather than the admissibility of the surveys and declined to strike the surveys. *Id.*; *see also United States v. 400 Acres of Land, more or less situate in Lincoln Cty. Nev.*, No. 2:15-cv-1743-MND-NJK, 2017 WL 4797517, at *5 (D. Nev. Oct. 24, 2017) (holding the objection that the survey questions are ambiguous does not affect the survey's admissibility); *Brighton Collectibles, Inc. v. RX Texas Leather Mfg.*, 923 F. Supp. 2d 1245, 1258 (S.D. Cal. 2013) (finding the survey questions to be "sloppy" and problematic, but holding this issue can be explored through cross examination).

The bulk of cases hold that an objection regarding the phrasing of survey questions and the use of potentially ambiguous terms is one that falls into the

– 8 –

category of "survey design." The Ninth Circuit has specifically found that this issue goes to the weight of the survey, not the admissibility. The Court declines to strike Ezell's survey on this basis.

### C. Leading and Biased Questions

Defendants next argue that the survey questions led and biased the respondents. The Ninth Circuit has held that an objection that a survey asked leading or biased questions goes to the weight, not the admissibility of the survey. *Southland Sod Farms*, 108 F.3d at 1143; *see also Medlock v. Taco Bell Corp.*, No. 1:07-cv-1314-SAB, 2015 WL 8479320, at *5 (E.D. Cal. Dec. 9, 2015) ("The Court finds that Defendants' criticisms of [the expert's] wording of the questions goes to the weight of the evidence, and not the admissibility of the survey."). Surveys can be admitted even if they contain "highly suggestive" questions, as long as the survey is "conducted according to accepted principles and [is] relevant." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1037 (9th Cir. 2010) (citation omitted). For example, a survey that exposes the respondent to the desired response before asking the critical connection may be "given little weight." McCarthy, at § 32.172. But this is an issue for the jury. The Court declines to strike the survey on this basis.

### D. Survey Format

Defendants argue that the website excerpt shown to the control group was biased because it used "gratuitous language." (Mot. at 21.) Defendants cite *Bobrick Washroom Equipment, Inc. v. American Specialties, Inc.*, No. CV 10-6938 SVW PLA, 2012 WL 3217858, at *18 (C.D. Cal. Aug. 8, 2012), *aff'd,* 565 F. App'x 660 (9th Cir. 2014), where the court excluded a survey because the ads shown to the control group were "substantially different" than the ads shown to the test group. For this reason, the "survey format effectively predetermined its result." *Id.* But *Bobrick* is distinguishable. Here, the differences between the website excerpt shown to the control group and that shown the test group are not so great that they predetermined

the result of the survey. This objection therefore goes to the "design" of the survey and is an issue for the jury. The survey should not be excluded for this reason.[4]

### E. Ezell's Conclusions

Defendants finally take issue with Ezell's conclusions. After coding all responses, Ezell concluded that 81.87% of the test group respondents received a false message, and 14.45% of the control group respondents received a false message. First, Defendants argue Ezell does not disclose how he coded the respondents' answers. (Mot. at 22.) This is incorrect. Ezell stated: if the respondent "gave a false message in terms of an open-ended response or a close-ended response, they would be in category 1. And if there was no false message at all, they would be in category 2. And sometimes the respondent might say one thing in terms of their open-ended response and somewhat contradict themselves in terms of their close-ended response." If so, they were put into category 3, which is "indeterminable." ("Ezell Depo.," Exhibit 13 to Declaration of T. Kevin Roosevelt, ECF No. 175-1, at 161:2–11.) Thus, Ezell explained how he coded the responses, and this is not a reason to exclude the survey.

Defendants next argue that Ezell improperly coded the responses of the control

---

[4] Defendants also bring up another objection to the control group excerpt. Defendants argue the excerpt "was written ***entirely by counsel to Quidel***, without [Ezell's] input." (Mot. at 20 (emphasis in original).) Citing *Elliott v. Google, Inc.*, 860 F.3d 1151, 1160 (9th Cir. 2017), Defendants argue this alone is reason to exclude the entire survey.
  The Court finds various flaws in this argument and encourages Defendants not to overexaggerate facts or misinterpret cases in a misleading way. First, Ezell testified that while Plaintiff's counsel drafted the website excerpt for the control group, Ezell reviewed it and agreed it was appropriate. (*See* Ezell Depo. at 113:10–17.) Therefore, it is inaccurate for Defendants to state that Ezell had no input on the issue. And second, *Elliott* does not hold that a survey should be excluded when it was designed by counsel, as Defendants state. (Mot. at 20 n.9.) Instead, the surveys in *Elliott* were entirely designed and conducted by counsel "who is not qualified to design or interpret surveys." 860 F.3d at 1160. Therefore, the surveys were stricken. But there is no question that Ezell conducted the survey here, and the fact that one portion of the survey was drafted by Plaintiff's counsel does not mean the entire survey should be excluded under Ninth Circuit precedent. *See* McCarthy, at § 32:166 ("Attorney cooperation with the survey professional in designing the survey is essential to produce relevant and usable data.").

group. Defendants argue if Ezell had properly coded the responses, more respondents in the control group would have been confused by the survey. For example, Ezell classified 23 physicians in the control group as "indeterminable" but Defendants argue 17 of those 23 respondents should have been classified as having received a "false message." (Mot. at 22.) Defendants argue if Ezell had properly coded these 17 respondents, almost 25% of the control group would have been misled, and the entire survey would therefore have to be excluded. (*Id.* at 22–23.)

Again, a "critique of the [survey's] conclusion" goes to the weight of the survey, not its admissibility. *See Clicks Billiards*, 251 F.3d at 1263; *see also Microsoft Corp. v. Motorola Inc.*, 904 F. Supp. 2d 1109, 1120 (W.D. Wash. 2012) (concluding that criticisms of an expert's conjoint analysis concerned "issues of methodology, survey design, reliability, and critique of conclusions, and therefore [went] to the weight of the survey rather than admissibility"); *Brighton Collectibles*, 923 F. Supp. 2d at 1258 (holding if the objection is that the survey had a "sweeping conclusion," this is a weakness that can be explored through cross examination or a contradictory expert opinion).

## IV. CONCLUSION

For the foregoing reasons, none of Defendants' objections lead the Court to conclude that Mr. Ezell's survey or testimony should be excluded. The Court **DENIES** Defendants' Motion. (ECF No. 135.)

**IT IS SO ORDERED.**

**DATED: October 21, 2019**

Hon. Cynthia Bashant
United States District Judge