1
2
3
4
5
6
7
8           **UNITED STATES DISTRICT COURT**
9           **SOUTHERN DISTRICT OF CALIFORNIA**
10
11   QUIDEL CORPORATION,                    Case No. 16-cv-3059-BAS-AGS
                              Plaintiff,
12                                          **ORDER:**
                                              **(1) GRANTING IN PART AND**
13           v.                                    **DENYING IN PART**
                                                   **DEFENDANTS' MOTION**
14   SIEMENS MEDICAL SOLUTIONS                     **FOR SUMMARY**
     USA, INC., *et al.*,                          **JUDGMENT; AND**
15
                              Defendants.      **(2) DENYING PLAINTIFF'S**
16                                                 **MOTION FOR SUMMARY**
                                                   **JUDGMENT**
17
                                            **[ECF Nos. 138, 145]**
18
19
20           After three years of litigation, this case has reached the summary judgment

21   stage, and both parties seek summary judgment in their favor.  Defendants Siemens

22   Medical Solutions USA, Inc. and Siemens Healthcare Diagnostics Inc. move for

23   summary judgment on all claims, ("Def. Mot.," ECF No. 138), and Plaintiff Quidel

24   Corporation moves for summary judgment on the element of falsity.  ("Pl. Mot.,"

25   ECF No. 145.)  Both motions are opposed, ("Pl. Opp'n," ECF No. 169; "Def. Opp'n,"

26   ECF No. 166).[1]  The Court finds the Motions suitable for determination on the papers

27   _____

28   [1] After four years, the Court assumed the parties would be familiar with the page length
     requirements for briefing.  Yet Plaintiff's opposition exceeds the page length requirement by one

and without oral argument.  Civ. L. R. 7.1(d)(1).  For the reasons stated below, the Court **GRANTS IN PART** Defendants' Motion and **DENIES** Plaintiff's Motion.

## **BACKGROUND**

This case revolves around two competing assays (blood tests) used for measuring thyroid stimulating immunoglobins, which can aid in the detection of Graves' disease.  Graves' disease is an immune system disorder that leads to the overproduction of thyroid hormones.  Generally, there are two types of assays available to aid in the diagnosis of Graves' disease: (1) TSH receptor antibody (TRAb) assays and (2) TSI only assays.  TRAb assays detect both stimulating and blocking thyroid immunoglobins (also known as "TSI" and "TBI"), while TSI only assays detect only stimulating immunoglobins.

Plaintiff entered the market first, and in 2008 submitted its product, Thyretain TSI Reporter BioAssay ("Thyretain"), for FDA approval.  (*See* Exhibit 4 to Declaration of Erik Haas, ECF No. 140-1.)  The FDA cleared Thyretain in 2009.  Plaintiff advertises Thyretain as a "TSI only" assay.  (Exhibit 1 to Declaration of Erik Haas, ECF No. 140, at 210:6–10.)  According to Plaintiff, "Thyretain is a cell-based assay that measures the functional activity of TSH receptor antibodies and returns a positive result when TSI bind to the stimulating epitope of the TSH receptor."  (Pl. Opp'n at 2 (emphasis omitted).)  If TSI is detected, this is a positive result, and a light is emitted.  This is known as a qualitative result.

Defendants entered the market in 2012 with their product IMMULITE, using Thyretain as the predicate device for their 510(k) application to the FDA.[2]  (Exhibit

_____

paragraph.  Although this is not a substantial violation of the rules, it is a violation nonetheless and the Court does not appreciate Plaintiff's attempt to gain an advantage by presenting extra material in briefing.  The Court **STRIKES** page 26 of Plaintiff's opposition brief, (ECF No. 169).

[2] There are two main processes though which the FDA reviews medical devices and either approves or clears them for use: the Premarket Approval (PMA) Process and the 510(k) PMN (or Premarket Clearance) Process.  Under the 510(k) process, "if a device is deemed 'substantially equivalent' to a pre-existing device with prior clearance, 'it can be marketed without further regulatory analysis.'" *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 925 (9th Cir. 2010) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996)).  "In other words, that device receives "510(k) clearance" and can be put on the

5 to Declaration of T. Kevin Roosevelt, ECF No. 171, at 4.)  In applying to the FDA, Defendants acknowledged that Plaintiff's product was "the only FDA-cleared TSI assay on the market at this time" while other approved TRAb assays "detect both stimulating and blocking thyroid antibodies" and had inferior "specificity for Graves' disease." (*Id.*)  While Thyretain is a bioassay, IMMULITE is an immunoassay. (Def. Mot. 4; Pl. Mot. 4.)  According to Defendants, IMMULITE "uses a novel 'bridge' technology which links the receptors that bind with TSI to signal receptors.  Those signal receptors in turn emit light that may be measured in a 'semi-quantitative' manner, depicting the concentration of TSI in a sample, rather than just a binary 'qualitative' result." (Def. Mot. at 4.)

The crux of this matter lies in Defendants' advertising of IMMULITE.  In Plaintiff's opinion, IMMULITE, as an immunoassay, "measures the binding of antibodies to the TSH receptor without discrimination," meaning it does not distinguish between stimulating or blocking antibodies. (Pl. Opp'n at 3.)  Plaintiff argues IMMULITE "has the potential to and actually does detect blocking antibodies." (*Id.* at 3.)  However, Defendants advertised IMMULITE as a "TSI only" assay (i.e. one that does distinguish between stimulating and blocking antibodies).

Defendants' proclaiming of IMMULITE to be an assay that detects TSI only is undisputed.  In its de novo request to the FDA, Defendants classified IMMULITE as an assay that "measures stimulating immunoglobins only." (Exhibit U to Declaration of T. Kevin Roosevelt, ECF No. 147; *see also* Exhibit 29 to Declaration of T. Kevin Roosevelt, ECF No. 169-1 (Defendants' 510(k) Premarket Notification: "TRAb assays measure both [TBI and TSI] quantitatively without distinguishing between the two, whereas the IMMULITE 2000 TSI measures stimulating immunoglobins only.")).  After the FDA cleared the product, Defendants sent out information to potential customers on the product, saying IMMULITE "utilizes

market." *Id.*

recombinant human TSH receptors (hTSHR) for the specific detection of thyroid stimulating autoantibodies." (Exhibit 23 to Declaration of T. Kevin Roosevelt, ECF No. 171.) Defendants distinguished IMMULITE from "TSHR autoantibody (TRAb) assays [which] do not distinguish between TSI and TBI." (*Id.*) Similar statements appeared on Defendants' website. (*See, e.g.*, Exhibit T to Declaration of T. Kevin Roosevelt, ECF No. 147-3, at 51:3–10 (testimony regarding Defendants' website in May 2016).)

Defendants advertised IMMULITE as "TSI only" for a few months. (Def. Mot. at 7–8.) When Plaintiff protested this advertising, Defendants dropped the "TSI only" claim. (*Id.*) Plaintiff argues that advertising IMMULITE in this way was false and has caused Plaintiff damages. Specifically, before IMMULITE entered the market, Quidel had four U.S. customers, which were four laboratories, two of which were LabCorp and Sonic. LabCorp and Sonic since have switched to using IMMULITE. (*Id.* at 12.) Whether these two customers (and others) considered or were deceived by Defendants' advertising in making the decision to switch is an issue in this case.

## LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by

demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

If the moving party fails to discharge this initial burden, summary judgment must be denied, and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970). If the moving party meets this initial burden, however, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." (citing *Anderson*, 477 U.S. at 242, 252)). Rather, the nonmoving party must "go beyond the pleadings" and by "the depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). Such admissions may be presented in testimony of a party's own witnesses through declarations. *See* Fed. R. Civ. Pro. 56(c)(4).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants move for summary judgment on Plaintiff's Lanham Act false advertising claims (section 43(a)), unfair competition claims (Cal. Bus. & Prof. Code

§ 17200), and False Advertising Law claims (Cal. Bus. & Prof. Code § 17500).[3] Defendants argue they should be granted judgment on various grounds: (1) Defendants' advertising is not false or deceptive; (2) the message in the advertising is immaterial and did not cause injury to Plaintiff; and (3) Plaintiff's unclean hands bar its claims.

The statements at issue are

(1) that the IMMULITE Assay detects TSI only, (2) that the IMMULITE Assay is a "TSI assay" that detects TSI only, and (3) that TRAb assays are distinguishable from the IMMULITE Assay, while failing to disclose that the IMMULITE Assay is substantially similar to TRAb assays that fail to differentiate between stimulating and blocking antibodies.

(First Amended Complaint, ECF No. 12, ¶ 24.) These can be summed up to one overarching statement: IMMULITE detects TSI only.

## A. <u>Legal Standard</u>

The same legal standard applies to all three of Plaintiff's causes of action. The elements of a Lanham Act § 43(a) false advertising claim are:

(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products

---

[3] Plaintiff's fourth cause of action is for intentional interference. In their Motion, Defendants do not address this claim except to argue "if [the Lanham Act and the UCL/FAL] claims fail, so does the interference claim." (Def. Mot. at 14.) Because the Court herein finds that Defendants are not entitled to summary judgment on the entirety of the first three claims, it similarly **DENIES** Defendants' motion for summary judgment on the intentional interference claim.

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). Claims pursuant to California Business and Professions Code section 17200 and section 17500 are "substantially congruent" to claims made under the Lanham Act. *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994) (citing *Academy of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir. 1991)); *JHP Pharm., Ltd. Liab. Co. v. Hospira, Inc.*, 52 F. Supp. 3d 992, 997 n.4 (C.D. Cal. 2014).

### B.  Literal Falsity

To meet the first element, statements can be "literally false, either on [their] . . . face or by necessary implication," or "literally true but likely to mislead or confuse consumers." *Southland Sod Farms*, 108 F.3d at 1139.  When evaluating whether a claim is literally false, it "must always be analyzed in its full context." *Id.*

### 1.  Ambiguity

Defendants argue the term "TSI only" is not literally false because it is "ambiguous and undefined."  (Def. Mot. at 15); *see Nutrition Distribution LLC v. PEP Research, LLC*, No. 16CV2328-WQH-BLM, 2019 WL 652391, at *4 (S.D. Cal. Feb. 15, 2019) ("[O]nly an unambiguous message can be literally false."); *In re Century 21-RE/MAX Real Estate Ad. Claims Litig.*, 882 F. Supp. 915, 923 (C.D. Cal. 1994) (same).  "An advertisement is not literally false if consumers need extrinsic information, assumptions, or inferences to reach the false conclusion." *Nutrition Distribution LLC*, 2019 WL 652391, at *4.

In support of this argument, Defendants point to the deposition of Plaintiff's expert Dr. Gupta, wherein she testified, "I'm not sure what you mean by TSI-only and not TSI-only."  (Exhibit 17 to Declaration of Erik Haas, ECF No. 140-1, at 302:24–25.)  But, an outside expert's confusion on the definition of a term being used at her deposition and out of context is not definitive.  What is relevant is whether the consumers would find the use of the term ambiguous.  As noted above, Plaintiff is contesting the truth of various statements, only one of which involves the specific,

contested phrase "TSI only." Defendants do not point to an example of where they used the phrase "TSI only" to consumers, let alone any evidence of consumers finding the phrase to be confusing. This is especially true considering the consumers are likely educated entities considering the phrase in context. Therefore, the Court finds Defendants have not demonstrated that the phrase "TSI only" is ambiguous.

## 2. Whether the Statements Are False or Misleading

Defendants combat the assertion that their statements that IMMULITE detects TSI only and does not detect TBI are false; Defendants argue that IMMULITE indeed detects TSI and does not detect TBI. (Def. Mot. at 16.) Further, Defendants argue the claims were always "made in conjunction with [the] statements regarding the intended use (diagnosing Graves' Disease) and [IMMULITE's] performance data (98% specificity)." (*Id.*) Defendants argue the claim is therefore literally true because, when read in context, the claims were that "when used for its intended purpose, IMMULITE could detect TSI only and help diagnose Graves' Disease accurately 98.5% of the time." (*Id.*) Defendants argue this message is true because IMMULITE "achieves excellent clinical specificity and clinical sensitivity." (*Id.*)

As to the first, broader argument that the advertising is not false because IMMULITE can detect TSI only, Plaintiff disagrees, arguing it is simply false to claim that IMMULITE can detect "TSI only" as the assay is "incapable of detecting stimulating antibodies only." Plaintiff argues IMMULITE "can return false positives due to detection of TBI." (Pl. Opp'n at 13.)[4]

In the Ninth Circuit, literal falsity is a question of fact, and summary judgment should not be granted where a reasonable jury could conclude a statement is not false.

---

[4] In their Motion, Defendants strangely focus on Plaintiff's product and its ability to detect TSI only. (Def. Mot. at 16–17.) While this argument might go to an unclean hands defense, it is immaterial here. Whether or not Plaintiff's advertising is false is not relevant when evaluating whether Defendants' advertising is false. Indeed, both products were cleared by the FDA as a "TSI assay" (*id.* at 17) but Plaintiff argues this is because Defendants' FDA submission was false and misleading, (Pl. Opp'n at 10).

*See Southland Sod Farms*, 108 F.3d at 1144–45 (overturning grant of summary judgment where a reasonable jury could determine advertisements were false based on conflicting testimony). Here, the Court has been presented with conflicting expert testimony as to whether IMMULITE actually detects TSI only. Plaintiff's expert Dr. Gupta opines that IMMULITE is unable to distinguish between TSI (also known as TSAb) and TBI (also known as TBAb). (Exhibit 9 to Declaration of T. Kevin Roosevelt, ECF No. 171, at 18.) Her opinion "refute[s] the claim of the Immulite bridge assay as detecting only TSIs," and she believes IMMULITE "is not specific for TSI as claimed." (*Id.* at 19, 23.)

Defendants retained Dr. Rapoport to opine whether Defendants' statements were false, deceptive, and/or material to the parties' customers. (Exhibit 3 to Declaration of Erik Haas, ECF No. 138-2.) In stark contrast to Dr. Gupta, Dr. Rapoport concludes, "the statements made by Siemens at issue in this litigation are not false, deceptive, or material to clinical laboratories' purchasing decisions." (*Id.* at 2.) This is because IMMULITE "does not detect so-called blocking antibodies in a clinically meaningful manner when used as indicated to aid in the diagnosis of hyperthyroid Graves' disease" and IMMULITE is properly referred to as a TSI assay. (*Id.* at 2–3.)

As the Ninth Circuit has held, "[i]f the plaintiff's evidence suggests that the products do not work as advertised and the defendant's evidence suggests the opposite, there is a genuine dispute of material fact for the fact-finder to decide." *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 993 (9th Cir. 2018); *see also, e.g.*, *Hansen Beverage Co. v. Vital Pharm., Inc.*, No. 08-CV-1545, 2010 WL 1734960, at *8 (S.D. Cal. Apr. 27, 2010) (holding that both parties had "presented evidence from which a reasonable juror could find by a preponderance of the evidence that each is entitled to a verdict in its favor" and this demonstrated a genuine issue of material fact as to whether the claim is literally false). Further, "[w]here the statements were made to sophisticated consumers with unique background knowledge and

experience," the court should consider that as part of the context in which the statements were made. *Kwan Software Eng'g, Inc. v. Foray Techs., LLC*, No. C 12-03762 SI, 2013 WL 244999, at *3 (N.D. Cal. Jan. 22, 2013), *aff'd*, 551 F. App'x 298 (9th Cir. 2013). Here, both sides offer competing expert testimony that involves technical expertise and familiarity with the products. Both sides have evidence as to whether the statements were false, especially considering the statements were made to those knowledgeable in the field. Therefore, a material fact exists as to whether the advertisements are "literally false, either on [their] face or by necessary implication, or [whether the ads are] literally true but likely to mislead or confuse consumers." *Southland Sod Farms*, 108 F.3d at 1139; *see also In re Apple Comp. Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989) ("As a general rule, summary judgment is inappropriate where an expert's testimony supports the nonmoving party's case.").

This finding is not changed by Defendants' second argument that when the "TSI only" statement is placed "in context" with IMMULITE's specificity information, the statement is true. There is still a material question of fact as to whether the statement is true, no matter when and how it is said.

However, such a finding does not end the entire inquiry. Defendants next argue that even if the statements are false, customers were not deceived. (Def. Mot. at 17.)

## C.  <u>Deception and Materiality</u>

When a plaintiff has shown falsity, deception may be presumed if the defendant intended to deceive customers. *See William H. Morris Co. v. Grp. W. Inc.*, 66 F.3d 255, 258 (9th Cir. 1995). However, here, the Court finds Plaintiff has not shown falsity and there is a material question of fact as to the issue. Therefore, the issue is whether the advertisements actually deceived or had the tendency to deceive a substantial segment of their audience. *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1180 (9th Cir. 2003). The deception must also be "material, in that it is likely to influence

the purchasing decision." *Southland Sod Farms*, 108 F.3d at 1139.

The parties dispute exactly who is in the relevant purchasing market that could be deceived by the advertising, but they do not dispute that laboratories are at least a part of the market. Therefore, the Court starts by analyzing any evidence of deception of laboratories.

### 1.    Laboratories

It is undisputed that two laboratories (Sonic/CPL and LabCorp) switched from using Thyretain to using IMMULITE. But Defendants argue the evidence shows that the laboratories switched not because of the advertising, but simply because IMMULITE was proven to be better. Indeed, as mentioned above, deception must be material. Further, "[i]n a suit for damages under section 43(a), . . . actual evidence of some injury *resulting from the deception* is an essential element of the plaintiff's case." *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989). If the advertisements did not influence the customers' decision, then there is no false advertising claim. *See BMMG, Inc. v. Am. Telecast Corp.*, 42 F.3d 1398 (9th Cir. 1994) (holding the plaintiff must "link the loss of sales to the alleged deception").

When the FDA cleared IMMULITE, it approved a package insert for the product. Defendants sent out this package insert, the Instructions for Use ("IFU"), and relevant documents to potential customers. The IFUs were given to customers and posted on a document library so customers can access them at any time. (Exhibit T to Declaration of T. Kevin Roosevelt, ECF No. 147-3, at 208:6–12.) It is Plaintiff's position that the IFU itself, along with Defendants' advertising of the assay through press releases and websites, contain Defendants' false statements. The IFU does refer to IMMULITE as a TSI only assay, but Defendants argue that even if it can be proven that this is false, advertising the product in this way did not deceive customers.

Defendants point to the depositions of two laboratory representatives. First, Mark Silberman, a representative for Sonic/CPL, testified CPL began looking at the

IMMULITE assay once it was cleared by the FDA. (Exhibit 24 to Declaration of Erik Haas, ECF No. 140-2, at 225:1–3.) "The possibility of adopting the IMMULITE TSI assay was a decision that started within CPL" because CPL wanted an assay that was "in general, an improvement" over Thyretain. (*Id.* at 226:11–19.) The decision about whether or not to adopt the assay "involved months of discussion and deliberation at CPL." (*Id.* at 234:18–21.)

Once the assay was cleared, CPL began evaluating the assay, which "involved a review of the relevant literature, such as the IFU and other information from the manufacturer." (*Id.* at 225:4–6.) CPL also conducted "a validation study" after FDA approval. (*Id.* at 225:4–6.) CPL does validation studies for all potential new assays, and the study for IMMULITE was signed off by multiple people within CPL. (*Id.* at 225:11–21.) The approval process is a "layered" one, requiring the approval of "a scientific doctor, the technical director, a pathologist, and a laboratory director." (*Id.* at 226:2–5.) The validation process proved to CPL that IMMULITE "performed comparably [to Thyretain] and conformed to [CPL's] validation protocol and acceptance criteria." (*Id.* at 227:10–11.) Ultimately, CPL concluded that IMMULITE "was a superior assay for use in the laboratory." (*Id.* at 227:21–228:1.)[5] IMMULITE had higher sensitivity, specificity, and stability "vis-à-vis the proficiency testing, the staff productivity, [and] the turnaround time." (*Id.* at 134:21–24.)

Mr. Silberman further testified he did not recall seeing any press releases about IMMULITE, and while the press releases may have made it to the laboratory, he is "usually reading IFUs and manufacturer notifications." (*Id.* at 232:16–233:6.) He does not believe that any of Defendants' press releases had any impact on the lab's decision to assess and validate IMMULITE. (*Id.* at 233:12–14.) Prior to the adoption of IMMULITE, Silberman did not review statements on Defendants' website about

---

[5] Specifically, Silberman testified to the difficulties that CPL had experienced with the Thyertain assay. (*Id.* at 24:11–25:24; 26:23–25.)

the assay, and does not remember going on Defendants' website.  (*Id.* at 233:15–25.)
CPL "is not guided by manufactures' sales and marketing collaterals on a website."
(*Id.* at 223:1–3.)

LabCorp's representative Andre Valcour was also deposed, and he testified
that it was "not true" that LabCorp made its decision to switch products based on
marketing material.  (Exhibit 30 to Declaration of Erik Haas, ECF No. 140-2, at
249:2–7.)  He testified to LabCorp's protocol when it is provided information about
a test like IMMULITE.  After receiving information on IMMULITE, he applied his
usual "analytic evaluation" for the assay.  (*Id.* at 57:16–17.)  In this evaluation, he
reviews all material about the product, which of course includes IFUs and other
information from vendors.  He and several others do "very thorough reviews of the
literature."  (*Id.* at 56:23–57:1.)  He testified that he understands that when vendors
give him papers regarding the product, "they're likely to provide [him] only papers
that are positive for their test."  (*Id*. at 55:12–15.)  He reviews the vendor's data to
"make sure that there's no evidence of either intentional or unintentional biases in
the study."  (*Id.* at 55:16–21.)  He considers it his "duty . . to try to understand every
aspect of the test that [he's] offering and all the potential weaknesses and strengths."
(*Id.* at 56:13–19.)  Specifically, here, he testified he reviewed a paper written by
Siemens entitled Clinical Evaluation of IMMULITE 2000 TSI assay "which is
essentially a summary of the FDA submission."  He also reviewed the "FDA
accepted" manufacturer's package insert for IMMULITE.  (*Id.* at 53:1–10.)  Because
the FDA is "incredibly rigorous in their vetting of the data[,]" he typically weighs
the FDA submission highest of all the documents.  (*Id.* at 55:25–56:4.)

In sum, he finds this lawsuit to be "frivolous" because it assumes that LabCorp
doesn't "do a very, very rigorous job of vetting our assays and that we can be swayed
by marketing."  (*Id.* at 91:14–21.)  He finds Plaintiff's suggestion in this suit
"personally offensive" because LabCorp does a "rigorous job and . . . [doesn't] get
swayed by marketing" but instead "make[s] decisions based on the facts."  (*Id.*)

Before that week, Mr. Valcour had not heard of the IMMULITE assay being referred to as a "TSI only" assay. (*Id.* at 96:20–22.)

In analyzing Mr. Silberman's and Mr. Valcour's testimony, Defendants focus on the laboratories' access to the press releases and Defendants' website. But whether or not laboratory representatives saw press releases or websites is not necessarily dispositive because the issue is whether they saw and were likely influenced by the false advertising. The allegedly false statements at issue existed in more places than press releases. It is not disputed that the customers were in possession of the IFUs and other documents sent by Defendants, which Plaintiff claims contain false statements. Mr. Silberman testified, "the official client bulletin, the IFU regarding overall sensitivity and specificity of our analytic methods . . . are sort of the dominant documents on which we predicate a lot of our decision to move forward." (Exhibit EE to Declaration of T. Kevin Roosevelt, ECF No. 147-5, at 125:19–24.) In context, this appears to mean that he begins by reading documents provided by the manufacturers, and then proceeds into the validation study and other evaluation methods discussed above.

However, simply because the laboratories reviewed the allegedly false statements in the package inserts and document library does not mean the statements had any material impact on their decision-making process. In *Appliance Recycling Centers of America, Inc. v. JACO Environmental, Inc.*, 378 F. App'x 652, 655 (9th Cir. 2010), the Ninth Circuit held the allegedly false statement of "patent pending" was not material to three utilities' decision-making process when "three utility officials testified that the 'patent pending' status . . . was not relevant to their utility's decision." Here, Defendants have submitted similar information as to that in *Appliance Recycling*; the lab representatives' testimonies show the alleged false statements were not material to their decision to switch products. And Plaintiff has not presented any conflicting evidence of materiality or evidence that the laboratories were influenced by the allegedly false statements. *See Skydive Arizona v.*

*Quattrocchi*, 673 F.3d 1105, 1110 (9th Cir. 2012) (holding materiality "is 'typically' proven through consumer surveys," but surveys are not required, and materiality can also be proven when the plaintiff presents "direct evidence that [the challenged] statements were likely to influence consumer's purchasing decisions"); *U.S. Rubber Recycling, Inc. v. Ecore Int'l*, CV 09-9516 SJO (OPx), 2011 WL 13130696, at *6 (C.D. Cal. Dec. 12, 2011) (finding the plaintiff had not presented a triable issue of fact as to whether the false marketing caused plaintiff to lose sales when plaintiff did not have "testimony from a single consumer stating that Defendant's claim . . . influenced its decision not to buy Plaintiff's products").

Plaintiff makes two arguments as to why the advertising is material. Plaintiff first argues the customers must have been deceived because the labs now believe that IMMULITE detects TSI only, and now repeat the allegedly false assertions on their website and marketing. (Pl. Opp'n at 19.) But simply because the customers have the same beliefs as Defendants about the product does not mean they were deceived. As noted above, they could have formed these beliefs in a number of ways—for example, their own internal validation and testing procedures. Second, Plaintiff argues that because the statement "TSI only" concerns the "inherent quality or characteristic" of the product, it is material. *See Pom Wonderful LLC v. Purely Juice, Inc.*, No. CV-07-2633 CAS (JWJx), 2008 WL 4222045, at *11 (C.D. Cal. July 17, 2008) ("The fact that Purely Juice's false advertising pertained to the very nature of its juice product establishes its materiality." (citing *Johnson & Johnson Vision Care, Inc. v. 1–800 Contacts, Inc.*, 299 F.3d 1242 (11th Cir. 2002))). The Court disagrees with this finding of *Pom Wonderful* that if the false advertising relates to an important quality of the product, it is naturally material. Instead, the Court follows the Ninth Circuit's materiality test, which asks whether the statement is likely to influence the purchasing decision. No matter what the false advertising pertains to, if the customer is not likely to be influenced by the statement, it is not material.

The Court finds that the evidence shows that the laboratories came to the

conclusion to use IMMULITE after their own sophisticated processes, and any false advertising was not material to their decisions. The Court finds there is no dispute of fact as to the issue of deceit of the laboratories. Because Plaintiff cannot prove its claims as to the laboratories, the Court **GRANTS** Defendants' Motion for Summary Judgment for claims of false advertising and unfair competition as it relates to the laboratories.

### 2. Physicians

Again, the inquiry does not end here. Quidel says the relevant market is not comprised of only laboratories, but also physicians, as they are the ones who "drive demand for the assays" and they too were deceived by the false statements. (Pl. Opp'n at 16.) The first issue is therefore whether the physicians are even in the relevant purchasing market. In *Coastal Abstract Service, Inc. v. First American Title Insurance Co.*, 173 F.3d 725, 735 (9th Cir. 1999), the Ninth Circuit approved a jury instruction related to the definition of the relevant purchasing public. Courts have interpreted this to mean, "[d]efining the relevant purchasing public is a task for the jury." *Gonzalez v. Allstate Ins. Co.*, No. CV 04-1548 FMC (PJWx), 2005 WL 5891935, at *9 (C.D. Cal. Aug. 2, 2005).

This Court agrees and finds that both sides have presented evidence as to whether physicians are in the relevant market for the assays. Specifically, Quidel points to the deposition of Defendants' employee, Carole Dauscher. Ms. Dauscher testified that Defendants previously contracted a marketing agency to conduct a marketing campaign aimed at clinicians. (Exhibit 36 to Declaration of T. Kevin Roosevelt, ECF No. 171-1, at 106:1–9.) According to Ms. Dauscher, the agency marketed to physicians as opposed to laboratories because "it's really important to educate the physicians . . . [b]ecause if they don't order the test, then there's . . . no point of having it in the laboratory." (*Id.* at 106:15–25.) Physicians were not the ones buying the assays, but through the marketing they became informed of the test, and they could go to Defendants' website or talk to the laboratories for more

information.  (*Id.* at 107:1–6; 108: 18–23.)  Further, Dr. Silberman, a director of Sonic/CPL laboratory testified that the clinicians are "substantially" in charge of deciding which type of assay to run.  (Exhibit 3 of ECF No 177, at 117:14–22.)  He testified the clinicians "have the capability of and ask for [the assay] by name . . . and in some circumstances they will specify."  (*Id.*)  Finally, a Siemens representative received an email from a doctor who asked if IMMULITE "is specific to TSI or if it potentially can detect TBI's directed towards the N-terminal part of the thyroid receptor."  (Exhibit 18 to Declaration of T. Kevin Roosevelt, ECF No. 171.)  This shows the physicians are aware of the details of the test, and therefore may be interested in how the product is marketed.

But Defendants point to another one of Quidel's experts, who states that at her institution, "when a TSI is ordered [by a clinician], there is no indication on the report of which assay (Roche, Thyretain, Immulite, etc.) was utilized" and the physician only receives the results from the test, i.e. the measurement of TSI.  (Exhibit 51 to Declaration of Erik Haas, ECF No. 140-2, at 9.)

Therefore, there is a dispute of material facts as to whether physicians are part of the relevant market of purchasers of the assays.  If the jury finds that the physicians are part of the relevant market, then the issue will become whether the physicians were deceived or likely to be deceived.  And even if the Court were to assume the jury would find the physicians to be part of the market, the Court finds there is a dispute of material fact as to whether the physicians were or are likely to be deceived.  Plaintiff's expert conducted a survey and determined that a substantial portion of physicians were deceived by Defendants' statements.  ("Ezell Report," Exhibit 12 to Declaration of Erik Haas, ECF 135-3, at ¶ 7.)  This creates a dispute of fact as to the issue of deception of physicians.

The Court **DENIES** Defendants' motion for summary judgment as it relates to the physicians

### D. **Unclean Hands**

In an alternative argument, Defendants argue that none of the above matters because Plaintiff's claims are entirely barred by the unclean hands defense.

"Unclean hands is a defense to a Lanham Act infringement suit." *Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 870 (9th Cir. 2002) (quoting *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987)); *see Emco, Inc. v. Obst*, No. CV03-6432-R(RZX), 2004 WL 1737355, at *4 (C.D. Cal. May 7, 2004) (applying the unclean hands defense to a Lanham Act false advertising claim).[6]  The doctrine of unclean hands "demands that a plaintiff act fairly in the matter for which he seeks a remedy.  He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim." *Kendall-Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App. 4th 970, 978 (Ct. App. 1999) (citing *Precision Co. v. Automotive Co.*, 324 U.S. 806, 814–15 (1945); and *Hall v. Wright*, 240 F.2d 787, 794–95 (9th Cir. 1957)).  To prevail on a defense of unclean hands, a defendant must demonstrate by clear and convincing evidence: (1) "that the plaintiff's conduct is inequitable;" and (2) "that the conduct relates to the subject matter of [the plaintiff's] claims." *Fuddruckers*, 826 F.2d at 847.  Whether the doctrine of unclean hands applies is a question of fact. *CrossTalk Prods., Inc. v. Jacobson*, 65 Cal. App. 4th 631, 639 (Ct. App. 1998).

Specifically, Defendants argue that Plaintiff's conduct was inequitable for two reasons: first, because Plaintiff "engage[s] in the very advertising it alleged is false and misleading."  (Def. Mot. at 24.)  This is because Thyretain also detects TBI and

---

[6] A few courts have held, "[u]nlike a Lanham Act claim, the unclean hands doctrine is not available as a defense to bar claims for unfair business practices act violations under Cal. Bus. & Prof. Code § 17200 et seq." *Certified Nutraceuticals, Inc. v. Avicenna Nutraceutical, LLC*, No. 3:16cv02810-BEN-BGS, 2018 WL 3618243, at *5 (S.D. Cal. July 30, 2018); *see also Cyclone USA, Inc. v. LL&C Dealer Servs., LLC*, No. 03-992 AJW, 2007 WL 9662337, at *14 (C.D. Cal. Nov. 8, 2007) (finding the defendant "has not shown that unclean hands is a defense that may be asserted in response to a claim brought under state unfair competition law").  The reasoning behind these decisions is unclear and this may not be a uniform holding.  But the Court need not opine on this issue at this time.

the evidence shows "when TBI is present in a patient's sample, it may bind to Thyretain's receptor, interfere with Thyretain's measurement of TSI, and result in a false 'negative' reading." (*Id*.) And second, Defendants argue Plaintiff "engaged in an illicit reimbursement scheme." (*Id.* at 24.)

Turning to the first allegation, to resolve whether Plaintiff engaged in false advertising, the Court must conduct the same analysis it conducted above for Defendants' assay. That is, the Court must determine whether it is "literally false" for Plaintiff to call Thyretain a TSI assay. And the same result above applies here— there is evidence on both sides of this argument, so a genuine issue of material fact exists. Dr. Rapoport opines that Quidel has misrepresented the performance of Thyretain. (Exhibit 3 to Declaration of Erik Haas, ECF No. 138-2, at 2.) "Quidel's stated belief that [Thyretain's] chimeric receptor 'sees' 'only' TSI is incorrect." (*Id.* at 3.) In contrast, Dr. Gupta opines that Thyretain "measures [TSI] by its ability to bind and activate TSHR leading to production of thyroid hormones and hyperthyroidism hence it is specific for stimulating antibody and can distinguish between stimulating and blocking activities." (Exhibit 9 to Declaration of T. Kevin Roosevelt, ECF No. 171, at 18.) Given this dispute of material fact, the Court cannot determine at this stage whether Plaintiff's advertising is false; therefore, the Court cannot determine whether Plaintiff has unclean hands due to its advertising of Thyretain as a "TSI only assay."

Turning to Defendants' second unclean hands theory, Defendants allege Plaintiff engaged in an "illicit reimbursement scheme" by telling customers to use the wrong Current Procedural Terminology ("CPT") billing code to submit reimbursement claims for Thyretain. (Def. Mot. at 9, 24.) Defendant argues this allowed Plaintiff to charge an inflated price for Thyretain. In response, Plaintiff argues that this allegation is not at all related to its claims against Defendants and therefore cannot form an unclean hands defense. (Opp'n at 25.) Indeed, the unclean hands defense is not designed so a party may bring up "misconduct in the abstract,

unrelated to the claim to which it is asserted as a defense." *Republic Molding Corp. v. B.W. Photo Utils.*, 319 F.2d 347, 349 (9th Cir. 1963). It can only be applied "where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation." *TrafficSchool.com, Inc. v. Edriver, Inc.*, 633 F. Supp. 2d 1063, 1084 (C.D. Cal. 2008). Because the Court grants judgment as to Plaintiff's claims regarding the laboratories in this Order, Defendants' unclean hands claim no longer is related to the claims at issue. Defendants claim Plaintiff told laboratories to use the wrong billing code, and thus profited more than it should have. This defense is not sufficiently related to what is left of Plaintiff's case after this Order.[7] This is especially true considering Defendants' timeline of the alleged scheme (and whether it overlaps with the present suit) is unclear, and "past misconduct cannot form the basis for an unclean hands defense: 'Plaintiff's position must be judged by the facts existing as they were when suit was begun, not by the facts existing in an earlier time.'" *Pom Wonderful LLC v. Welch Foods, Inc.*, 737 F. Supp. 2d 1105, 1109 (C.D. Cal. 2010) (quoting 6 McCarthy on Trademarks and Unfair Competition § 31:48 (4th ed. 2010)).

The Court **DENIES** Defendants' motion for summary judgment based on the unclean hands defense.

---

[7] And even if it were to be determined that Defendants' unclean hands defense was sufficiently related to the rights Plaintiff asserts, a court "must not automatically apply the doctrine of unclean hands and 'permit a defendant wrongdoer to retain the profits of his wrongdoing merely because the plaintiff himself is possibly guilty of transgressing the law.'" *POM Wonderful LLC v. Coca Cola Co.*, 166 F. Supp. 3d 1085, 1092 (C.D. Cal. 2016) (quoting *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 387 (1944)). "Rather, determining whether the doctrine of unclean hands precludes relief requires balancing the alleged wrongdoing of the plaintiff against that of the defendant, and 'weigh[ing] the substance of the right asserted by [the] plaintiff against the transgression which, it is contended, serves to foreclose that right.'" *Northbay Wellness Grp., Inc. v. Beyries*, 789 F.3d 956, 960 (9th Cir. 2015) (quoting *Republic Molding Corp.*, 319 F.2d at 350). This weighing would be difficult at this stage given the status of this case.

**E. Conclusion**

The Court **GRANTS** summary judgment for the first three causes of action as they relate to Plaintiff's claims regarding deception of the laboratories. It denies the remainder of the Motion.

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff moves for summary judgment solely on the element of falsity. Plaintiff argues it has demonstrated the falsity of Defendants' statements. The same statements are at issue here as in Defendants' Motion: the IMMULITE detects TSI only; that IMMULITE is not like a TRAb assay; and that IMMULITE does not detect TBI. (Pl. Mot. at 15–17.) As is likely evident at this point, the Court finds a genuine issue of material fact for this element. Therefore, for the reasons laid out above, the Court **DENIES** Plaintiff's Motion.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** Defendants' motion for summary judgment and **DENIES** Plaintiff's motion for summary judgment. Given that the Court grants summary judgment as to most of Plaintiff's claims regarding the laboratories, the Court **ORDERS** the parties to schedule a conference with Magistrate Judge Schopler to discuss settlement and/or how this case will proceed.

**IT IS SO ORDERED.**


**DATED: October 21, 2019**

Hon. Cynthia Bashant
United States District Judge