GORDON & REES LLP
M.D. Scully (SBN 135853)
101 W. Broadway, Suite 2000
San Diego, CA 92101
mscully@gordonrees.com
Tel: (213) 270-7871

PATTERSON BELKNAP WEBB & TYLER LLP
Erik Haas (admitted *pro hac vice*)
1133 Avenue of the Americas
New York, New York 10036
ehaas@pbwt.com
Tel: (212) 336-2117

*Attorneys for Defendants Siemens*
*Medical Solutions USA, Inc. and*
*Siemens Healthcare Diagnostics Inc.*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUIDEL CORPORATION, a Delaware Corporation,<br><br>      Plaintiff,<br><br>     v.<br><br>SIEMENS MEDICAL SOLUTIONS USA, INC., a Delaware corporation, SIEMENS HEALTHCARE DIAGNOSTICS INC. a California corporation, and DOES 1-50 INCLUSIVE,<br><br>      Defendants. | Case No. 3:16-CV-03059<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANTS' COUNTERCLAIMS AND UNCLEAN HANDS DEFENSE**<br><br>Judge: Hon. Cynthia A. Bashant<br>Date: December 16, 2019<br>Time: N/A<br>Courtroom: 4B<br><br>[Filed and served concurrently with Declaration of Erik Haas] |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF MATERIAL FACTS .................................................................. 4

    A.    The Parties' TSI Assays ................................................................ 4

    B.    The Parties' Mirror Image Advertising ................................... 5

    C.    Quidel's Fraudulent Reimbursement Scheme ....................... 6

    D.    Quidel Fails to Develop a Competitive Response to IMMULITE ........ 7

    E.    Quidel Launches a Disparagement Campaign Against Siemens........... 8

    F.    Quidel Abuses the Legal Process to Disparage Siemens...................... 9

    G.    Siemens Files its Amended Answer and Counterclaims .................... 11

ARGUMENT ..................................................................................................... 11

I.    SIEMENS' COUNTERCLAIMS MAY PROCEED .................................. 12

    A.    Siemens' Trade Libel Claim is Viable.................................... 12

    B.    Siemens' Abuse of Process Claim is Not Barred by the Litigation Privilege ........................................................... 14

    C.    Siemens' UCL Claim is Viable.............................................. 17

    D.    Siemens' Claims Are Not Time-Barred.................................. 20

II.    SIEMENS' UNCLEAN HANDS DEFENSE MAY PROCEED ................. 22

    A.    Quidel Engaged in Inequitable Conduct Related to Its Claims .......... 22

    B.    Each of Quidel's Legal Arguments Fails................................ 23

CONCLUSION.................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Barnes-Hind, Inc. v. Superior Court*,
    181 Cal. App. 3d 377 (Cal. App. Ct. 1986)................................................................ 12

*Certified Nutraceuticals, Inc. v. Avicenna Nutraceutical, LLC*,
    2018 U.S. Dist. LEXIS 127276 (S.D. Cal. July 27, 2018)................................. 22

*Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City*,
    383 F.3d 110 (3d Cir. 2004) ........................................................................ 24

*E.D.C. Techs., Inc. v. Seidel*,
    225 F. Supp. 3d 1058 (N.D. Cal. 2016)................................................. 17

*Electronics for Imaging Inc. v. Atl. Mut. Ins. Co.*,
    2006 U.S. Dist. LEXIS 90882 (N.D. Cal. Dec. 15, 2006) .................... 15

*Emco, Inc. v. Obst*,
    2004 U.S. Dist. LEXIS 12118 (C.D. Cal. May 7, 2004)............................. 22, 23

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*,
    826 F.2d 837 (9th Cir. 1987) ................................................................ 22

*Gaspar Physical Therapy, Inc., v. Roberts*,
    2018 U.S. Dist. LEXIS 185860 (S.D. Cal. Oct. 29, 2018)................................ 12

*Hardisty v. Moore*,
    2012 U.S. Dist. LEXIS 61465 (S.D. Cal. May 2, 2012) .................................... 15

*Intamin, Ltd. v. Magnetar Techs. Corp*,
    623 F. Supp. 2d 1055 (C.D. Cal. 2009).................................................. 23

*United States ex rel. Marcus v. Hess*,
    317 U.S. 537 (1943) ............................................................................ 19

*Mut. Pharm. Co. v. Watson Pharm., Inc.*,
    2009 U.S. Dist. LEXIS 107880 (C.D. Cal. Oct. 19, 2009) ........................... 23

*Owens v. Chasko*,
    2011 U.S. Dist. LEXIS 81470 (E.D. Cal. July 25, 2011) ............................. 14

*Pom Wonderful LLC v. Welch Foods, Inc.*,
    737 F. Supp. 2d 1105 (C.D. Cal. 2010).................................................. 23

*Reger v. Smith*,
2006 U.S. Dist. LEXIS 63215 (E.D. Cal. Aug. 21, 2006) ................................. 13

*Republic Molding Corp. v. B. W. Photo Utils.*,
319 F.2d 347 (9th Cir. 1963) ............................................................................ 24

*Rodriguez v. Panayiotou*,
314 F.3d 979 (9th Cir. 2002) ........................................................................... 15

*Rusheen v. Cohen*,
37 Cal. 4th 1048 (2006) ................................................................................... 14

*United States ex rel. Schmidt v. Zimmer, Inc.*,
386 F.3d 235 (3d Cir. 2004) ............................................................................ 19

*Siam v. Kizilbash*,
130 Cal. App. 4th 1563 (Cal. Ct. App. 2005) .................................................. 14

*Theme Promotions, Inc. v. News Am. FSI, Inc.*,
1998 U.S. Dist. LEXIS 23560 (N.D. Cal. May 29, 1998) ................................ 12

*Trovan, Ltd. v. Pfizer, Inc.*,
2000 U.S. Dist. LEXIS 7522 (C.D. Cal. May 23, 2000)................................... 13

**Statutes**

31 U.S.C. § 3729(a)(1) .......................................................................................... 19

Defendants Siemens Medical Solutions USA, Inc. and Siemens Healthcare Diagnostics Inc. (collectively, "Siemens") respectfully submit this memorandum of law in opposition to Plaintiff Quidel Corporation's ("Quidel") Motion for Summary Judgment on Siemens' Counterclaims and Unclean Hands Defense.

## PRELIMINARY STATEMENT

Quidel's motion for summary judgment should be denied in its entirety because it raises only flawed legal challenges to Siemens' counterclaims and its unclean hands defense. Quidel does not and cannot contest *any* of the factual record upon which Siemens' claims and defense are based because the core of that record is comprised of the admissions of Quidel's own representatives and expert witnesses. Quidel instead resorts to legal arguments that misstate the governing legal standards. Applying the correct standards, the undisputed record establishes that Siemens' counterclaims and unclean hands defense are viable.

As a threshold matter, this Court already ruled on Siemens' motion for summary judgment that the exact same unclean hands defense depends upon questions of fact for the jury to decide. (Dkt. No. 254 at 19.) Quidel's attempt to reargue this Court's prior ruling should be summarily rejected.

Turning to the substance, Siemens' counterclaims and unclean hands defense are predicated on the same undisputed facts. *First*, the record shows that the briefly utilized Siemens advertising Quidel challenges is the mirror image of the advertising Quidel made (and continues to make) concerning its assay for the last decade. Siemens patterned its advertising after Quidel's because the parties' assays use the *same* technology for the *same* intended use, and the parties rely on the *same* performance data to substantiate the *same* performance claims. Moreover, as every Quidel scientific witness has agreed, the parties' assays perform comparably when used for their shared intended purpose of aiding in the diagnosis of Graves' Disease. That is the *same* conclusion drawn by the *same* Food and Drug Administration ("FDA") personnel that cleared both parties' assays. And it is the

*same* conclusion reached by the only independent peer-reviewed head-to-head clinical study comparing the parties' assays. Accordingly, Siemens' and Quidel's mirror-image advertising was equally true (or false). The only differences between the parties' advertising is that Siemens stopped making the primary claim at issue immediately after launch, while Quidel amplified that claim into comparative superiority messages that it continues to make today (in conjunction with other admittedly false claims). Quidel's false advertising claims were disingenuous when brought, and are barred by its profoundly unclean hands.

*Second*, the undisputed record establishes the knowing falsity of Quidel's preposterous allegations that Siemens sought to "promote" the margin customers could earn by using a reimbursement rate for Siemens' assay that is "reserved" for Quidel's assay. Quidel conceded that it had and has *no* evidence that Siemens ever promoted the margin customers could earn on the reimbursement of its TSI assay compared to other types of assays. Further, Quidel admitted that it was advised by its experts that its own assay was not eligible for the reimbursement rate it claimed was "reserved" for its assay. ██████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████ Thus, Quidel engaged in a far more egregious reimbursement fraud than the baseless one it falsely alleges Siemens perpetrated; this alone is independent grounds for finding unclean hands. The Court's dismissal of Quidel's claims relating to its laboratory customers does not preclude Siemens from advancing this aspect of its defense, as Quidel made the same false statements in its marketing materials to physicians. Moreover, Quidel's wrongful promotion is sufficiently related to the remaining claims for it to remain a viable component of Siemens' defense. Also, as this Court recognized, the unclean hands defense "must be judged by the facts existing as they were when suit *was begun*" (Dkt. No. 254 at 20 (emphasis added)), and from that perspective, this aspect of the defense may proceed.

***Third***, the record shows that, corresponding with the launch of Siemens' assay in March 2016, Quidel embarked upon a campaign of unfair and wrongful conduct designed to dissuade customers from purchasing Siemens' assay. Quidel's wrongful conduct included (i) making knowingly false superiority and performance claims regarding its assay, (ii) perpetuating its fraudulent reimbursement scheme, and (iii) disparaging Siemens and its assay to the parties' customers and to physicians, including by attempting to convert documents from this litigation into marketing tools to seize an unfair competitive advantage. Unlike Siemens' alleged conduct, Quidel engaged in a deliberate and malicious scheme to target and disparage Siemens and its product in the marketplace. Unlike Siemens, Quidel made false superiority claims that Quidel's witnesses concede are baseless, having admitted that both assays perform comparably for their shared intended purpose. Unlike Siemens, Quidel brazenly engaged (and engages) in reimbursement fraud to seize an unfair competitive advantage. Unlike Siemens, Quidel baselessly disparaged Siemens by asserting that the use of Siemens' assay could result in unnecessary surgeries, a position Quidel's own expert testified was absurd. And unlike Siemens, Quidel has attempted to exploit this litigation by republishing litigation documents to the parties' customers to facilitate and further its disparagement campaign. This undisputed malfeasance provides an alternate ground for Siemens' unclean hands defense, and establishes the viability of Siemens' counterclaims for violations of the California Unfair Competition Law ("UCL"), trade libel, and abuse of process.

Unable to refute these facts, Quidel raises baseless legal challenges to Siemens' claims, which notably it did not raise on a motion to dismiss (or in opposition to Siemens' motion to amend). Quidel argues that Siemens must prove "special damages" in support of its trade libel claim, but there is no such requirement where, as here, Quidel's conduct was libelous *per se*. Quidel argues that its republication of litigation documents to third parties is protected by the

1  litigation privilege, but this privilege applies only to communications made "to
2  achieve the objects of the litigation."  Quidel argues that Siemens lacks standing to
3  bring a UCL claim, but ignores the factual record and bends the law beyond
4  recognition in an attempt to defeat this viable claim.  And Quidel suggests that
5  Siemens' claims are partially time-barred, but Quidel waived this argument and, in
6  any event, Siemens' claims are timely under well-established tolling doctrines.
7  Equally baseless is Quidel's renewed challenge to Siemens' unclean hands defense
8  on the grounds that Siemens was not harmed by Quidel's conduct.  That is both
9  untrue and legally irrelevant.  The unclean hands defense does not require a
10  showing of economic harm, but rather a showing that Quidel engaged in inequitable
11  conduct related to its claims.  The undisputed facts show it repeatedly did.

Siemens respectfully submits Quidel's motion should be denied.

## STATEMENT OF MATERIAL FACTS

### A.    The Parties' TSI Assays

In 2009, the FDA cleared Quidel's Thyretain TSI Reporter BioAssay
("Thyretain") for sale to aid in the diagnosis of Graves' Disease.  (Ex. 1 at 13:1-7;
Ex. 2.)[1]  Graves' Disease is characterized by the presence of thyroid stimulating
immunoglobulins ("TSI"), which may stimulate excess production of thyroid
hormones.  (Ex. 3 at 8-12.)  Thyretain uses a genetically-modified receptor that
preserves the primary TSI binding sites, and eliminates the binding sites for thyroid
*blocking* immunoglobulins ("TBI"), which are not indicative of Graves' Disease.
(Ex. 4 at 8-9, 20.)  Thyretain generates a light-emitting enzyme, which is
interpreted as a binary "positive" or "negative" (known as a "qualitative" result)
depending on whether the emitted brightness is above or below a threshold level.
(*Id.*; Ex. 5 at 53:8-18.)  Quidel persuaded the FDA to clear Thyretain as a "TSI
assay" by representing that the modified receptor made the assay specific for the
detection of TSI in Graves' Disease patients.  (Ex. 4 at 8-9; Ex. 5 at 55:17-21.)

28
---
[1] Citations to "Ex." refer to exhibits to the accompanying Declaration of Erik Haas.

Seven years later, in March 2016, the FDA cleared Siemens' IMMULITE 2000/2000 XPi TSI Assay ("IMMULITE") for the *same* intended use as Thyretain. (Ex. 6 § H.1.) Indeed, the *same* FDA personnel who cleared Thyretain as a "TSI assay" cleared IMMULITE as a "TSI assay," and did so because both assays use the *same* receptor, which is designed to specifically detect TSI. (Ex. 5 at 110:20-111:4; Ex. 6 § L; Ex. 7 at 105:5-9; Ex. 8 at 2.) But unlike Thyretain, IMMULITE uses a novel "bridge" technology that detects and reports TSI in a "semi-quantitative" manner. (Ex. 6 § H.1; *see also* Ex. 5 at 69:5-16.)

### B. The Parties' Mirror Image Advertising

For years, Quidel has claimed that its assay detects "TSI only," or that it "detects only the TSI." (Ex. 1 at 210:6-10; Ex. 9 at 5.) Quidel told its customers that Thyretain could detect "TSI only" because of its modified receptor—the exact same receptor that IMMULITE also uses. (Exs. 10–12.) Further, every one of Quidel's scientific witnesses agreed that the two assays perform comparably when used as intended. (Ex. 5 at 238:16-20; Ex. 13 at 220:2-14, 253:20-254:20; Ex. 14 at 263:6-20; Ex. 15 at 219:5-9; Ex. 16 at 4; Ex. 17 at 56:19-57:3.) Thus, to the extent Thyretain is "TSI only," so too is IMMULITE.

When Siemens launched IMMULITE in 2016, it released a few marketing pieces informing customers of its new assay, some of which said that IMMULITE detects "TSI only." (*E.g.*, Ex. 18.) Siemens did not view the "TSI only" claim as controversial because (i) the claim was substantiated by the same type of performance data that substantiated Quidel's mirror-image claims, (ii) that data showed the parties' assays performed comparably for their shared intended use, and (iii) the parties' assays achieved those results by using the same receptor. (Ex. 6 §§ L-M; Ex. 8 at 2; Ex. 5 at 238:16-20; Ex. 13 at 220:2-14.) Quidel nonetheless protested Siemens' use of the "TSI only" statement. Purely to avoid the burden of litigation, Siemens stopped making the claim after a few months. (Ex. 19.)

Quidel's witnesses have since conceded that Siemens' assay *does* detect "TSI

only" when used as intended to aid the diagnosis of Graves' Disease, and that there is **no evidence** that TBI in real patients binds to the assay's receptor when used as intended. (Ex. 13 at 254:4-20; Ex. 20 at 110:6-19, 40:25-41:13.) Independent studies have indicated the same. (Ex. 3 at 22-27; Ex. 17 at 56:19-25, 192:15-24.)

Quidel's expert witnesses also acknowledged that, while there is a **possibility** that TBI could bind to the receptor used in both parties' assays, that prospect "is hypothetical because it has never been shown in the real world." (Ex. 20 at 110:16-19.) Moreover, every relevant Quidel witness admitted that to the extent IMMULITE has the **potential** to detect TBI, so too does Thyretain. (Ex. 1 at 105:3-110:17; Ex. 5 at 82:25-83:15; Ex. 13 at 184:6-18; Ex. 14 at 226:7-19; Ex. 15 at 114:22-115:10; Ex. 17 at 31:14-21; Ex. 20 at 123:13-124:9; Ex. 21 at 146:14-147:8.) Indeed, Quidel's primary scientific expert freely admitted that, applying Quidel's made-for-litigation definition of "TSI only," Thyretain cannot detect TSI only.[2] (Ex. 16 at 3; Ex. 20 at 122:7-10.) Simply put, the parties' mirror-image advertising was equally true, or equally false. If Thyretain detects "TSI only," then so too does IMMULITE. But if—under Quidel's theory of the case—IMMULITE does not detect "TSI only," then neither does Thyretain.

### C.    Quidel's Fraudulent Reimbursement Scheme

Quidel alleged that Siemens advertised IMMULITE as a "TSI assay" to secure higher Medicare and Medicaid reimbursement for its customers. (FAC ¶¶ 18-19.) But the record shows that it was Quidel—not Siemens—that engaged (and continues to engage) in a fraudulent reimbursement scheme. When Quidel launched Thyretain in 2009, it implemented a marketing "Conversion Plan" to give potential customers a "financial incentive" to "convert" to Thyretain.[3] (Ex. 22; Ex.

---

[2] Quidel also acknowledged that it has long been "aware of the possibility that Thyretain measured the *net stimulatory effect* of blocking **and** stimulating antibodies," and that Thyretain may generate "false negatives." (Ex. 5 at 82:19-83:3.) And Quidel has long known that the "presence of blocking antibodies" can interfere with Thyretain, resulting in a "false negative." (Ex. 21 at 153:12-154:6.)

[3] Reimbursement for assays under Medicare, Medicaid, and other federal programs

1 at 56:19-58:21, 85:16-87:5.)  Quidel told them that Thyretain was eligible for reimbursement under the Current Procedural Terminology ("CPT") Code 84445, for which Medicare and other insurers reimburse laboratories at a rate significantly higher than other available thyroid assays.  (Ex. 22; Ex. 23; Ex. 1 at 60:2-14.) ██

██████████████████████████████████████████████████████████

████████████████████████████████ (Ex. 1 at 60:2-14; Ex. 24.)

But here's the rub:  Quidel *knew* that Thyretain was not actually eligible for reimbursement under Code 84445.  That code is only available for "*quantitative*" assays, but the FDA cleared Thyretain as a "*qualitative*" assay.  (Ex. 25 at 309, 319; Ex. 5 at 177:17-178:1.)  Quidel knew as much:  Its own internal and external consultants had explained that because of Thyretain's qualitative status, it *did not qualify* for reimbursement under Code 84445.  (Ex. 1 at 135:18-136:17; 136:22-137:6; 67:20-68:18; Ex. 5 at 177:17-178:1 ("CPT code 84445 is not an appropriate reimbursement code for Thyretain"); Ex. 26.)

Yet this has not stopped Quidel.  For years, it has brazenly urged customers to use the wrong code when seeking reimbursement from CMS for Thyretain.  To this day, Quidel's website lists Code 84445 as an appropriate reimbursement code for Thyretain.  (Ex. 23.)  Quidel blanketed laboratories *and physician offices* with letters claiming that "Thyretain test is available from most national reference labs by ordering CPT code 84445."  (Exs. 27–29.)  And Quidel's "Thyretain FAQ," a pamphlet for customers, tells healthcare providers and laboratories that the "CPT code for the Thyretain TSI Reporter BioAssay is 84445."  (Ex. 30.)

### D. Quidel Fails to Develop a Competitive Response to IMMULITE

Leading up to Siemens' launch of its TSI assay in 2016, Quidel knew it faced a serious competitive threat.  Quidel's witnesses testified that they knew the parties'

___

is determined by the Centers for Medicare and Medicaid Services ("CMS"), which pays claims by reference to five-digit codes known as CPT codes.  *See* AMA, CPT® Purpose & Mission, https://tinyurl.com/yxmrsj4d.

TSI assays "achieve comparable performance" when used as intended and have "comparable sensitivity and specificity metrics." (Ex. 14 at 263:6-18; Ex. 13 at 220:2-14; Ex. 15 at 219:5-9; Ex. 17 at 56:19-57:3; Ex. 5 at 238:16-20.) Quidel's witnesses also admitted they knew that Siemens' assay is faster, easier to use, and less expensive. (Ex. 17 at 107:21-110:17; Ex. 31 at 66:5-20.) At first, Quidel responded by trying to develop new assays. Quidel tried and failed to develop a quantitative version of Thyretain. (Ex. 1 at 25:1-13.) Next, it tried to develop an automated immunoassay, like Siemens' assay, but that failed too. (Ex. 1 at 25:14-22.) Finally, Quidel tried to develop a "TBI assay" that could be used in conjunction with Thyretain. (Ex. 1 at 25:23-26:17.) The FDA rejected Quidel's application. (Ex. 5 at 249:19-251:23.)

**E.      Quidel Launches a Disparagement Campaign Against Siemens**

Without a viable competitive assay, Quidel resorted to a smear campaign against Siemens. In late 2015, when Quidel first learned of IMMULITE's clearance outside the United States, Quidel "commissioned" Dr. George Kahaly, Quidel's longtime paid consultant, to conduct a study to "demonstrate that [IMMULITE] do[es] NOT detect ONLY TSI." (Exs. 32–34.) In late 2016, Kahaly conducted another study at Quidel's request—this time in response to an email entitled "Thyretain at risk," which explained that "[t]he Siemens assay has made inroads" with major laboratory customers. (Ex. 35.) Both studies are fatally flawed pseudoscience. (Ex. 3 at 29; *see also* Ex. 36 at 15.)

Quidel then exploited these flawed studies to make false comparative superiority claims, telling customers that "only" Thyretain could detect "TSI only," and not IMMULITE. But based on the definition of "TSI only" Quidel has advanced in this litigation, ***neither*** party's assay would detect "TSI only"—making Quidel's claim that "only" its assay detects "TSI only" necessarily false. Nevertheless, Kahaly, "[a]t Quidel's request," began peddling this falsehood to customers. (Ex. 1 at 34:6-11, 37:4-11.) Kahaly met with the Laboratory

Corporation of America ("LabCorp")—one of the largest laboratories in the country—throughout 2016 and 2017. (Ex. 37 at 172:6-174:2, 176:6-178:23.) At these meetings, Kahaly touted his flawed research and told LabCorp employees that only Thyretain, not "binding assays" such as IMMULITE, detects "TSI only"; and that while IMMULITE could not "differentiate[] between" blocking and stimulating antibodies, Thyretain could. (Ex. 38; Ex. 53.) Kahaly also met with Quest, another national reference laboratory, and made similar claims. (Ex. 1 at 34:12-21; Ex. 39.)

Quidel also targeted physicians. After purchasing contact details for over 10,000 clinicians, Quidel sent a letter asserting that IMMULITE "cannot differentiate between the Ab functionality" but Thyretain could. (Exs. 40–42; Ex. 1 at 204:5–8.) In the same letter, Quidel urged the physicians not to order TSI tests from LabCorp—which by then had decided to adopt IMMULITE. (Ex. 42.)

In addition to making these false superiority claims, Quidel continued to publish false performance claims on its website that it knew to be untrue when made. From launch to the filing of its complaint, Quidel advertised that Thyretain can provide results in "3 to 4 hours." (Ex. 43.) That is wildly untrue. Quidel's witnesses conceded that it is "not possible to get results from Thyretain in less than 18 to 21 hours." (Ex. 5 at 128:16-129:3, 178:23-179:19; Ex. 17 at 108:11-109:10; Ex. 21 at 142:16-143:3.) And again, Quidel clearly knew its advertising was false: Quidel's submission to the FDA disclosed that Thyretain takes far longer than 3-4 hours to provide results. (Ex. 4 at 9.)

F.    **Quidel Abuses the Legal Process to Disparage Siemens**

After Quidel filed this lawsuit, it improperly converted its pleadings and other litigation documents into inappropriate marketing materials. Just one day after filing its complaint, Quidel's CEO, Douglas Bryant, sent a copy to LabCorp.[4] (Ex. 46.) When LabCorp notified Quidel that it intended to adopt Siemens' assay,

---

[4] Bryant had already had multiple phones calls with LabCorp representatives about the planned lawsuit. (Ex. 44; Ex. 45 at 83:4-11; Ex. 37 at 35:18-36:12.)

Bryant escalated.  In August 2017, he sent LabCorp's CEO a formal letter that amplified Quidel's allegations, and attached Quidel's First Amended Complaint. (Ex. 47.)  Bryant claimed that Thyretain was a "true TSI only assay," whereas Siemens' assay "compares similarly to other TRAb assays, detecting <u>but not</u> differentiating between stimulating and blocking antibodies." (*Id.* (emphasis in original).)  He asserted that Thyretain, but not IMMULITE, should be "reimbursed at higher rates." (*Id.*)  And he resorted to scare tactics, warning LabCorp that use of Siemens' assay "may lead to false positives and the misdiagnosis and mistreatment of patients," including "unnecessary surgery."[5] (*Id.*)  Bryant later admitted he had no basis for these allegations, and Kahaly similarly ridiculed the supposed risk of unnecessary procedures.[6] (Ex. 45 at 167:5-23, Ex. 20 at 188:7-189:14.)

On October 20, 2017, Bryant again wrote to LabCorp's CEO offering "some new information," namely, that the Court had denied Siemens' motion to dismiss. (Ex. 48.)  After repeating its allegations that IMMULITE was not truly "TSI only" and that the higher reimbursement rate was "reserved" for Thyretain, Bryant then emphasized the Court's ruling to bolster its disparagement of Siemens: "As you can see … the court rejected the arguments made by Siemens." (*Id.*)

Quidel also marketed its baseless allegations to Sonic Healthcare, USA ("Sonic"), the only other customer that "switched" from Quidel's assay to Siemens' assay.  On January 18, 2017, less than a month after Quidel had filed suit, it sent Sonic a copy of the complaint.  (Ex. 49.)  Sonic's corporate representative testified that he had never heard of a company sending its customers copies of litigation

---

[5] Quidel reiterated similar allegations to the ***physicians*** it contacted.  (Ex. 42.) Kahaly likewise warned LabCorp in a later email that Siemens' assay "could lead to underdiagnosing or misdiagnosing patients."  (Ex. 50.)

[6] Quidel's own witnesses have conceded that, if Quidel's theory of the case is true, then ***Thyretain*** could also result in a patient receiving a "negative" diagnosis even though that patient has Graves' Disease.  (Ex. 5 at 82:19-83:15; Ex. 21 at 153:23-154:6.)  And they admitted that Thyretain may detect substances other than TSI (or TBI), resulting in false positives.  (Ex. 20 at 118:7-17; Ex. 13 at 184:23-185:14.)

10

documents, as Quidel had done. (Ex. 31 at 259:4-16.) Quidel also spoke with Quest, another customer, about the litigation in an effort to rebut Siemens' "claim[] to detect TSI only." (Ex. 37 at 22:6-9, 25:17-26:3, 27:11-19, 29:13-23.)

### G. Siemens Files its Amended Answer and Counterclaims

Siemens' Second Amended Answer and Counterclaims ("SACC") includes three counterclaims: (i) violations of California's Unfair Competition Law; (ii) trade libel; and (iii) abuse of process. (*See* Dkt. No. 252 ¶¶ 57-70.) These claims are premised on Quidel's false claims that Thyretain alone detects "TSI only" (*id.* ¶¶ 36-50); Quidel's false claims regarding the high reimbursement rate available for Thyretain (*id.* ¶¶ 25-35); Quidel's false claims about the speed at which its assay can generate results (*id.* ¶¶ 51-52); and Quidel's false and disparaging marketing campaign about Siemens' IMMULITE assay (*id.* ¶¶ 36-50).

Siemens' SACC also sets out in detail the basis for its unclean hands defense, which is a complete bar to Quidel's claims. This defense is based on four factual predicates: (i) Quidel made advertising claims that are the mirror image of the Siemens advertising that Quidel challenges in this action, and that are equally false and misleading; (ii) Quidel disparaged Siemens by making the knowingly baseless and false claim that use of Siemens' assay "may lead to misdiagnosis"; (iii) Quidel engaged and continues to engage in a fraudulent reimbursement scheme far more egregious than the reimbursement scheme that Quidel falsely and baselessly alleged Siemens engaged in; and (iv) Quidel falsely advertised that its assay yields results in the same time frame as Siemens' assay. (SACC at pp. 8-10.)

## ARGUMENT

Quidel does not contest *any* of the factual record upon which Siemens' counterclaims and unclean hands defense are based. Instead, Quidel posits narrow legal challenges that misstate the governing law. Applying the correct legal standards, it is clear that Siemens counterclaims and unclean hands defense are viable.

## I. SIEMENS' COUNTERCLAIMS MAY PROCEED

### A. Siemens' Trade Libel Claim is Viable

Quidel asserts that Siemens must adduce evidence of special damages to support its trade libel counterclaim. (Mot. at 6.) That argument fails as a matter of law because a claim for trade libel does not require proof of "special damages" where, as here, the challenged statements were libel *per se*. (SACC ¶ 64.) In such cases, it is "unnecessary to prove special damages" because "damage to [Siemens'] reputation is presumed." *Gaspar Physical Therapy, Inc.*, *v. Roberts*, 2018 U.S. Dist. LEXIS 185860, at *18 (S.D. Cal. Oct. 29, 2018).[7]

Contrary to Quidel's suggestion, courts apply this rule not only to traditional libel claims, but to claims for trade libel as well. In *Theme Promotions, Inc. v. News Am. FSI, Inc.*, 1998 U.S. Dist. LEXIS 23560 (N.D. Cal. May 29, 1998), the court recognized that a trade libel claim "ordinarily" requires special damages, but clarified that a "determination that a publication is libelous per se negates the necessity of pleading special damages." *Id.* at *20; *see also Garon v. eBay, Inc.*, 2011 U.S. Dist. LEXIS 148621, at *23-24 (Nov. 30, 2011) (a trade libel claim is actionable where plaintiff has "alleged a statement that is libelous per se or pleaded special damages."). Quidel notes that trade libel is "more akin to unfair competition" because it is directed at a party's goods or business reputation rather than the party's personal reputation, but this has no bearing on the rule that a plaintiff need not prove special damages where the statements are libelous *per se*.

A statement is libelous *per se* when its "defamatory meaning appears from the language itself without the necessity of explanation." *Barnes-Hind, Inc. v. Superior Court*, 181 Cal. App. 3d 377, 384-85 (Cal. App. 1986) (citation omitted).

---

[7] Quidel erroneously asserts that Siemens first cited to *Gaspar* in its amended counterclaims in response to the Court's ruling on Quidel's anti-SLAPP motion. In fact, Siemens previously cited to *Gaspar* in its opposition to Quidel's prior (and since mooted) motion for summary judgment on Siemens' First Amended Counterclaims, which ***predated*** the Court's anti-SLAPP ruling. (*See* Dkt. No. 160.)

If "by any reasonable interpretation the language is susceptible of a defamatory meaning," it is "error for a court to rule that a publication cannot be defamatory on its face." *Id.* at 385; *see also Theme Promotions*, 1998 U.S. Dist. LEXIS 23560, at *20 (publication of language "which from its nature necessarily must, or presumably will as its natural and proximate consequence, occasion … pecuniary loss[,] … prima facie constitutes a cause of action [for trade libel].").

Siemens has presented ample evidence that Quidel made *per se* libelous statements. For example, Quidel falsely (and repeatedly) told the parties' customers that using IMMULITE would result in the improper treatment of patients. In his August 2017 letter to LabCorp, Quidel's CEO warned that using IMMULITE would "lead to false positives and the misdiagnosis and mistreatment of patients," including "unnecessary surgery."[8] (Ex. 47.) And in another letter to LabCorp, Kahaly—Quidel's paid consultant who held himself out as a purported "independent" expert—warned that use of IMMULITE "could lead to underdiagnosing or misdiagnosing patients." (Ex. 50.) Quidel's marketing executive made similar allegations in communications with physicians. (Ex. 51.) Quidel has since admitted it had no basis for this allegation, (Ex. 45 at 167:5-23), and Kahaly testified the proposition was "ridiculous." (Ex. 20 at 188:7-189:16.) Because these statements impugn the character and integrity of Siemens and its assay "without the necessity of explanation," they are libelous *per se*. *See Reger v. Smith*, 2006 U.S. Dist. LEXIS 63215, at *12 (E.D. Cal. Aug. 21, 2006) (allegation that company was indifferent to patients is libel per se); *Trovan, Ltd. v. Pfizer, Inc.*, 2000 U.S. Dist. LEXIS 7522, at *38 n.15 (C.D. Cal. May 23, 2000) (when a defendant makes "false statements regarding deadly side effects" of a drug, "injury would certainly be presumed"). Accordingly, Siemens need not plead or prove

---

[8] Quidel reinforced these libelous statements by attaching its complaint, which similarly alleged (without basis) that IMMULITE could lead to the "misdiagnosis," resulting in "improper treatment of patients and unnecessary procedures," including "surgery to remove all or part of a patient's thyroid." (FAC ¶¶ 15–17.)

special damages, and may proceed on its trade libel claim.

**B.   Siemens' Abuse of Process Claim is Not Barred by the Litigation Privilege**

Quidel has abandoned all attempts to challenge Siemens' abuse of process claim on the merits, and instead rehashes a single legal argument that this Court has already implicitly rejected: that the claim is barred by the litigation privilege.  This Court has already held that the communications giving rise to Siemens' abuse of process claim—Quidel's republication of its pleadings and other litigation documents to the parties' customers—were made for purely commercial purposes, not to achieve its goals in the litigation.  (Dkt. No. 247 at 12.)  That holding is dispositive of Quidel's attempt to resurrect its litigation privilege argument because the litigation privilege only extends to communications made "to achieve the objects of the litigation."  (*Id.* at 16.)

To prevail on its abuse of process claim, Siemens must establish that Quidel (i) "contemplated an ulterior motive in using the process" and (ii) "committed a willful act in the use of the process not proper in the regular conduct of the proceedings."  *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1057 (Cal. 2006).  An abuse of process claim lies where the "process is used to obtain an unjustifiable collateral advantage."  *Owens v. Chasko*, 2011 U.S. Dist. LEXIS 81470, at *11 (E.D. Cal. July 25, 2011).  "The gist of the tort is the "misuse of the judicial process for a purpose other than that which it was intended to serve."  *Siam v. Kizilbash*, 130 Cal. App. 4th 1563, 1579 (Cal. App. 2005).

Here, Quidel improperly exploited the judicial process by repurposing its pleadings and the Court's order denying Siemens' motion to dismiss as marketing materials weaponized to damage Siemens' (and its product's) reputation.  Quidel told LabCorp of its intention to bring this lawsuit before it filed it, and Bryant, its CEO, sent the complaint to LabCorp (among others) just ***one day*** after it filed the lawsuit.  (Ex. 45 at 82:10-83:17; Ex. 46.)  In August 2017, Bryant sent its amended

pleading to LabCorp, again invoking the formality of the legal process in an attempt to legitimize its allegations. (Ex. 47.) Then, days after this Court denied Siemens' motion to dismiss, Bryant sent that order directly to LabCorp, claiming that "the Court [had] rejected the arguments made by Siemens." (Ex. 48.) Leveraging legal documents to gain an unfair commercial advantage is an "improper use of the machinery of the legal system." *Owens*, 2011 U.S. Dist. LEXIS 81470, at *10 (citation omitted). Such conduct is sufficient to prevail on an abuse of process claim. *See*, *e.g.*, *Hardisty v. Moore*, 2012 U.S. Dist. LEXIS 61465, at *16 (S.D. Cal. May 2, 2012) ("[T]he use of civil litigation as a weapon to damage another's business may give rise to a cause of action for abuse of process."); *Electrs. for Imaging Inc. v. Atl. Mut. Ins. Co.*, 2006 U.S. Dist. LEXIS 90882, at *16 (N.D. Cal. Dec. 15, 2006) (denying motion to dismiss abuse of process claim premised on party "us[ing] the courts to gain a competitive advantage").

Quidel does not dispute these facts, but argues that its conduct is protected by the litigation privilege because the parties' customers may have had an interest in the outcome of this litigation. As this Court has recognized, however, the litigation privilege applies only to communications "(1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) ***to achieve the objects of the litigation***; and (4) that have some connection or logical relation to the action." *Argentieri v. Zuckerberg*, 8 Cal. App. 5th 768, 780 (Cal. App. 2017) (emphasis added) (internal quotation marks and citation omitted); (*see* Dkt. No. 247 at 16.) In order to "achieve the objects of the litigation," the communication must "***function as a necessary or useful step in the litigation process and . . . serve its purposes***." (*Id*. at 785 (emphasis added)); *see also Rodriguez v. Panayiotou*, 314 F.3d 979, 988 (9th Cir. 2002) (privilege applies only to communications that "have a *functional* connection to litigation") (emphasis in original).[9]

---

[9] Quidel primarily relies on the Ninth Circuit's non-precedential decision in *Youngevity Int'l Corp. v. Andreoli*, 749 F. App'x 634 (9th Cir. 2019), to argue that republication of a complaint to those with a "substantial interest in the outcome of

1      Quidel has not even attempted to explain how its conversion of its pleadings

2  and the Court's ruling into marketing tools in any way was intended to "achieve the

3  objects of the litigation."  Nor could it: a "misuse of the judicial process for a

4  purpose other than that which it was intended to serve," by definition, cannot "serve

5  [the] purpose" of the litigation, as it must for the privilege to apply.  Quidel's

6  attempt to distinguish *Hardisty* fails for this same reason.  Quidel suggests that the

7  *Hardisty* court insufficiently considered the defendant's litigation privilege

8  argument, but that court found it plausible that the defendant acted with "an ulterior

9  motive and wrongfully used the process to coerce an unjustifiable collateral

10 advantage."  2012 U.S. Dist. LEXIS 61465, at *16-17.  Such conduct could not

11 have been a "necessary or useful step in the litigation process," so the Court had no

12 reason to directly respond to the defendant's litigation privilege argument.[10]

13      Moreover, this Court has already held that Quidel distributed the litigation

14 documents "to promote the sale of Thyretain and provide Quidel's opinion

15 regarding the competitive product IMMULITE," and explained that the "purpose of

16 the letter was to . . . improve Quidel's relationship and business with the clients."

17 (Dkt. No. 247 at 12.)  Thus, even accepting that the parties' customers had an

18 interest in the litigation, Quidel's goal was to further its disinformation and

19 disparagement campaign in attempt to boost sales; not prosecute this action.

20 Because the communications were commercial in nature, and in no way helped

21 Quidel "achieve the objects of the litigation," the litigation privilege does not bar

22 the pending litigation," standing alone, is sufficient to invoke the litigation
23 privilege.  *Youngevity* is distinguishable on its facts: whereas in *Youngevity* the
   challenged press release merely "announc[ed] the initiation of [the] action,"
24 Quidel's conduct here included false and disparaging statements that went far
   beyond a mere summary of its litigation allegations.  The *Youngevity* court also did
25 not address the requirement that the communication must be made to "achieve the
   objects of the litigation," *Argentieri*, 8 Cal. App. 5th at 780, and based its broad
26 interpretation of the privilege on a decision whose "vitality" the California appellate
27 division has since cautioned "is in doubt."  *Id.* at 784.

28 [10] Siemens has already responded to Quidel's baseless accusation that Siemens
   violated the Court's Order by citing to *Hardisty* in the SACC.  (*See* Dkt. No. 267.)

Siemens' abuse of process claim.  *See E.D.C. Techs., Inc. v. Seidel*, 225 F. Supp. 3d

1058, 1067-69 (N.D. Cal. 2016) (litigation privilege does not apply to emails

attaching copy of complaint sent to current, former, and potential customers).[11]

### C.     Siemens' UCL Claim is Viable

Quidel once again does not contest any of the factual record upon which

Siemens' UCL claim is premised, but instead advances two flawed legal challenges.

First, Quidel is incorrect that Siemens lacks statutory standing under the UCL

because it has not suffered an injury in the form of "lost money or property."  Cal.

Bus. & Prof Code § 17204.  To establish standing under the UCL, Siemens need

only "demonstrate some form of economic injury."  *Kwikset Corp. v. Superior

Court*, 51 Cal. 4th 310, 323 (Cal. 2011).  Under this "expansive standing doctrine,"

*AngioScore, Inc. v. TriReme Med., LLC*, 70 F. Supp. 3d 951, 962 (N.D. Cal. 2014),

"[t]here are innumerable ways in which economic injury from unfair competition

may be shown."  *Kwikset*, 51 Cal. 4th at 323; *see also AngioScore*, 70 F. Supp. 3d

at 962 (the UCL is "broadly expansive as to what sort of economic injury

suffices").  In addition, "[t]he quantum of injury necessary to satisfy this

requirement requires only that plaintiff 'allege some specific identifiable trifle' of

injury."  *In re Qualcomm Litig.*, 2017 U.S. Dist. LEXIS 185519, at *16-17 (S.D.

Cal. Nov. 8, 2017) (quoting *Kwikset*, 51 Cal. 4th at 323).

Here, Siemens has alleged and will prove at trial that it suffered economic

injury in the form of "harmed business reputation, lost goodwill, and lost sales."

(SACC ¶ 61.)  Courts have repeatedly found such injury sufficient to establish

standing under the UCL.  In *Obesity Research Inst. LLC v. Fiber Research Int'l*,

---

[11] *See also Env't Furniture v. Bina*, 2010 U.S. Dist. LEXIS 151115, at *22 (C.D.
Cal. Aug. 10, 2010) (same for email "sent to third parties who are not participants
in this lawsuit"); *GetFugu, Inc. v. Patton Boggs LLP*, 220 Cal. App. 4th 141, 154
(Cal. App. 2013) (same for communications to nonparties that may have "an
interest in the outcome of the litigation"); *Rothman v. Jackson*, 49 Cal. App. 4th
1134 (Cal. App. 1996) (same for "communications which only serve interests that
happen to parallel or complement a party's interests in the litigation").

*LLC*, for instance, this Court held a party had UCL standing based allegations of "lost sales, market share, and goodwill." 165 F. Supp. 3d 937, 948 (S.D. Cal. 2016) (Bashant, J.); *see also Qualcomm*, 2017 U.S. Dist. LEXIS 185519, at *18 (standing satisfied by alleging "lost customers, goodwill, and the loss of business relationships"); *Storm Mfg. Grp., Inc. v. Weather Tec Corp.*, 2013 U.S. Dist. LEXIS 136882, at *21 (C.D. Cal. Sep. 23, 2013) (same for alleged loss of customers and damage to goodwill); *AngioScore*, 70 F. Supp. 3d at 962 (injury to market share or loss of business is a "paradigmatic, and indeed the original" form of UCL injury).

Quidel also argues that Siemens lacks standing because it cannot show that Quidel's fraudulent reimbursement scheme, which violated the False Claims Act, caused Siemens any injury. This is nonsense. As Quidel's own documents have revealed, Quidel engaged in this fraudulent reimbursement scheme to secure sales by "converting" customers to Quidel's assay. (Ex. 22; Ex. 1 at 56:19-58:21, 85:16-87:5.) Quidel's scheme therefore caused harm to Siemens in the form of lost business and market share, which is sufficient to establish statutory standing under the UCL. Accordingly, Quidel's standing arguments are without merit.[12]

Second, Quidel asserts that Siemens' UCL claim under the "unlawful" prong cannot proceed because Siemens "cannot prove that Quidel violated any laws." (Mot. at 16.) This is incorrect. The record demonstrates that Quidel engaged in trade libel, which is sufficient to support Siemens' UCL claim. *See G.U.E. Tech, LLC v. Panasonic Avionics Corp.*, 2015 U.S. Dist. LEXIS 194011, at *17-18 (C.D. Cal. Sept. 15, 2015) ("Because [plaintiff] has adequately stated a claim for trade libel, it has also adequately stated a claim for a violation of the UCL.").

---

[12] As an afterthought, Quidel argues that Siemens is not entitled to restitution under the UCL. But Siemens is not seeking an award of restitution. (*See* SACC, Prayer for Relief.) Rather, Siemens seeks only injunctive relief and attorneys' fees under the UCL. *See Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 790 (Cal. 2010) ("[T]he right to seek injunctive relief . . . is not dependent on the right to seek restitution; the two are wholly independent remedies."). And as this Court has previously held, "ineligibility for restitution is not a basis for denying standing under the UCL." *Obesity Research Inst.*, 165 F. Supp. 3d at 948.

The undisputed record also shows that Quidel's fraudulent reimbursement scheme violated the False Claims Act, which imposes liability upon "any person" who "knowingly . . . ***causes to be presented***, a false or fraudulent claim for payment" to the federal government. 31 U.S.C. § 3729(a)(1) (emphasis added). Since launch, Quidel developed and executed a marketing plan by which it would "convert" the market to its assay by telling customers that Thyretain was eligible for a higher (***quantitative*** assay) reimbursement rate—even though Quidel's own consultants told it that rate did not apply to its ***qualitative*** assay. (*Supra*, at 6-7.) Quidel continues to knowingly market that incorrect reimbursement rate to customers to this very day. Such actionable conduct under the False Claims Act constitutes a separate basis on which to find that Quidel violated the UCL.

Quidel claims that it cannot be liable for False Claims Act violations because Quidel's customers submit reimbursement claims rather than Quidel itself. (Mot. at 16.) That is no defense. It is black-letter law that the False Claims Act "reach[es] any person" who "knowingly ***assisted*** in causing the government to pay claims which were grounded in fraud," without "regard to whether that person had ***direct contractual*** relations with the government." *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 544-45 (1943) (emphasis added). Thus, courts routinely find liable companies that encouraged healthcare providers to submit false Medicare reimbursements. *See, e.g.*, *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 244 (3d Cir. 2004) (FCA claim actionable where defendant "pursued a marketing scheme" that it knew would result in others submitting false claims); *Strom ex rel. United States v. Scios, Inc.*, 676 F. Supp. 2d 884, 892 (N.D. Cal. 2009) (applying FCA to manufacturer that "encouraged submission" of false Medicare reimbursement claims); *United States ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 114, 120 (D.D.C. 2003) (FDA extends to one whose fraudulent conduct "induces payment by the government.").

**D.  Siemens' Claims Are Not Time-Barred**

Finally, Quidel's argument that Siemens' counterclaims are barred in part by the statute of limitations fails for four separate reasons.

First, Quidel has waived this argument by raising it for the first time at such a late juncture in the litigation.  Quidel could have raised this argument in its opposition to Siemens' motion for leave to assert counterclaims (Dkt. No. 100, Nov. 16, 2018), its subsequent motion to dismiss (Dkt. No. 141, April 18, 2019), or its prior motion for summary judgment (Dkt. No. 148, April 26, 2019).[13]  Allowing Quidel to assert a statute of limitations defense now will prejudice Siemens, who believed that its counterclaims related back to December 19, 2016, the date Quidel commenced this action.  Had Siemens known that Quidel intended to assert this defense, it would have litigated differently, including by seeking additional discovery regarding Quidel's ***ongoing*** misconduct.  It will be prejudiced if Quidel is permitted to assert the defense now.  *See Karoun Dairies, Inc. v. Karlacti, Inc.*, 2014 U.S. Dist. LEXIS 92723, at *18-19 (S.D. Cal. July 8, 2014) (affirmative defense waived where plaintiffs "would be prejudiced by their inability to conduct discovery on the issue due to the untimeliness of [a] … defense that could have been raised much earlier."); *Mitchell v. Cty. of Orange*, 2009 U.S. Dist. LEXIS 17928, at *7-8 (C.D. Cal. Mar. 6, 2009) (statute of limitations defense waived when raised for first time on summary judgment because "plaintiff would be prejudiced" given that "[f]act and expert discovery are closed" and "[b]oth parties … spent substantial time and resources" regarding the allegedly time-barred claim).

Second, even if Quidel could assert this defense, the statute of limitations did not begin to run until Siemens discovered the conduct giving rise to its counterclaims.  *See Brooks v. Tarsadia Hotels*, 2019 U.S. Dist. LEXIS 98166, at

---

[13] Although Quidel disclosed its statute of limitations defense in its answer to Siemens' SACC, Quidel didn't file that pleading until October 25, 2019, nearly a year after it first opposed Siemens' counterclaims.

*27 (S.D. Cal. June 11, 2019) ("The discovery rule applies to the UCL."); *DC Comics v. Pac. Pictures Corp.*, 938 F. Supp. 2d 941, 951 (N.D. Cal. 2013) (under Cal. Civ. Proc. Code § 339(1), which governs trade libel claims, the "discovery rule postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action."); *Robertson v. Nw. Adm'rs, Inc.*, 1999 U.S. Dist. LEXIS 4238, at *18 (N.D. Cal. Mar. 26, 1999) (for abuse of process claims, "the discovery of the injury and its cause signify the 'accrual point' from which the appropriate statute of limitations run"). Here, the limitations period did not begin until September 2018, when Siemens first learned of Quidel's knowing misconduct. (*See* Dkt. 119 at 5 (recognizing Siemens' counterclaims are based on information learned in September 2018).) Accordingly, Siemens' claims are not time-barred.

Third, even if the discovery rule did not apply here, Siemens' claims are still timely because "[u]nder California law, a counterclaim relates back to the filing of the original complaint" for purposes of a statute of limitations defense. *Prods. & Ventures Int'l v. Axus Stationary (Shanghai) Ltd.*, 2017 U.S. Dist. LEXIS 121823, at *7 (N.D. Cal. Aug. 2, 2017); *see also Ra Med. Sys. v. PhotoMedex, Inc.*, 373 F. App'x 784, 786 (9th Cir. 2010) ("[U]nder California law a statute of limitations is suspended or tolled for defendant's then unbarred counterclaims upon plaintiff's filing the complaint.").[14] Given that Quidel filed its complaint on December 19, 2016, the limitations periods on Siemens' abuse of process, trade libel, and UCL claims began to run on December 19, 2015; December 19, 2014; and December 19,

---

[14] Although some courts have previously held that this tolling rule applies only to "compulsory cross-complaints" that are "subject-matter related" to the plaintiff's complaint, recent decisions have clarified that this rule applies to all counterclaims, including permissive counterclaims. *See ZF Micro Devices, Inc. v. TAT Capital Partners, Ltd.*, 5 Cal. App. 5th 69, 92 (Cal. App. 2016) ("[A] defendant's cross-complaint against the plaintiff, irrespective of whether it is related to the matters asserted in the complaint, is entitled to the benefit of the tolling doctrine."); *Malaivanh v. Humphreys Coll.*, 2017 U.S. Dist. LEXIS 131003, at *10 (E.D. Cal. Aug. 6, 16, 2017). Regardless, Siemens' counterclaims *are* "subject-matter related" to Quidel's complaint, and thus relate back even under the narrower approach.

2012, respectively. All of the conduct at issue falls well within the actionable period for each claim: Quidel launched its disparagement campaign in 2016; its fraudulent reimbursement scheme is ongoing; and its abuse of process necessarily occurred after it commenced this action.

Finally, even if neither of these tolling doctrines applied, Quidel has identified the wrong date for evaluating Siemens' assertion of its counterclaims. The correct date would *not* be April 1, 2019 (the date on which Siemens formally served its counterclaims), but rather October 24, 2018, the date on which Siemens sought leave to assert those counterclaims (and served Quidel with its proposed counterclaims). *See Turtle v. Castle Records, Inc.*, 2005 U.S. Dist. LEXIS 39397, at *5 (N.D. Cal. May 17, 2005) (counterclaims are treated as having been filed on the day intervener "moved to intervene.").

## II.     SIEMENS' UNCLEAN HANDS DEFENSE MAY PROCEED

Quidel challenges Siemens' unclean hands defense, but fails to address that the Court already ruled that the defense presents questions of fact for the jury to decide. (Dkt. No. 254 at 19.) That alone is a basis to deny its motion. Moreover, Quidel makes no attempt to challenge the facts upon which Siemens' defense is based but instead raises a handful of flawed legal arguments.

### A.     Quidel Engaged in Inequitable Conduct Related to Its Claims

The unclean hands doctrine "provides a defense to false advertising claims under the Lanham Act." *Emco, Inc. v. Obst*, 2004 U.S. Dist. LEXIS 12118, at *12 (C.D. Cal. May 7, 2004). To prevail, Siemens must prove that Quidel's "conduct is inequitable," and "the conduct relates to the subject matter of its claims." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987); (*see also* Dkt. No. 254, at 18.) Courts regularly bar claims when, as here, the plaintiff engaged in the same conduct for which it faults the defendant. *See Certified Nutraceuticals, Inc. v. Avicenna Nutraceutical, LLC*, 2018 U.S. Dist. LEXIS 127276, at *10-11 (S.D. Cal. July 27, 2018) (unclean hands barred claims

premised on a "patented formula" misrepresentation because plaintiff had also falsely claimed a patented process for its own product); *Mut. Pharm. Co. v. Watson Pharm., Inc.*, 2009 U.S. Dist. LEXIS 107880, at *16 (C.D. Cal. Oct. 19, 2009) (same where plaintiffs "engaged in precisely the same activity over which they now seek to enjoin their competitors."); *Emco*, 2004 U.S. Dist. LEXIS 12118 (same where parties engaged in identical advertising).

The same result follows here. Quidel made and continues to make statements regarding Thyretain's ability to detect "TSI only." If those statements were false when briefly made by Siemens, they were (and remain) false when made by Quidel for nearly a decade. (*See supra*, at 5-6.) There is no basis for **Quidel** to obtain summary judgment on this unclean hands theory given that the Court has already that "there is evidence on both sides of this argument, so a genuine issue of material fact exists." (Dkt. No. 254 at 19.) Similarly, while Quidel alleges that Siemens falsely marketed the reimbursement rate for IMMULITE, in fact it was Quidel that has falsely marketed the reimbursement rate available for its assay.[15]

## B.    Each of Quidel's Legal Arguments Fails

Quidel advances a series of legal arguments in opposition. None has merit.

First, Quidel argues that Siemens has not suffered any harm as a result of Quidel's conduct. This is both factually untrue and legally irrelevant. To support an unclean hands defense, a defendant need not "demonstrate that it was somehow injured or prejudiced by [plaintiff's] conduct." *Intamin, Ltd. v. Magnetar Techs. Corp.*, 623 F. Supp. 2d 1055, 1075-76 (C.D. Cal. 2009); *see also Pom Wonderful LLC v. Welch Foods, Inc.*, 737 F. Supp. 2d 1105, 1113 (C.D. Cal. 2010) ("[T]he Ninth Circuit … **has not held** that a defendant asserting an unclean hands defense is **required** to demonstrate prejudice.") (emphasis added). Thus, Quidel's objection fails as a matter of law.[16]

---

[15] Quidel has also falsely marketed the time in which its assay can generate results.
[16] *Republic Molding Corp. v. B. W. Photo Utils.*, 319 F.2d 347 (9th Cir. 1963), does

Second, Quidel argues that if Siemens' unclean hands defense is based on Quidel's fraudulent reimbursement scheme and its false claim that its assay can provide results in three to four hours, those theories no longer "relate to the subject matter of its claims" following the Court's grant of summary judgment to Siemens on Quidel's claims as they relate to the parties' actual customers (i.e., the laboratories). Although the Court reasoned that these theories are "not sufficiently related to what is left of Plaintiffs' case" (Dkt. No. 254 at 20), Quidel may not distance itself from its egregious misconduct so easily. What the Court did not have before it at the time (because Quidel did not attempt to distinguish its unclean hands on these grounds) was that Quidel advanced the same wrongful reimbursement statements to physicians that it made to laboratories. (Exs. 23, 27–29.) The undisputed facts thus demonstrate that this aspect of Siemens' unclean hands defense remains viable. In addition, as this Court recognized, Quidel's conduct "must be judged by the facts existing *as they were when suit was begun*." *Id.* (emphasis added); *see also Kendall-Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App. 4th 970, 978 (Cal. App. 1999) (a plaintiff "must *come into* court with clean hands.") (emphasis added). It is undisputed that Quidel's misconduct related to the subject matter of its claims when it brought those claims. It would be inequitable to allow Quidel to absolve itself of its unclean hands merely because it was unable to prevail on the merits of its affirmative claims.

Moreover, Quidel misapplies the relevant standard. To establish that

---

not hold otherwise. There, the court held that evidence of harm "either to the defendant or to the public interest" is "relevant"—but not dispositive—of unclean hands. *Id.* at 349-350. *Citizens Financial Grp., Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110 (3d Cir. 2004), the other case Quidel cites, reached the same conclusion. *Id.* at 129 (injury to public relevant consideration). In any event, Quidel's fraudulent reimbursement scheme not only gives Quidel unclean hands, but also demonstrates harm to Siemens and the public interest. *See POM Wonderful LLC v. Coca Cola Co.*, 166 F. Supp. 3d 1085, 1099 (C.D. Cal. 2016) (a "statutory violation gives a party unclean hands.") (citing *Adler v. Fed. Republic of Nigeria*, 219 F.3d 869, 873 (9th Cir. 2000)).

Quidel's "conduct relates to the subject matter of its claims," Siemens need only show that Quidel has acted inequitably "relative to the matter in which [it] seeks relief." *Precision Instr. Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945); *see also Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 841 (9th Cir. 2002) (unclean hands defense viable if the conduct relates "to the controversy in issue."). Quidel's conduct easily satisfies this standard: Quidel's false claims regarding its assay and its fraudulent reimbursement scheme are the ***mirror image*** of conduct Quidel baselessly alleges Siemens to have engaged in. The fact that the laboratories are out of the case has no bearing on this analysis.

Finally, Siemens may continue to pursue its unclean hands defense against Quidel's UCL claim. Although "[a] few courts have held" that unclean hands cannot serve as a "bar" to a UCL claim, as this Court recognized, "[t]he reasoning behind these decisions is unclear." (Dkt. No. 254 at 18 n.6.) Indeed, the courts that have reached this conclusion appear to have misread the California Supreme Court's decision in *Cortez v. Purolator Air Filtration Products Co.*, 23 Cal. 4th 163, 179-181 (Cal. 2000), which recognized that equitable defenses may not "wholly defeat" a UCL claim and clarified that it "does not follow" that such defenses "may not guide the court's discretion in fashioning the equitable remedies" available under the statute, including whether to provide relief at all. Accordingly, a "UCL defendant may assert equitable considerations"—including unclean hands—and the "court must permit the defendant to offer such considerations." *Id.*; *see also Aguilar v. Zep Inc.*, 2014 U.S. Dist. LEXIS 120315, at *60 (N.D. Cal. Aug. 27, 2014) (citing *Cortez* to deny plaintiffs' motion for summary judgment on unclean hands defense as applied to UCL claim).

## CONCLUSION

For the foregoing reasons, Siemens respectfully requests that the Court deny Quidel's Motion for Summary Judgment.

1    DATE:  December 2, 2019          Respectfully submitted,

2                                     PATTERSON BELKNAP WEBB & TYLER LLP

3                                     /s/ Erik Haas
                                      Erik Haas
4                                     1133 Avenue of the Americas
                                      New York, New York 10036
5                                     Phone: (212) 336-2000
                                      Fax: (212) 336-2222
6
                                      /s/ M.D. Scully
7                                     GORDON & REES LLP
                                      M.D. Scully (SBN 135853)
8                                     101 W. Broadway, Suite 2000
                                      San Diego, CA 92101
9                                     mscully@gordonrees.com
                                      Tel: (213) 270-7871
10
11                                    Attorneys for Defendants Siemens Medical
                                      Solutions USA, Inc. and Siemens Healthcare
12                                    Diagnostics Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28