GORDON & REES LLP
M.D. Scully (SBN 135853)
101 W. Broadway, Suite 2000
San Diego, CA 92101
mscully@gordonrees.com
Tel: (213) 270-7871

PATTERSON BELKNAP WEBB & TYLER LLP
Erik Haas (admitted *pro hac vice*)
1133 Avenue of the Americas
New York, New York 10036
ehaas@pbwt.com
Tel: (212) 336-2117

*Attorneys for Defendants Siemens*
*Medical Solutions USA, Inc. and*
*Siemens Healthcare Diagnostics Inc.*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUIDEL CORPORATION, a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>SIEMENS MEDICAL SOLUTIONS USA, INC., a Delaware corporation, SIEMENS HEALTHCARE DIAGNOSTICS INC. a California corporation, and DOES 1-50 INCLUSIVE,<br><br>Defendants. | Case No.  3:16-CV-03059-BAS-AGS<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:      Hon. Cynthia A. Bashant<br>Date:       Briefing Schedule Set By Order<br>Courtroom: 4B<br><br>Filed and served concurrently with the Declaration of Erik Haas |

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND ........................................................................................................3

    A.    Quidel Pleads Claims Based On Lost Laboratory Business .................3

    B.    Quidel Confirms That Any Alleged Injury Arose From Lost Sales To Sonic And LabCorp ...............................................................4

    C.    Quidel Subpoenas Representatives From Sonic And LabCorp ............7

    D.    Quidel's Damages Expert Opines That Quidel's Damages Stem From Lost Laboratory Sales ................................................................7

    E.    Quidel's Survey Expert Does Not Assess Causation or Injury .............8

    F.    The Court Dismisses Quidel's Laboratory Claims ...............................9

    G.    The Court Grants Summary Judgment Dismissing Siemens' Counterclaims For Lack Of Economic Injury ....................................10

    H.    The Court Grants Siemens Permission To Move For Summary Judgment .........................................................................................10

ARGUMENT ...........................................................................................................11

I.    QUIDEL CANNOT PROCEED TO TRIAL BECAUSE IT CANNOT SHOW ANY INJURY DUE TO SIEMENS' ADVERTISING ...................11

    A.    Quidel Does Not Have A Viable "$10 Million" Damages Claim .......13

    B.    Quidel Cannot Presume Injury ...........................................................14

    C.    Quidel Cannot Show Irreparable Injury ..............................................17

CONCLUSION ........................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Active Sports Lifestyle USA, LLC v. Old Navy, LLC*,
   No. 12-cv-572, 2014 WL 1246497 (C.D. Cal. Mar. 21, 2014) ........................... 18

*AJ Reyes v. Educ. Credit Mgmt. Corp.*,
   No. 15-cv-00628, 2016 WL 2944294 (S.D. Cal. May 19, 2016) ........................ 14

*BMMG, Inc. v. Am. Telecast Corp.*,
   42 F.3d 1398 (9th Cir. 1994) ............................................................................ 12

*Cafasso v. Gen. Dynamics C4 Sys.*,
   637 F.3d 1047 (9th Cir. 2011) .......................................................................... 11

*Cascade Yarns, Inc. v. Knitting Fever, Inc.*,
   No. 10-cv-861, 2015 WL 1735517 (W.D. Wash. Apr. 15, 2015) ...................... 16

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ......................................................................................... 11

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) ......................................................................................... 17

*Edson v. Home Box Office*,
   198 F.3d 253 (9th Cir. 1999) ............................................................................ 14

*Fay Ave. Props., LLC v. Travelers Prop. Cas. Co.*,
   No. 11-cv-2389, 2014 WL 12570974 (S.D. Cal. July 1, 2014) ......................... 14

*Guam Paradise Co. v. Mitsubishi Corp.*,
   12 F.3d 1106 (9th Cir. 1993) ............................................................................ 12

*Harper House, Inc. v. Thomas Nelson, Inc.*,
   889 F.2d 197 (9th Cir. 1989) ................................................................. 12, 16, 17

*Herb Reed Enters. v. Fla. Entm't Mgmt., Inc.*,
   736 F.3d 1239 (9th Cir. 2013) ..................................................................... 17, 18

*Hubbard v. Willow Wood Nursing Ctr., Inc.*,
   No. 17-cv-03076, 2019 WL 8277248 (N.D. Ga. Dec. 30, 2019) ...................... 13

*Korea Supply Co. v. Lockheed Martin Corp.*,
63 P.3d 937 (Cal. 2003)........................................................................17

*Life Alert Emergency Response, Inc. v. LifeWatch, Inc.*,
601 F. App'x 469 (9th Cir. 2015)...........................................................17

*MJC Am., Ltd. v. Gree Elec. Appliances, Inc.*,
No. 13-cv-04264, 2014 WL 12597149 (C.D. Cal. Aug. 13, 2014)....................12

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*,
210 F.3d 1099 (9th Cir. 2000).............................................................11

*Out of the Box Enters. v. El Paseo Jewelry Exch.*,
732 F. App'x 532 (9th Cir. 2018).........................................................16

*Parlour Enters. v. Kirin Grp., Inc.*,
152 Cal. App. 4th 281 (2007)........................................................12, 13, 16

*Ryan's Exp. Transp. Servs., Inc. v. Caterpillar, Inc.*,
No. 07-cv-0008, 2009 WL 803129 (D. Nev. Mar. 24, 2009) .............................13

*TrafficSchool.com, Inc. v. Edriver Inc.*,
653 F.3d 820 (9th Cir. 2011) .........................................................14, 16

*Tucker v. Pac. Bell Mobile Servs.*,
208 Cal. App. 4th 201 (2012).............................................................16

*Use Techno Corp. v. Kenko USA, Inc.*,
No. 06-cv-02754, 2007 WL 4169487 (N.D. Cal. Nov. 20, 2007) .....................14

*VBS Distrib., Inc. v. Nutrivita Labs., Inc.*,
No. 18-56317, 2020 WL 2086557 (9th Cir. Apr. 30, 2020) ..................10, 12, 16

**Statutes**
Cal. Bus. & Prof. Code § 17204 ......................................................12, 16

**Other Authorities**
Fed. R. Civ. P. 8(a)(2)..................................................................14

Fed. R. Civ. P. 56(a) ...................................................................11

1   Defendants Siemens Medical Solutions USA, Inc. and Siemens Healthcare
2   Diagnostics Inc. (collectively, "Defendants" or "Siemens") move for summary
3   judgment dismissing Plaintiff Quidel Corporation's ("Quidel") remaining claims.

4   **PRELIMINARY STATEMENT**

5   Quidel cannot prove it was injured or damaged by Siemens' conduct.
6   Throughout this litigation, Quidel pleaded, alleged, and testified that its sole
7   economic injury, and indeed its *only* injury, from Siemens' alleged false advertising
8   was the loss of sales from two laboratories that switched from using Quidel's assay
9   to using Siemens' assay.  The Court previously ruled that the laboratories'
10  comprehensive, comparative, and independent assessment of the parties' assays—
11  and not any statements by Siemens—caused the labs to switch assays.  Dkt. No.
12  254 at 10-16.  For that reason, the Court dismissed Quidel's pleaded claims that
13  laboratories were misled or influenced by Siemens' advertising (the "laboratory
14  claims").  Seeing the writing on the wall, Quidel pivoted to assert in opposition to
15  Siemens' motion for summary judgment that Siemens' advertising might have
16  misled and deceived physicians.

17  Siemens had not directed a summary judgment motion at any claim premised
18  on the assertion that physicians were misled because Quidel had never alleged such
19  a claim.  Quidel's first complaint did not mention physicians.  Its Amended
20  Complaint mentioned "clinicians" once, and only to distinguish them from Quidel's
21  actual customers, the laboratories.  It made no Rule 26 disclosures regarding
22  physicians.  And its three sets of verified interrogatory responses did not mention
23  physicians.  Relying on Quidel's representations in its opposition motion, however,
24  the Court ruled there could be a question of fact as to whether physicians were
25  deceived.

26  But regardless of how physicians *interpreted* Siemens' advertising (and
27  Siemens disputes that any were misled), the evidence is unequivocal that Quidel
28  was not *injured* by, has not suffered damages from, and will not face irreparable

harm because of Siemens' advertising.  Quidel's affirmative disclosures and testimony establish it has not been harmed as a result of any Siemens advertising to physicians.  In fact, its Rule 30(b)(6) witness and damages expert alike testified that the **only** harm Quidel suffered was losing the two laboratory contracts.  They disclaimed that Quidel was harmed from physicians that might have switched to Siemens' assay, from any loss of goodwill, or from anything else.  Accordingly, following the resolution of summary judgment on Quidel's pleaded laboratory claims, Siemens moved for and was granted leave to file this motion for summary judgment on Quidel's unpleaded, unspecified and unsupported physician claims.

Just recently—in a footnote of its opposition to Siemens' application to file this motion—Quidel for the **first time** proffered (three) "theories" of how it was harmed:  (1) Quidel's Rule 26 disclosures said it had incurred $10 million in damages; (2) courts can simply "presume" a plaintiff was harmed; and (3) evidence of injury is unnecessary for injunctive relief.  Dkt. No. 294 at 7-8 n.1.  That belated disclosure underscores the inequity of Quidel's attempted trial-by-ambush.  But that inequity can readily redressed, as each theory is factually and legally deficient.

*First*, as Quidel's corporate representative and damages expert testified, the $10 million figure in Quidel's Rule 26 disclosures are sales from the two laboratories that switched from Quidel's assay to Siemens'.  But this Court already ruled those laboratories switched based upon their independent assessment of the parties' assays, and not as a result of any Siemens' advertising.  Those purported damages, consequently, are out of the case.  And Quidel has never proffered any other computation of damages, and in fact affirmatively testified it had no other damages, which is reason alone to grant summary judgment.

*Second*, Quidel's assertion that it may proceed to trial on a presumption of injury merely confirms that it has none, and directly contravenes the law of this case and this Circuit.  As this Court and the Ninth Circuit recently ruled, a plaintiff may not proceed to trial on false advertising claims without *actual* evidence of

1    *actual* injury.  The record establishes that Quidel cannot make that showing.

2        *Third,* Quidel's contention that it may salvage its case by forgoing damages

3    and pursuing only injunctive relief fails for the same reasons.  Absent actual

4    evidence of a likely future injury, Quidel may not proceed to trial.  Indeed, the

5    Ninth Circuit has squarely adopted the Supreme Court's directive that the

6    irreparable harm required for injunctive relief may not be presumed.  By its own

7    admissions, Quidel has not and cannot make that showing.

8        Because Quidel cannot prove that it suffered any harm due to Siemens'

9    conduct, Siemens respectfully requests that the Court grant summary judgment on

10   Quidel's remaining "physicians claims."

11                            **BACKGROUND**

12       The facts recited herein are based primarily on Quidel's admissions,

13   including testimony from its Rule 30(b)(6) and expert witnesses, Quidel's

14   responses to discovery requests, and Quidel's internal documents maintained in the

15   ordinary course of business.  The references to an "Exhibit" (or "Ex.") are to the

16   transcripts and documents annexed to the accompanying declaration of Erik Haas.

17       **A.    Quidel Pleads Claims Based On Lost Laboratory Business**

18       In December 2016, Quidel brought this suit against Siemens challenging

19   certain of Siemens' advertisements for the IMMULITE® 2000/2000 TSI Assay

20   ("IMMULITE TSI").  Dkt. No. 1.  Manufacturers, like Siemens and Quidel, sell

21   assays, such as the IMMULITE TSI assay and Thyretain TSI Reporter BioAssay

22   ("Thyretain"), to reference laboratories.  Those labs in turn perform the tests on

23   specific instruments installed in their labs.  ████████████████████████

24   ████████████████████████████████████████████████████████████

25   ██████████████████████████████████████ In its original Complaint,

26   however, Quidel could not identify any laboratory that had been deceived into

27   switching assays.  *See* Dkt. No. 1.  Quidel also did not make a single mention of

28   physicians in its original Complaint, and did not suggest that physicians even know

what instruments the labs have installed (such that physicians are in the position to order tests by brand from labs, rather than by type of test (e.g., a TSI test)).  *See generally id.*

Siemens moved to dismiss because Quidel had not alleged it was injured.  *See* Dkt. No. 5-1.  In lieu of a response, Quidel filed its First Amended Complaint, curing its pleading deficiency by alleging that it was harmed because one laboratory customer, Sonic Healthcare, USA ("Sonic"), was misled by Siemens' advertising and had switched to Siemens' assay.  Dkt. No. 12 ("FAC") ¶ 22.  The only reference Quidel made to physicians in its amended pleading was to clarify that the parties' customers ***are not*** "clinicians," but "laboratories."  FAC ¶ 21.  In other words, Quidel mentioned clinicians to clarify its claims actually were ***not*** about them.  Quidel made no allegation that it was harmed as a result of physicians or clinicians being misled.

### B.    Quidel Confirms That Any Alleged Injury Arose From Lost Sales To Sonic And LabCorp

Throughout discovery, Quidel time and again confirmed that the only purported injury it had sustained was losing sales from two reference-lab customers.  In its initial disclosures, Quidel identified eight representatives from Sonic and another reference laboratory, Laboratory Corporation of America ("LabCorp"), as having discoverable information.  Ex. 4 at 3-5.  Quidel did not identify ***anyone*** as a practicing endocrinologist or physician that might have knowledge about its claims.[1]  *Id.*  With respect to its computation of damages, Quidel said:

> Defendants' wrongful conduct has resulted in Quidel ***losing contracts*** for Thyretain in the neighborhood of $300,000 in revenues on an annual basis, as a direct result of ***Sonic Healthcare USA, a reference laboratory***

---

[1] Quidel identified one individual, Alex Katayev, as having an M.D.  Dr. Katayev is listed as the "Associate Vice President, Director, Clinical Science Assessment" at LabCorp.  *Id.* at 4.

*in Texas*, switching from Thyretain to the IMMULITE Assay. In addition, Defendants' conduct may directly result in the loss of an additional $3 million in annual revenue from the cancellation of other Quidel contracts with third parties, including *LabCorp*. These contracts would have continued into the foreseeable future and losses from this business alone will cost Quidel in excess of $10 million in damages.

Ex. 4 at 9 (emphases added). Quidel served its damages computations in 2017, and never updated them to allege it was harmed because physicians were allegedly misled.

Siemens then served interrogatories and requested that Quidel identify "any and all damages that [Quidel] claim[ed] to have suffered as result of Siemens' alleged false statements." Ex. 5 at 9. In its verified responses, Quidel parroted the statements in its initial disclosures. *Id.* at 9 (alleging a loss of $300,000 annually from Sonic and $3 million in lost contracts from LabCorp). In response to Siemens' request that Quidel identify "every customer" that Quidel claimed it lost as a result of Siemens' false advertising, Quidel identified exclusively the two labs: *Sonic and LabCorp*.[2] No mention of physicians was made. *Id.* at 8-9.

As discovery continued, Siemens asked Quidel to update its interrogatory responses, which Quidel did in September 2018. *See* Ex. 6; Ex. 7. Once again, Quidel identified LabCorp and Sonic as the *only* two customers it lost due to Siemens' advertising. Ex. 6 at 4-5. And once again, Quidel articulated two bases for its damages claims: perceived losses from Thyretain-related contracts with Sonic and LabCorp. *Id.* at 6-7. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

---

[2] Jeff Houtz, Quidel's then-Senior Marketing Manager, verified under penalty of perjury that these responses were true and correct. *Id.* at 13.

[3] Michelle Brooks, Quidel's Director of Commercial Operations, verified under penalty of perjury that these responses were true and correct. Ex. 6 at 8.

Case No. 16-cv-03059
Motion for Summary Judgment

1 ██████████████████████████████

2      Quidel also said in those responses that it had suffered amorphous losses due

3 to "reputational harm"; that Siemens' conduct "has resulted in Quidel having to

4 offer discounted pricing"; and that Quidel had to incur increased "marketing

5 expenditures." Ex. 6 at 7. However, Quidel did not quantify any of these amounts.

6 And when pressed, Quidel's corporate representative for these topics expressly

7 ***disclaimed knowledge of any*** economic injury attributable to such harm. *See* Ex. 3

8 at 136:10-137:23 (testifying that she has no knowledge as to why Quidel offered

9 discounted pricing; has "no basis" to tie Quidel's marketing expenditures to

10 Siemens' alleged misconduct; and has not done any analysis "to quantify the

11 reputational harm to Quidel's thyroid portfolio").

12 ████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████████████████

14 ████████████████████████████████████████████—Siemens again asked

15 Quidel to update its interrogatory responses. *See* Ex. 12 (seeking confirmation that

16 Quidel's interrogatory responses reflect "Quidel's current position in this

17 litigation"). Quidel's third sworn interrogatory responses confirmed that Quidel's

18 damages claims were *still* premised on its perceived loss of sales to ***Sonic and***

19 ***LabCorp***, not clinicians or physicians.[4] Ex. 13 at 4-7.

20      In sum, during the two-year period from the filing of the complaint to the

21 close of discovery—and in response to multiple discovery requests from Siemens—

22 ███████████████████████████████████████████████████████████████

23 █████████████████████████████████████████████████████.

24

25 ─────────────────────────────

26 [4] ████████████████████████████████████████████████████████████████████

27 ████████████████████████████████████ This time, Quidel's Vice President of Finance,
Kristin Caltrider, verified under penalty of perjury that the responses were true and

28 accurate. Ex. 13 at 8.

**C.     Quidel Subpoenas Representatives From Sonic And LabCorp**

Consistent with its allegations, Quidel subpoenaed documents and testimony from only two third parties:  Sonic and LabCorp.  *See* Exs. 15-18.  Quidel sought a plethora of information from both laboratories, including documents and testimony regarding their decisions to stop purchasing Thyretain from Quidel and transition to Siemens' IMMULITE TSI assay.  Ex. 16 at Nos. 16-17; Ex. 18 at Nos. 16-17. Each lab produced thousands of pages of documents, and the Rule 30(b)(6) witnesses for LabCorp and Sonic were deposed at the end of 2018.

The discovery obtained from Sonic and LabCorp confirmed what both parties knew from day one:  Reference laboratories are sophisticated entities and only adopt assays after time-consuming and intensive validation processes.  *See* Dkt. No. 138-1 at 11-14.  Without question, Siemens' limited advertising was not material to those laboratories' decision to stop using Thyretain and to begin using the IMMULITE TSI assay; it didn't even factor into them.  *See id.*; *see also* Dkt. No. 254 at 10-16.  It was "frivolous" for Quidel to contend otherwise.  Ex. 30 to Dkt. No. 140-2, at 90:5-91:23.

**D.     Quidel's Damages Expert Opines That Quidel's Damages Stem From Lost Laboratory Sales**

Quidel then offered its damages expert to opine on the economic injury that Quidel incurred due to Siemens' alleged misconduct.  ████████████████

████████████████████████████

████████████████     ████████████████████████

████████████████████████████

████████████████████████████

████████████████ .     ████████████████

████████████████████████████

████████████████████████████

████████████████████████████████



**E.      Quidel's Survey Expert Does Not Assess Causation or Injury**

Well after the deadline for amending pleadings had passed, and following the close of fact discovery, Quidel proffered an expert report from Matthew G. Ezell, who had conducted an online survey of "physicians that specialize in endocrinology." Ex. 21 ¶ 7. The purpose of Mr. Ezell's survey, according to him, was to determine "what *message* or messages" were "communicated by" the IMMULITE TSI assay "websites." *Id*. ¶ 2 (emphasis added). Siemens moved to strike the survey as irrelevant (among other reasons), because physicians order TSI tests from a *reference laboratory*, which in turns runs *its* assay of choice (not the physician's), and provides the results of the type of test conducted to the physicians. *See* Dkt. No. 135-1 at 10-16.

But the court need not resolve that issue, because there is a more fundamental problem. The survey did not, and did not even attempt to, address whether Siemens' advertising had ***any impact*** on the respondent physicians' ordering practices. Ex. 22 at 54:4-57:17. Thus, even assuming physicians' opinions are

---

[5]

relevant to this case,[6] the survey asked respondents how they *interpreted* Siemens' website. It did not attempt to ascertain whether Siemens' website *influenced* their ordering decisions, or whether they had switched at all from Quidel's assay. *Id*. Mr. Ezell's survey therefore did not provide any evidence of materiality, causation, or injury.[7]

### F.   The Court Dismisses Quidel's Laboratory Claims

Following expert disclosures, Siemens moved for summary judgment on each of Quidel's pleaded claims: false advertising under the Lanham Act, a violation of California's Unfair Competition Law ("UCL"), and intentional interference with prospective economic relations. Dkt. No. 138. Each of those pleaded claims turned on Quidel's allegations about Siemens' advertising of the IMMULITE TSI assay to the two laboratory customers at issue, Sonic and LabCorp, *not* any physicians.

In opposition to Siemens' motion, Quidel reiterated the position that it had maintained throughout the case, namely, that "[t]wo . . . laboratories, LabCorp and Sonic/CPL, bought Siemens' lies and switched from Thyretain to Immulite." Dkt. No. 169 at 6-7. But Quidel also passingly argued for the first time that physicians "drive the demand and are the ultimate end-users of Siemens' and Quidel's assays." *Id*. Quidel further claimed that Siemens marketed directly to physicians. *Id.* Quidel did not claim it had suffered *any* incremental economic injury from the purported physician marketing. *See id.*

---

[6] Although Siemens maintains that physicians are not part of the relevant market, the Court has concluded that "there is a dispute of material facts as to whether physicians are part of the relevant market of purchasers of the assays." Dkt. No. 254 at 17. Regardless, Quidel still has not demonstrated Quidel was injured as a result of any physician deception, as it must.

[7] While this motion focuses on Quidel's lack of causation, injury, and damages, Quidel likewise cannot demonstrate materiality. There is no evidence that any physician switched his or her ordering practices from Thyretain because of Siemens' advertising.

On Quidel's pleaded claims, the Court found that the record conclusively established that "the laboratories came to the conclusion to use the IMMULITE TSI assay after their own sophisticated processes" and, therefore, that any "false advertising was not material to their decisions." Dkt. No. 254 at 15-16.  With those findings, the Court dismissed each of Quidel's claims as they relate to the laboratories.  *Id.* at 16, 20.

The Court also found, however, that there was a "dispute of material facts" (1) as "to whether physicians are part of the relevant market," and (2) "as to whether the physicians were or are likely to be deceived."  *Id.* at 17.  The Court did not consider whether Quidel could maintain claims pertaining to physician marketing absent a showing of injury.  That issue remained undecided.

### G.   The Court Grants Summary Judgment Dismissing Siemens' Counterclaims For Lack Of Economic Injury

Separately, Quidel moved for summary judgment on Siemens' claims for trade libel, abuse of process, and unfair competition.  *See* Dkt. No 268-1.  Earlier this year, the Court granted *in part* Quidel's motion for summary judgment.  Dkt. No. 285.  As pertinent here, the Court held that, to proceed to trial, it is not enough for a claimant to "contend that it 'has alleged and will prove at trial' economic injury."  *Id.* at 13.  Rather, the asserted claims must be dismissed where a party cannot present "evidence" of economic injury.  *Id.*  Shortly thereafter, the Ninth Circuit came to a similar conclusion, holding that summary judgment should be granted "when the plaintiff fail[s] to present any evidence of injury resulting from defendants' deception."  *VBS Distrib. Inc. v. Nutrivita Labs., Inc.*, No. 18-56317, 2020 WL 2086557, at *1 (9th Cir. Apr. 30, 2020).

### H.   The Court Grants Siemens Permission To Move For Summary Judgment

Following the Court's decision and the Ninth Circuit's opinion in *VBS*, Siemens requested permission to file this motion for summary judgment.  Dkt. No. 292.  In opposition, and for the first time, Quidel identified the injury and damages

it allegedly suffered.  Dkt. No. 294 at 7-8 n.1.  According to Quidel, (1) its Rule 26 disclosures identified "$10 million" in damages; (2) its damages and injury can be "presumed"; and (3) injunctive relief does not require any evidence of injury.  *Id.* As discussed below, each argument is less persuasive than the last.

## ARGUMENT

Summary judgment should be granted when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Although the moving party bears "the initial burden of production and the ultimate burden of persuasion" on summary judgment, *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000), once it has satisfied that burden, the nonmovant must "go beyond the pleadings and . . . designate specific facts showing there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986).  To avoid summary judgment, "a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations."  *Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1061 (9th Cir. 2011).

## I.   QUIDEL CANNOT PROCEED TO TRIAL BECAUSE IT CANNOT SHOW ANY INJURY DUE TO SIEMENS' ADVERTISING

Quidel's claims should be dismissed because there is no evidence that Siemens' conduct injured or damaged Quidel.  From the start of this case through the close of discovery, Quidel claimed that it was injured because two laboratories switched from IMMULITE TSI to Thyretain.  That was the sole harm Quidel claimed to have suffered.  But as the Court previously held, the parties' laboratory customers were neither deceived nor affected by Siemens' marketing.  *See* Dkt. No. 254 at 11-16.  Quidel's physician claims fare no better.

As the Court made clear, it is not enough for a claimant to "contend that it 'has alleged and will prove at trial' economic injury."  Rather, the asserted claims must be dismissed where a party cannot present "evidence" of economic injury.

Dkt. No. 285 at 13.  The UCL claim, as the Court explained, requires Quidel to demonstrate that it "suffered *injury in fact* and [ ] lost money or property *as a result of the unfair* competition."  Dkt. 285 at 12 (quoting Cal. Bus. & Prof. Code § 17204) (emphasis added).

The Lanham Act is no different.  To sustain a false advertising claim, this Court held, "actual evidence of some injury **resulting from** the deception" is an "essential element of the plaintiff's case."  Dkt. 254 at 11 (quoting *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989)) (emphasis added). Summary judgment should therefore be granted when the plaintiff cannot show the requisite economic injury—*i.e.*, that it "lost any sales due to the [defendant's] alleged deception."  *BMMG, Inc. v. Am. Telecast Corp.*, 42 F.3d 1398 (9th Cir. 1994) (unpublished).  Indeed, the Ninth Circuit recently explained that "[s]ummary judgment is thus proper when the plaintiff 'fail[s] to present any evidence of injury resulting from defendants' deception.'"  *VBS Distrib.*, 2020 WL 2086557, at *1-2 (quoting *Harper House*, 889 F.2d at 210).

Quidel's intentional interference with prospective economic relations claim has the same requirement.  Causation and injury are an "essential element" of that tort.  *Guam Paradise Co. v. Mitsubishi Corp*, 12 F.3d 1106 (9th Cir. 1993) (unpublished).  Quidel must proffer evidence to "establish it would have obtained" some contract "but for [Siemens'] wrongful interference."  *Id*.; *see also MJC Am., Ltd. v. Gree Elec. Appliances, Inc.*, No. 13-cv-04264, 2014 WL 12597149, at *7 (C.D. Cal. Aug. 13, 2014) (holding the alleged *wrongful conduct* must cause a disruption with the relevant business relationships).  Put differently, Quidel must show "a reasonable probability the lost economic advantage would have been realized but for the defendant's wrongful acts."  *Parlour Enters. v. Kirin Grp., Inc.*, 152 Cal. App. 4th 281, 294 (2007).

Throughout this case, Quidel's theory of injury has turned on the customer laboratories—the entities that actually buy the assays from Siemens and Quidel.

*See supra*, Sections A-E.  With that theory gone, Quidel identified—for the first time—its purported injury in response to Siemens' motion to amend the scheduling order.  Dkt. No. 294 at 7-8 n.1.  None withstand scrutiny.

### A.  Quidel Does Not Have A Viable "$10 Million" Damages Claim

Quidel first insists that its initial disclosures identified "approximately $10 million" in damages.  *Id.*  For starters, a party's own "computation of damages" from its Rule 26 disclosures is not admissible evidence, let alone the kind sufficient to defeat summary judgment.  *See Ryan's Exp. Transp. Servs., Inc. v. Caterpillar, Inc.*, No. 07-cv-0008, 2009 WL 803129, at *6 (D. Nev. Mar. 24, 2009) (granting summary judgment when plaintiff simply referred to "computation[s] of damages . . . previously produced"); *see also Hubbard v. Willow Wood Nursing Ctr., Inc.*, No.17-cv-03076, 2019 WL 8277248, at *4 (N.D. Ga. Dec. 30, 2019) (damages computation "is not evidence").

But even if those disclosures were admissible, the "$10 million" dollar figure comes entirely from Quidel's lost contracts with Sonic and LabCorp, not clinicians.  In its initial disclosures Quidel insisted that it had "los[t] contracts for Thyretain in the neighborhood of $300,000" from "Sonic Healthcare," and "an additional $3 million in annual revenue from the cancellation of other Quidel contracts with third parties, including LabCorp.  These contracts would have continued into the foreseeable future and losses from this business alone will cost Quidel in excess of $10 million in damages."  Ex. 4 at 9 (emphasis added).  Quidel's alleged "$10 million" in damages come exclusively from its lost contracts with laboratories, and those claims were already dismissed.  *See* Dkt. No. 254 at 10-16.

If anything, Quidel's damages computation is reason alone to grant summary judgment.  Outside of the lost lab contracts, Quidel's Rule 26 disclosures do not quantify *any* other harm—and do not even mention "physicians" as a theory of damages.  Ex. 4 at 9.  Rule 26, though, requires that a "party seeking damages ***must*** timely disclose its theory of damages as well as its computation of those damages,"

1  and a plaintiff "***must*** supplement its initial damage computation to reflect

2  information obtained during discovery." *Fay Ave. Props., LLC v. Travelers Prop.*

3  *Cas. Co.*, No. 11-cv-2389, 2014 WL 12570974, at *3 (S.D. Cal. July 1, 2014)

4  (emphasis added).  Failure to do so is grounds for summary judgment, because

5  "[d]efendants have no way to defend against" a plaintiff's "inchoate damage claims

6  and theories." *Use Techno Corp. v. Kenko USA, Inc.*, No. 06-cv-02754, 2007 WL

7  4169487, at *3 (N.D. Cal. Nov. 20, 2007) (dismissing Lanham Act claim at

8  summary judgment).

9       While that is fatal, there is a deeper problem still.  Nowhere does Quidel's

10  Complaint allege that it was harmed because physicians were misled by Siemens'

11  advertising. *See supra* at 3-4.  "Federal Rule of Civil Procedure Rule 8(a)(2)

12  requires that the allegations in the complaint give the defendant fair notice of what

13  the plaintiff's claim is and the grounds upon which it rests." *AJ Reyes v. Educ.*

14  *Credit Mgmt. Corp.*, No. 15-cv-00628, 2016 WL 2944294, at *4 (S.D. Cal. May 19,

15  2016) (Bashant, J.) (dismissing new allegations at summary judgment).  For that

16  reason, courts reject new, unpleaded theories of damages asserted first at summary

17  judgment. *E.g.*, *Edson v. Home Box Office*, 198 F.3d 253 (9th Cir. 1999)

18  (unpublished).  The same result should follow here.

19       **B.    Quidel Cannot Presume Injury**

20       Quidel also claims the Court may presume injury for its Lanham Act claim.

21  That is incorrect. *TrafficSchool.com, Inc. v. Edriver Inc.*, a case on which Quidel

22  appears to rely, "presumed commercial injury" to "*establish standing*" because the

23  plaintiff "compet[ed] directly with defendant."[8]  653 F.3d 820, 827 (9th Cir. 2011)

24  _____

25  [8] Even then, Quidel's reliance on *TrafficSchool* is misplaced, because Siemens (and
    Quidel) compete with multiple device manufacturers for Graves' Disease. ████████

26  ████████████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████

28  ████████████████████████  █████████████████████████████████████

(emphasis added).  Just as this Court rejected Siemens' reliance on cases that allowed a party to survive a motion to dismiss based on its attestation of harm (Dkt. No. 285 at 13), the *TrafficSchool* decision on standing does not afford Quidel the right to proceed to trial without actual evidence of actual injury.

Rather, in the second half of the *TrafficSchool* opinion, the Ninth Circuit explained that whatever the presumption for standing, plaintiffs cannot recover damages when they do not "produce any proof of past injury or causation." *Id.* at 831.  In such cases, the Ninth Circuit held, "the district court [would have] no way to determine with any degree of certainty what award would be compensatory." *Id.* Indeed, this Court held the same during the last round of summary judgment briefing, explaining that "actual evidence of some injury resulting from the deception" is an "essential element of the plaintiff's case."  Dkt. No. 254 at 11; *see also Cascade Yarns, Inc. v. Knitting Fever, Inc.*, No. 10-cv-861, 2015 WL 1735517, at *7 (W.D. Wash. Apr. 15, 2015) ("[The] inability to show injury is accordingly fatal to [plaintiff's] Lanham Act claims for monetary damages.").

The Ninth Circuit has repeatedly reached the same conclusion after *TrafficSchool.*  In *Out of the Box Enterprises v. El Paseo Jewelry Exchange*, for example, the Ninth Circuit held that whatever the presumption of injury that *TrafficSchool* affords for standing, the failure to provide "evidence sufficient to establish the existence and amount of its damages" is fatal to a plaintiff's claim for monetary relief.  732 F. App'x 532, 535 (9th Cir. 2018) (granting JMOL).  And, more recently, in *VBS Distribution v. Nutrivita Laboratories*, the plaintiff's

██████████████████████████████████████████████████

████████████████████████████████ Thus, it is unreasonable to assume that "[s]ales gained by [Siemens] are [] likely to come at [Quidel's] expense." *TrafficSchool*, 653 F.3d at 825. ███████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████

"evidence" of injury at summary judgment consisted of an affidavit from its CEO, asserting the defendant's ads "deprived [them] from being able to fairly compete in the marketplace, and have diverted sales." 2020 WL 2086557, at *1. That affidavit was more than what Quidel has offered, but the Ninth Circuit still affirmed the district court's grant of summary judgment. *Id.* at *2. The court explained that "[w]hen a party seeks damages for an allegedly false advertisement under the Lanham Act, 'actual evidence of some injury resulting from the deception is an essential element of the plaintiff's case.'" *Id.* at *1 (quoting *Harper House*, 889 F.2d at 210).

The same logic applies here. As detailed above, from pleading through discovery, Quidel banked on being able to prove causation, damages, and injury from losing two laboratory contracts. Its damages expert and corporate representative both testified they were not aware of any evidence that Quidel was harmed because physicians switched assays (or its reputation and goodwill was damaged). Quidel cannot, now, presume away its lack of evidence.

The same is true of Quidel's UCL and intentional interference claims. As this Court recently held, to avoid summary judgment, a party asserting a UCL claim must show that it "suffered injury in fact and [ ] lost money or property *as a result of the unfair competition*." Dkt. No. 285 at 12 (quoting Cal. Bus. & Prof. Code § 17204); *see also TrafficSchool*, 653 F.3d at 825 n. 1 ("Plaintiffs filing an unfair competition suit [under the UCL] must prove a pecuniary injury . . .and immediate causation."). By the same token, Quidel's intentional interference claim (like most torts) requires proof of causation and damages. *Parlour Enters.*, 152 Cal. App. 4th at 294. Quidel has no such proof.

Moreover, "[a] UCL action is equitable in nature; damages cannot be recovered." *Tucker v. Pac. Bell Mobile Servs.*, 208 Cal. App. 4th 201, 226 (2012). The only monetary relief available under the UCL is restitution, defined as "money or property that [the] defendants took directly from [the] plaintiff" or "money or

1   property in which [the plaintiff] has a vested interest." *Korea Supply Co. v.*

2   *Lockheed Martin Corp.*, 63 P.3d 937, 947 (Cal. 2003).  Quidel has not alleged that

3   Siemens directly took money or property from it; Quidel also has not alleged (nor

4   could it) that it had a vested interest in revenue from hypothetical future sales of

5   Thyretain to customers who ultimately chose to purchase IMMULITE TSI.  That

6   absence is fatal to its UCL claim.

7        Because Quidel lacks evidence of damages caused by Siemens' advertising

8   to physicians, its remaining claims should be dismissed.

9        **C.    Quidel Cannot Show Irreparable Injury**

10       As a fall back, Quidel contends that injunctive relief does not require "proof

11   of injury."  Dkt. No. 294 at 8 n.1.  Quidel, again, is incorrect.  Of course, a party

12   seeking injunctive relief does not need to show a *past* "injury when suing to

13   enjoin," but it is black-letter law that a plaintiff must prove "the possibility that [it]

14   may suffer ***future injury***" to receive injunctive relief.  *Harper House,* 899 F.2d at

15   210 (emphasis added).  Those "seeking injunctive relief must proffer evidence

16   sufficient to establish a likelihood of irreparable harm."  *Herb Reed Enters. v. Fla.*

17   *Entm't Mgmt.*, *Inc.*, 736 F.3d 1239, 1251 (9th Cir. 2013).  For that reason

18   "unsupported and conclusory statements," "presumptions" of injury, and evidence

19   of "customer confusion" do not "support a finding of likely irreparable harm."  *Id.*at

20   1250-51. And the requirement of showing irreparable future injury, the Supreme

21   Court has held, cannot be presumed.  *See eBay Inc. v. MercExchange, L.L.C.*, 547

22   U.S. 388, 393 (2006); *see also Life Alert Emergency Response, Inc. v. LifeWatch,*

23   *Inc.*, 601 F. App'x 469, 473 (9th Cir. 2015) (applying *eBay* to the Lanham Act).

24       Again, there is no evidence that—four years after IMMULITE TSI entered

25   the market—that Quidel faces some future, unrecoverable injury.  As previously

26   explained, Quidel—at best—might be able to demonstrate with its survey that some

27   physicians were confused by Siemens' advertisements.  But, as the Ninth Circuit

28   explained, "gone are the days" where "a likelihood of confusion" is enough to

presume "that the plaintiff will suffer irreparable harm." *Herb Reed*, 736 F.3d at 1250.  And if Quidel asserts that its reputation or goodwill are at risk (from ads that do not disparage Quidel), the same result should follow.  Quidel's corporate representative and damages expert both disclaimed any knowledge that Quidel's reputation had been or will be harmed.  *See supra* 6-8.  Quidel's inability to muster "evidence beyond speculation that it will face a loss of goodwill" accordingly dooms its request for injunctive relief.  *Active Sports Lifestyle USA, LLC v. Old Navy, LLC*, No. 12-cv-572, 2014 WL 1246497, at *2 (C.D. Cal. Mar. 21, 2014).

## **CONCLUSION**

For the foregoing reasons, Siemens' motion for summary judgment should be granted.

DATE:  June 9, 2020

Respectfully submitted,

PATTERSON BELKNAP WEBB & TYLER LLP

*/s/ Erik Haas*
Erik Haas
1133 Avenue of the Americas
New York, New York 10036
Phone: (212) 336-2000
Fax: (212) 336-2222

*/s/ M.D. Scully*
GORDON & REES LLP
M.D. Scully (SBN 135853)
101 W. Broadway, Suite 2000
San Diego, CA 92101
mscully@gordonrees.com
Tel: (213) 270-7871

*Attorneys for Defendants Siemens Medical Solutions USA, Inc. and Siemens Healthcare Diagnostics Inc.*